**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**BEAUFORT DIVISION**

| | |
|---|---|
| TIMOTHY GLIBOWSKI, on behalf of himself and all others similarly situated,<br><br>                         Plaintiff,<br><br>     -against-<br><br><br>SCANA CORPORATION, SOUTH CAROLINA ELECTRIC & GAS COMPANY, KEVIN MARSH, JIMMY ADDISON, STEPHEN BYRNE, MARTIN PHALEN, MARK CANNON, RUSSELL HARRIS, JEFFREY B. ARCHER, SARENA BURCH, W. KELLER KISSAM, RONALD T. LINDSAY, and JAMES MICALI,<br><br>                     Defendants. | **C/A No.** _____9:18-273-TLW_____<br><br><br><br>**CLASS ACTION COMPLAINT**<br><br>**CLASS CERTIFICATION REQUESTED**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, by his undersigned attorneys, for his complaint against Defendants, alleges the following upon information and belief, except as to those matters pertaining to his own acts:

**INTRODUCTION**

1.　　This case is brought by Plaintiff, who is a citizen and resident of the state of South Carolina, on behalf of himself and all other utility ratepayers who are within the service area of defendant SCANA's subsidiary South Carolina Electric & Gas Company ("SCE&G") against SCANA, SCE&G and the Individual SCANA Defendants Marsh, Addison, Byrne, Phalen, Cannon, Harris and Micali (collectively referred to as "the RICO Defendants") for their participation in an unlawful Racketeering Enterprise in violation of the Racketeer Influenced and

Corrupt Organizations Act ("RICO"), Title 18, United States Code, Section 1964 et seq.

2.      The RICO Defendants, in furtherance of their Racketeering Enterprise, conducted a series and pattern of racketeering acts, as further described herein, including the mailing to Plaintiff  and other members of the putative Class of fraudulently inflated electric bills, in violation of the civil RICO statute, 18 U.S.C. § 1964.

3.      The RICO Defendants and their co-conspirators in the Racketeering Enterprise used the proceeds from the fraudulently inflated utility bills to generate unlawful proceeds by means of a series of racketeering acts spanning a period of several years and continuing to the present, for the purpose of defrauding the Class of residential ratepayers and commercial ratepayer businesses of their valuable time, money and property.

## JURISDICTION & VENUE

4.      This Court has subject-matter jurisdiction, pursuant to 28 U.S.C.A. § 1331, over the claims in this lawsuit.

5.      This Court has personal jurisdiction over Defendants SCANA and SCE&G because they are organized under the laws of the state of South Carolina, have their corporate headquarters within the State, and the events giving rise to the matter in controversy occurred within the State.

6.      This Court has personal jurisdiction over the individual Defendants named and described below, since they are citizens and residents of the state of South Carolina.

7.      This Court has supplemental jurisdiction to hear and decide relevant causes of action arising under the laws of the state of South Carolina.

8.      Venue is proper under 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965(a), as all relevant

events occurred after the enactment of the Base Load Review Act of 2007, S.C. Code Ann. § 58-33-210, et. seq. ("the BLRA") and, upon further information and belief, Defendants' actions giving rise to the claims occurred in this District.

9.     Venue is proper in this division pursuant to Local Civil Rule 3.01.

## PARTIES

10.     Plaintiff Timothy Glibowski is a citizen and resident of the state of South Carolina, and his residence is within the service area of SCE&G.

11.     Defendant SCANA is an energy-based holding company engaged through its principal subsidiaries, including Defendant SCE&G, in electric and natural gas utility operations and other energy-related businesses in South Carolina, North Carolina and Georgia. SCANA, which was formed on December 31, 1984, is incorporated in South Carolina and maintains its principal executive offices at 100 SCANA Parkway, Cayce, South Carolina 29033. SCANA and SCE&G are an amalgamation of interests, entities, and activities so as to blur the legal distinction between SCANA, and its activities and its subsidiary SCE&G, and its activities.

12.     SCE&G is regulated by the South Carolina Public Service Commission ("SCPSC"). The SCPSC is tasked with protecting the public from predatory and monopolistic behavior by SCE&G and the other utilities regulated by it.

13.     Defendant SCE&G, SCANA's principal subsidiary, is engaged in the generation, transmission, distribution and sale of electricity and transportation of natural gas to customers. Unless noted otherwise, reference to "SCANA" herein denotes both SCANA and SCE&G.

14.     SCANA is a publicly authorized monopoly with the exclusive right to provide electricity within its service areas. Class members had no choice but to purchase electricity from SCANA if their property was located within the SCANA franchise areas.

15.     Executives of SCANA enriched themselves through increased salaries, "performance bonuses" and other compensation linked to their alleged "success" with regard to the "progress" in the construction , and completion of two new 1,1 17-megawatt nuclear reactors at the V.C. Summer Generating Station (the "Nuclear Reactor Project"), when in truth and in fact, such "progress" was based on little more than repeated fraudulent statements and misrepresentations of material fact relating to that Project.

16.     For example, in 2014, top executives of SCANA received performance based bonuses relating, in part, to the alleged "operational excellence" of the Nuclear Reactor Project, equal to approximately 20% of their base pay.

17.     In addition, during the time period from 2007 to 2016, the compensation of SCANA's top executives increased from $8.5 million to $14 million. In all, SCANA paid its executives and employees approximately $24,787,692 in performance based bonuses related in whole or in part to the Nuclear Reactor Project.

18.     Defendant Kevin Marsh ("Marsh"), who was, during the relevant time period, the Chief Executive Officer and Chairman of the Board of SCANA, enriched himself at the expense of SCANA's customers and, in the process, committed numerous breaches of his fiduciary duty. Among other things, in 2016 Defendant Marsh received a bonus of $3.3 million, in part for "oversight and support" of the Nuclear Reactor Project construction activities.

19.     Defendant Jimmy Addison ("Addison"), the Chief Financial Officer for SCANA, enriched himself at the expense of SCANA's customers and, in the process, committed numerous breaches of his fiduciary duty. Among other things, in 2016 Addison received a bonus of $620,000, in part for his efforts to secure additional financing relating to the failed Nuclear Reactor Project at the V.C. Summer Nuclear Generating Station.

4

20.    Defendant Stephen A. Byrne ("Byrne"), the Executive Vice President of SCANA, also holds the position of President for Generation and Transmission and Chief Operating Officer of SCE&G. He has occupied these positions since at least February 24, 2012. Defendant Byrne enriched himself at the expense of SCANA's customers and, in the process, committed numerous breaches of his fiduciary duty. Among other things, in 2016 Byrne received a bonus of $620,000, in part for his continuing oversight of various aspects the Nuclear Reactor Project's construction activities. Byrne also received a bonus in 2012 of $184,750 for his "efforts and achievements" associated with the Project.

21.    Defendant Martin Phalen ("Phalen"), former SCANA senior vice president of administration, sold SCANA stock that he indirectly controlled on May 1, 2017 -- prior to the public release, but after he was informed of a report by Bechtel Power Corp. ("the Bechtel Report") that was highly critical of defendant SCANA's and Santee Cooper's management of the Nuclear Reactor Project -- for a profit of approximately $2.7 million.

22.    Defendant Mark Cannon ("Cannon"), a former SCANA vice president and treasurer, also sold shares of SCANA stock that he directly owned on February 29, 2016 – prior to the public release of the Bechtel Report -- for a profit of approximately $520,000.

23.    Defendant Russell Harris ("Harris") has served since 2013 as both President of SCE&G Gas Operations and SCANA's senior vice president, and sold shares of SCANA stock that he indirectly controlled on February 26, 2016 – prior to the public release of the Bechtel Report -- for a profit of approximately $163,000.

24.    Defendant Jeffrey B. Archer ("Archer"), Senior Vice President and Chief Nuclear Officer of SCE&G is also the Senior Vice President of SCANA, and has occupied these positions since at least February 24, 2012. As such, Archer was on site at VC Summer and knew or should

have known of the imminent failure of the project, despite repeated public representations that the project was moving forward on schedule.

25.     Defendant Sarena D. Burch ("Burch") is the Senior Vice President for Risk Management and Corporate Compliance and Senior Vice President for Fuel Procurement and Asset Management. Defendant Burch has held those positions in SCANA and SCE&G since 2016.

26.     Defendant W. Keller Kissam ("Kissam"), since at least February 24, 2012, has served as both the President of Retail Operations for SCE&G, and as Senior Vice President for SCANA.

27.     Defendant Ronald T. Lindsay ("Lindsay"), since at least February 24, 2012 has served as the Senior Vice President, General Counsel and Assistant Secretary of SCANA, and upon information and belief, supervised, reviewed, and approved the filing with the SCPSC of the rate increase applications and supplements as described in paragraphs 52 through 82, *infra*.

28.     Defendant James Micali ("Micali"), a former member of SCANA's board of directors, sold shares of SCANA stock that he owned on February 23, 2016 – prior to the public release of the Bechtel Report -- for an approximate profit of $66,100.

29.     Defendants Marsh, Addison, Byrne, Phalen, Cannon, Harris, Archer, Burch, Kissam, Lindsay and Micali are hereinafter collectively referred to as the "Individual SCANA Defendants."

30.     The fraudulent and deceitful conduct by SCANA and/or the Individual SCANA Defendants, intended by them to persuade SCPSC to allow them to offer electricity at higher than just and reasonable rates, harmfully impacted, and continues to impact the Class and the public at large.

## CLASS ACTION ALLEGATIONS

31.    Plaintiff brings this action as a class action pursuant to Rules 23(a), 23(b)(1) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all South Carolina customers of the Defendants and any other local electric cooperatives who have been charged, and paid those charges, for costs associated with the construction of two nuclear power reactors at V.C. Summer Nuclear Power Station in South Carolina, which defendant SCANA has now abandoned. The class period runs from 2007 to present (the "Class Period") and includes all persons who sustained damage by paying the inflated charges as alleged herein as a result of such electricity purchased (the "Class").

32.    Excluded from the Class are the Justices of the United States Supreme Court, the Justices of the South Carolina Supreme Court, the Judges of the Fourth Circuit Court of Appeals, the Judges of the United States District Court of South Carolina, the defendants, members of each of Defendants' immediate families, and the legal representatives, affiliates, heirs, successors or assigns of any of defendants.

33.    Class certification pursuant to Rule 23(b)(1) is appropriate because the prosecution of separate actions by individual members of the class would create the risk of inconsistent or varying adjudications with respect to individual members of the class, and could substantially impede the ability of other members to protect their interests.

34.    Class certification pursuant to Rule 23(b)(3) is also appropriate because class action treatment is a superior method for the fair and efficient adjudication of the controversy. Common issues predominate over individual issues, and there is no interest by members of the class in individually controlling the prosecution of separate actions.

35.    Plaintiff's claims are typical of the claims of the members of the Class as all

members of the Class purchased electricity from Defendants at wrongfully inflated rates and are similarly affected by the wrongful conduct of SCANA, and the Individual SCANA Defendants in violation of the laws described herein.

36.    The size of the class renders joinder impracticable, and failure to certify the class will likely prevent individuals who have been damaged by Defendants' fraudulent scheme from pursuing their claims. Without a class action, individual class members would face burdensome litigation expenses, deterring them from bringing suits that would adequately protect their rights. Whatever difficulties may exist in the management of the class action are greatly outweighed by the class action procedure that would provide claimants with a method for the redress of claims that they may not otherwise be capable of pursuing. The class action device is superior to individual litigation under the circumstances of this case because it provides the benefits of unitary adjudication, judicial economy and economies of scale. The class action device in this civil RICO action provides access to the courts and a measure of justice and accountability for the individual and business claimants whose incomes, business and properties have been damaged by Defendants' fraudulent and unlawful conduct.

37.    The Plaintiff and all Class members seek treble damages for their injury under the civil RICO provisions of 18 U.S.C. § 1964(c), including but not limited to economic damages for injury to their income, business, and property (including diminution of property values), cost of the suit, attorney's fees, injunctive relief and any other relief to which they may be entitled in law and/or equity.

38.    While the exact number of Class members is unknown to Plaintiff currently, a majority of the residents and businesses in South Carolina buy their electricity from SCANA, and thus tens of thousands of persons and businesses are likely to be members of the Plaintiff Class.

SCE&G, distributes and sells electricity to over five hundred thousand customers in twenty-four counties.

39.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained competent counsel, experienced in class action litigation and litigation involving RICO, the construction of nuclear power plants, the commission of fraud on a state agency to obtain inflated and unjustified rate increases, and fraud. Plaintiff is a member of the Class and does not have interests antagonistic to or in conflict with the other members of the Class.

40.    There are numerous questions of law and fact which are common to the Class and which predominate over any questions affecting individual members of the class, including:

a.   whether SCANA and the Individual SCANA Defendants have violated the laws of the United States as alleged herein;

b.   whether SCANA and the Individual SCANA Defendants knew or should have known that potential design issues would impact on the cost of, and completion of, construction of the Nuclear Reactor Project as set forth more fully herein;

c.   whether SCANA and the Individual SCANA Defendants acted in a commercially reasonable, prudent and competent manner in the selection, design, supervision and administration of the contract(s) to construct the Nuclear Reactor Project;

d.   whether SCANA and the Individual SCANA Defendants engaged in acts of mail fraud, wire fraud or other RICO predicate acts in direct violation of the federal RICO statute;

e.   whether the Defendants have engaged in a pattern of unlawful conduct;

f.   whether SCANA and the Individual SCANA Defendants have conducted or participated, directly or indirectly, in a pattern of unlawful conduct in the operation, management or conduct of an enterprise in violation of 18 U.S.C. § 1962(c);

g.   whether SCANA and the Individual SCANA Defendants have violated18 U.S.C. § 1962(d) by conspiring to or attempting to conduct or participate, directly or

indirectly, in a pattern of unlawful conduct in the operation, management or conduct of an enterprise in violation of 18 U.S.C. § 1962(c);

h.   whether Plaintiff and the proposed class members were injured as a result of SCANA and the SCANA Individual Defendants' RICO predicate acts and RICO violations, and, if so, the appropriate class-wide measure of damages;

i.    whether publicly disseminated documents and statements issued during the Class Period and filed with the SCPSC omitted and/or misrepresented material facts concerning the defendants' business, finances, future business prospects and future prospects for success in the construction of the Nuclear Reactor Project;

j.    whether Defendants participated in and pursued the common course of conduct complained of;

k.   whether Defendants acted willfully, recklessly or with gross negligence in omitting and/or misrepresenting material facts or in aiding and abetting misstatements; and, or,

l.    the extent of damages sustained by Plaintiff and by members of the Class and the appropriate measure of damages.

## FACTUAL ALLEGATIONS

**A.    SCANA Pushes for Legislation That Would Pave the Way for a Runaway Nuclear Construction Project**

41.    In February 2007, the South Carolina Legislature passed the BLRA with little public scrutiny or media attention. Ostensibly, the BLRA was designed to avoid a feared electricity shortage and to incentivize privately-owned utilities to create more nuclear power capacity in South Carolina. Because the costs of nuclear construction were so high—the reasoning went—utilities should be allowed to build nuclear capacity on a "pay as you go" model, and to charge rate-paying customers up front for the costs. The BLRA would provide a regulatory structure to do just that, allowing utilities to petition state regulators for rate increases to pay for large capital projects.

42.    The BLRA passed the South Carolina Legislature easily—passing the South Carolina House by a 104-6 vote, and easily passing the South Carolina Senate with 25 of 46 state

senators co-sponsoring the bill.[1] According to observers who followed the bill at the time—including the president of the S.C. Small Business Chamber of Commerce—SCANA was among the bill's major backers, and lobbied heavily for the bill.[2] Indeed, upon its passage, SCANA would immediately act to take advantage of the BLRA by embarking on an expansive reactor construction project at the V.C. Summer Site, with the plan to bill rate-paying customers up front for the costs. Others, such as Bob Guild, an environmental lawyer who chaired the S.C. Sierra Club in 2007, referred to it as a "stealth project." Guild also said, that he "knew nothing about it, and I've been involved in utility regulation since the late '70s and early '80s. It was completely under the radar as far as I was concerned."[3]

43.    The BLRA describes its "purpose" as being "to provide for the recovery of the prudently incurred costs associated with new base load plants. . . when constructed by investor-owned electrical utilities, while at the same time protecting customers of investor owned electrical utilities from responsibility for imprudent financial obligations or costs."

44.    In reality, however, the BLRA gave a blank check to the Defendants to rack up inflated expenses and cost overruns, and to pay themselves exorbitant bonuses.

45.    Crucially, however, the BLRA contained some backstops, albeit insufficient, against imprudently incurred costs, and thus put SCANA at risk of being on the hook for any such

---

[1] The exact Senate vote count is unknown as the vote took place off the record.

[2] Although lobbying records are not readily available for 2007, SCANA is known to have spent a total of $1.5 million lobbying South Carolina legislators since 2009. SCANA also spent $63,000 in campaign contributions during the 2006 South Carolina state election cycle, making it the eleventh largest overall contributor that year. In 2008, that number more than doubled to $168,605, making SCANA the sixth largest donor in the state. SCANA has been in the top-ten South Carolina state election spenders in every election cycle since—most recently spending $224,644 in the 2016 cycle. (data compiled from https://www.opensecrets.org).

[3] http://www.thestate.com/news/politics-government/articlel 6564 1762.html

imprudent costs. Section 58-33-275(E) of the BLRA states:

> In cases where a party proves by a preponderance of the evidence that there has been a material and adverse deviation from the approved schedules, estimates, and projections set forth in Section 58-33-270(B)(1) and 58-33-270(B)(2), as adjusted by the inflation indices set forth in Section 58-33-270(B)(5), the commission may disallow the additional capital costs that result from the deviation, but only to the extent that the failure by the utility to anticipate or avoid the deviation, or to minimize the resulting expense, was imprudent considering the information available at the time that the utility could have acted to avoid the deviation or minimize its effect.

46.     Further, while the BLRA allows a utility to recover costs from ratepayers even for abandoned nuclear construction projects, such recovery is not allowed "to the extent that the failure by the utility to anticipate or avoid the allegedly imprudent costs, or to minimize the magnitude of the costs, was imprudent considering the information available at the time that the utility could have acted to avoid or minimize the costs." Thus, SCANA's management and Board were on notice from the outset that their ability to recover costs from South Carolina ratepayers was contingent upon a public appearance that such costs were prudent.

**B.     SCANA Plans to Expand the V.C. Summer Nuclear Site**

47.     By April 2007—before the BLRA had even become law—SCANA was already publicly touting a massive planned expansion of the V.C. Summer Station. In other words, SCANA had clearly lobbied for the bill with a plan already in mind to expand the V.C. Summer Station and bill ratepayers for the cost. In SCANA's initial plan in the Company's Q1 2007 earnings conference call on April 27, 2007, a SCANA executive stated that "along with our partner, Santee Cooper, we currently expect to file a joint application with the Nuclear Regulatory Commission later this year, for a combined construction and operating license which will cover two units ..." SCANA further stated that they expected to recover capital costs for the project under the BLRA.

48.    In March 2008, SCE&G filed an application with the federal Nuclear Regulatory Commission ("NRC") for a license to build the two reactor Nuclear Reactor Project, which were intended to be more powerful than the single 966-megawatt reactor located on the Site. This NRC application triggered a multiyear review process.

49.    Defendant Marsh addressed how SCANA would manage the significant risks related to cost overruns and delays when he provided direct testimony during a 2008 hearing:

> The business processes and structures for this oversight group are being formalized at this time. In all, we estimate more than 50 people will be assigned to this task. At the center of this structure will be a dedicated group of SCE&G personnel that will monitor each aspect of the construction process on a day-to-day basis and will report progress, issues and variances to an executive steering committee that includes me as SCE&G's president, and a senior executive from Santee Cooper and to the SCANA board of directors.[4]

50.    In May 2008, SCE&G and Santee Cooper—as 55% and 45% owners of the project, respectively[5]—signed an Engineering, Procurement and Construction contract (the "EPC Contract") with Westinghouse Electric Company ("Westinghouse") and Stone & Webster, Inc. to act as prime contractors to build two Westinghouse AP1000 nuclear reactors at the V.C. Summer Site. Westinghouse, Stone & Webster and all other construction contractors for the Nuclear Reactor Project are hereinafter collectively referred to as "the Consortium."

C.    **SCANA Files Annual Applications For Rate Increases**

51.    On or about May 30, 2008, SCANA, in furtherance of the Nuclear Reactor Project, filed a Combined Application with the SCPSC, pursuant to the BLRA, seeking a Certificate of Environmental Compatibility and Public Convenience and Necessity and for a Base Load Review Order to construct and operate a two-unit, 2,234 net megawatt nuclear facility, i.e. the Nuclear

---

[4] Direct Testimony of Kevin B. Marsh on Behalf of South Carolina Electric & Gas Company, Docket No. 2008-196-E, https://www.nrc.gov/docs/ML0910/ML091060781.pdf

[5] February 27, 2009 Order Approving Combined Application, Order No. 2009-104, page 2.

Reactor Project (the "Base Load Application").

52.    In its Base Load Application, SCANA (through the Individual SCANA Defendants) made several false and misleading statements to the SCPSC, to Plaintiff, and to other customers by and through their filings with the SCPSC, including, but not limited to, the following:

    a.  the Nuclear Reactor Project was necessary to meet the growing needs of its customers for electric power and to support the continued economic development of the state of South Carolina;[6]

    b.  the anticipated commercial service date for Unit 2 of the Nuclear Reactor Project would be April 1, 2016;[7]

    c.  the anticipated commercial service date for Unit 3 of the Nuclear Reactor Project would be January 1, 2019;[8]

    d.  that the Nuclear Reactor Project would utilize a Westinghouse AP1000 reactor which represents an advanced nuclear generating design and received nuclear design certification from the NRC on September 13, 2004;[9]

    e.  To ensure efficient construction and operation, the Units will be built using standardized designs pre-approved by the NRC and advanced modular construction 2 techniques;[10]

    f.  SCE&G has chosen nuclear generating capacity to meet its base load requirements having carefully evaluated the life-cycle costs, reliability, the fuel, and environmental risks of other options;[11] and,

    g.  that the Nuclear Reactor Project would cost approximately $6,313,376,000.[12]

53.    On May 30, 2008, in combination with its application to construct the nuclear

---

[6] Docket No. 2008-196-E-Order No. 2009-104 dated February 27, 2009, p.2.
[7] Westinghouse/Stone & Webster contractually committed to have substantially completed Unit 2 by April 1, 2016 and Unit 3 by January 1, 2019. Order 2009-104(A) at 93. *Id.*
[8] *Id.*
[9] Docket No. 2008-196-E at ¶4.
[10] *Id.*
[11] *Id.* at ¶12..
[12] *Id.* at Exhibit F.

facility, SCANA requested the SCPSC to approve the first of multiple rate increases to fund the Nuclear Reactor Project. The proposed average increase to the residential class was 0.52%; small general service class was 0.48%; medium general service class was 0.51% and large general service class was 0.44%.[13]

54.    On or about March 2, 2009, pursuant to the BLRA by way of Order No. 2009-104(A) and relying on SCANA false and misleading representations, SCPSC approved SCANA's proposal to construct the Nuclear Reactor Project and to increase rates charged to the residential class, the general service class, the medium general service class and the large general service class.

55.    On May 29, 2009, pursuant to S.C. Code Ann. §58-33-280, SCANA submitted its second request for the approval of revised rates subsequent to the initial revised rates approved on March 2, 2009 in Commission Order No. 2009-104(A) in Docket No. 2008-196-E. The proposed average increase to the Residential class was 1.21%; the Small General Service class was 1.07%; the Medium General Service class was 1.13%, and the Large General Service class was 0.95%.[14] In its May 29, 2009 application, SCANA falsely and misleadingly represented to the SCPSC that it had met all current milestones approved by the Commission in Order No. 2009-104A for the project, as adjusted pursuant to the construction schedule contingencies authorized in that order, and that it had completed 28 of the 146 Commission-approved milestones are being tracked.[15] SCANA also falsely represented to the SCPSC that construction of the Project was progressing on schedule to meet the Unit 2 & 3 Substantial Completion dates of April 1, 2016 and January 1, 2019 respectively.[16]

---

[13] Order 2009-104, p. 2.
[14] Docket No. 2009-211-E.
[15] Docket No. 2009-211-E at 14.
[16] *Id.* at 20.

56.    On September 30, 2009, based upon the false and misleading statements made in SCANA's May 29, 2009 application for the approval of revised rates, SCPSC approved SCANA's application.

57.    On May 27, 2010, pursuant to S.C. Code Ann. §58-33-280, SCANA submitted its third request for the approval of revised rates. The proposed average increase to the Residential class was 2.82%; the Small General Service class was 2.71%; the Medium General Service class was 2.82%, and the Large General Service class was 2.55%.[17]

58.    In Exhibit A to its May 27, 2010 application, SCANA falsely represented that the Company had met all current construction milestones approved by the Commission in Order No. 2010-12, as adjusted pursuant to contingencies authorized in Order No. 2009-104(A), and that 48 of the 146 milestones had been completed as of March 31, 2011.[18] SCANA further stated that the Company was on track to complete the Units at the construction cost forecast of $6.3 billion dollars, and that construction of the project was progressing on schedule to meet the Unit 2 & 3 Substantial Completion dates of April 1, 2016 and January 1, 2019.[19]

59.    On September 30, 2010, based upon the false and misleading statements made in SCANA's May 27, 2010 application for the approval of revised rates, SCPSC issued an Order Approving Revised Rates.[20]

60.    On May 27, 2011, pursuant to S.C. Code Ann. §58-33-280, SCANA submitted its fourth request for the approval of revised rates. The proposed average increase to the Residential class was 2.83%; the Small General Service class was 2.67%; the Medium General Service class

---

[17] Docket No. 2010-157-E at 5.
[18] *Id.* at Ex. A, p. 2
[19] *Id.* at Ex. A, p. 9
[20] Docket No. 2010-157-E, Order No. 2010-625

was 2.67%, and the Large General Service class was 2.49%.[21] In Exhibit A to its application, SCANA stated that the Company had met all current construction milestones approved by the Commission in Order No. 2010-12, as adjusted pursuant to contingencies authorized in Order No. 2009-104(A) and that 59 of the 146 milestones had been completed as of March 31, 2011.[22] SCANA also falsely represented that it was "on track to complete the Units at the capital cost forecast of approximately $4.3 billion as approved in Order No. 2011-345."[23]

61.     In Exhibit A to its May 27, 2011 application, SCANA stated that construction of the Units was progressing on schedule, but a delay in the issuance of the Combined Operating License would not allow Unit 2 to be completed by the substantial completion date set forth in the EPC Contract.[24] However, SCANA falsely went on to state that "[t]he Project Licensing and Permitting, Engineering, Procurement and Construction work remains on schedule to meet the Units' Substantial Completion dates."[25]

62.     On September 30, 2011, based upon the false and misleading statements made in SCANA's May 29, 2011 application for the approval of revised rates, SCPSC issued an Order Granting Request for Approval of Revised Rates.

63.     On May 27, 2012, pursuant to S.C. Code Ann. §58-33-280, SCANA submitted its fifth request for the approval of revised rates. The proposed average increase to the Residential class was 2.69%; the Small General Service class was 2.55%; the Medium General Service class was 2.46%, and the Large General Service class was 2.28%.[26] In Exhibit A to its application,

---

[21] Docket No. 2011-207-E.
[22] *Id.* at Ex. A.
[23] *Id.* at Ex. A.
[24] Docket No. 2011-207-E at Ex. A, p. 6
[25] *Id.* at Ex. A, p. 18.
[26] Docket No. 2011-207-E.

SCANA falsely stated that the Company had met all current construction milestones approved by the Commission in Order No. 2010-12, as adjusted pursuant to contingencies authorized in Order No. 2009-104(A), and that 72 of the 146 milestones had been completed as of March 31, 2012.[27]

64.    In Exhibit A to its May 27, 2012 application, SCANA stated that it anticipated the gross construction costs to be $156 million over the projected costs on December 31, 2011.[28] SCANA also falsely represented that "as of March 31, 2012, the Company and its contractors remain on schedule to complete all required milestones as adjusted pursuant to the milestone schedule contingencies approved by the Commission in Order No. 2009-104(A)."[29]

65.    On September 28, 2012, based upon the false and misleading statements made in SCANA's May 27, 2012 application for the approval of revised rates, SCPSC issued an Order Granting Request for Approval of Revised Rates.

66.    On May 31, 2013, pursuant to S.C. Code Ann. §58-33-280, SCANA submitted its sixth request for the approval of revised rates. The proposed average increase to the Residential class was 3.10%; the Small General Service class was 3.04%; the Medium General Service class was 3.07%, and the Large General Service class was 2.66%.[30] In Exhibit A to its application, SCANA falsely stated that the Company had met all current construction milestones approved by the Commission in Order No. 2012-884, as adjusted pursuant to contingencies authorized in Order No. 2009-104(A), and that 84 of the 146 milestones had been completed as of March 31, 2013.[31] SCANA also informed SCPSC that "[t]he current cost estimates include no cost changes apart from changes in timing of costs and minor shifts in costs among cost categories that occur in the

---

[27] Docket No. 2012-186-E at 6.
[28] *Id.* at Ex. A, p. 3.
[29] *Id.* at Ex. A, p. 18.
[30] Docket No. 2013-150-E at 6.
[31] *Id.* at Ex. A, p. 2.

normal course of managing the project"[32] and that "[t]he Project Licensing and Permitting, Engineering, Procurement and Construction work remains on schedule to meet the Units' Substantial Completion Dates taking into account the schedule contingencies approved in Order 2009-104(A)."[33]

67.    On September 27, 2013, based upon the false and misleading statements made in SCANA's May 31, 2013 application for the approval of revised rates, SCPSC issued an Order Granting Request for Approval of Revised Rates.

68.    On May 30, 2014, pursuant to S.C. Code Ann. §58-33-280, SCANA submitted its seventh request for the approval of revised rates.[34] The proposed average increase to the Residential class was 3.09%; the Small General Service class was 3.08%; the Medium General Service class was 3.07%, and the Large General Service class was 2.70%.[35] In Exhibit A to its application, SCANA falsely stated that the Company had met all current construction milestones approved by the Commission in Order No. 2012-884, as adjusted pursuant to contingencies authorized in Order No. 2009-104(A), and that 96 of the 146 milestones had been completed as of March 31, 2014.[36]

69.    In Exhibit A to its May 30, 2014 application, SCANA reported that Westinghouse was performing a Revised Fully-Integrated Construction Schedule that would provide a more detailed evaluation of the engineering and procurement activities necessary to accomplish the schedule.[37] SCANA also informed SCPSC that the revised construction

---

[32] *Id.* at Ex. A, p. 2.
[33] *Id.* at Ex. A, p. 19.
[34] Docket No. 2014-187-E
[35] *Id.* at 6.
[36] *Id.* at Ex. A, p. 2.
[37] *Id.* at Ex. A, p. 3.

schedule would affect cash flow estimates and it has not accepted responsibility for any of the additional estimated costs as a result of the revised construction schedules.[38]

70.     On September 27, 2014, based upon the false and misleading statements made in SCANA's May 30, 2014 application for the approval of revised rates, SCPSC issued an Order Granting Request for Approval of Revised Rates.

71.     On May 29, 2015, pursuant to S.C. Code Ann. §58-33-280, SCANA submitted its eighth request for the approval of revised rates.[39] The proposed average increase to the Residential class was 2.80%; the Small General Service class was 2.89%; the Medium General Service class was 3.00%, and the Large General Service class was 2.57%.[40] In Exhibit A to its application, SCANA falsely stated that the Company had met all current construction milestones approved by the Commission in Order No. 2012-884, as adjusted pursuant to contingencies authorized in Order No. 2009-104(A), and that 105 of the 146 milestones had been completed as of March 31, 2015.[41]

72.     In Exhibit A to its May 29, 2015 application, SCANA reported that while construction was slightly delayed, the increase in delayed milestones was the result of the recognition, under the BLRA, of the Revised, Fully-Integrated Construction Schedule.[42] SCANA also reported that, despite the delays, spending was approximately $963 million less than the capital cost schedule approved in Order No. 2012-884.[43]

73.     On September 30, 2015, based upon the false and misleading statements made in SCANA's May 29, 2015 application for the approval of revised rates, SCPSC issued an Order

---

[38] *Id.* at Ex. A, p. 4.
[39] Docket No. 2015-160-E
[40] *Id.* at 6.
[41] *Id.* at Ex. A, p. 3.
[42] *Id.* at Ex. A, p. 3.
[43] *Id.* at Ex. A, p. 5.

Granting Request for Approval of Revised Rates.

74.    On June 27, 2016, pursuant to S.C. Code Ann. §58-33-280, SCANA submitted its ninth request for the approval of revised rates.[44] The proposed average increase to the Residential class was 3.10%; the Small General Service class was 2.99%; the Medium General Service class was 3.25%, and the Large General Service class was 2.96%.[45] In Exhibit A to its application, SCANA falsely stated that the Company had met all current construction milestones approved by the Commission in Order No. 2015-661, as adjusted pursuant to contingencies authorized in Order No. 2009-104(A), and that 110 of the 146 milestones had been completed as of March 31, 2016.[46]

75.    Despite having received the Bechtel Report months earlier, SCANA failed to report any of the recommendations and conclusions made by the Bechtel Report to SCPSC. Instead, SCANA informed SCPSC that overall progress continues with approximately 3,700 contractor and subcontractor personnel on site daily, and cash flow forecasts provided by Westinghouse indicated that it should be able to complete constructing the Nuclear Reactor Project for $126 million less than the capital cost approved in Order No. 2015-661.[47]

76.    On October 26, 2016, based upon the false and misleading statements made in SCANA's June 27, 2016 application for the approval of revised rates, SCPSC issued an Order Granting Request for Approval of Revised Rates.

77.    SCPSC relied upon the representations made by SCANA and the Individual SCANA Defendants in its numerous applications for revised rates and its quarterly reports to approve their requests to bill the Class in advance of the completion of construction of the Nuclear Reactor Project.

---

[44] Docket No. 2016-224-E.
[45] *Id.* at 6.
[46] *Id.* at p. 6.
[47] *Id.* at p. 6.

78.     Beginning in 2009, SCANA began billing Class members in advance for the Nuclear Reactor Project and Class members paid sums associated with the Nuclear Reactor Project to SCANA and Santee Cooper.

79.     Upon information and belief, SCANA has raised the rates of the Class members nine times to fund the Nuclear Reactor Project.[48] Pursuant to the BLRA and the approved rate increases, the Class was required to pay SCANA for costs in advance of any benefit being conferred by the Nuclear Reactor Project being placed in service, in addition to the cost of the electricity they had consumed.

80.     Upon information and belief, approximately 18% of a SCANA customer's power bill pays for the Nuclear Reactor Project, and Class Members have contributed $1.4 billion towards the Project.

81.     The state of South Carolina has designated exclusive service areas to SCANA to provide electricity effectively providing SCANA a monopoly within this exclusive service area. Therefore, the Class had no reasonable alternative to purchase the electricity it needed.

**D.      Westinghouse Internal Report on Risks Associated with AP1000 Projects**

82.     Upon information and belief, in August 2011, Westinghouse received an internal report prepared by one of their employees entitled "The Case for Paradigm Shift: An assessment of project delivery risk against the backdrop of industry practice" which detailed risks associated with the AP1000 projects (the "WEC Report").

83.     The WEC Report identified multiple risks associated with the AP1000, and thus the Nuclear Reactor Project, including, but not limited to the following:

    a.   there was a general feeling among Westinghouse engineers that the AP1000 projects are at risk;

---

[48] *Id.* at Ex. A, p. 3.

b.  the AP1000 Design was not complete, even though it is currently under construction which virtually assures large numbers of changes will occur to both systems and structures;

c.  issuing an incomplete design CFC to the field virtually assures numerous Construction Change Order Requests which are likely to result in Delay Claims and Liquidated Damages;

d.  the AP1000 Construction Packages differ from typical construction industry standard packages;

e.  the cost risks associated with potential division of responsibility errors, omissions, and uncertainty regarding agreement on scope and responsibility can be significant;

f.  the Construction Packages contain design drawings which utilize what are called 'standard details,' but they have not been collected in a ready-to-reference Standard Detail Library;

g.  the AP1000 construction documents do not currently include a Master Spec nor follow the Construction Specifications Institute Format model which is the industry standard; and,

h.  the AP1000 designs are not sealed by a professional engineer.

84.     Upon information and belief, neither Westinghouse, SCANA, nor the Individual SCANA Defendants materially acted on the recommendations made by the WEC Report to improve and/or salvage the Nuclear Reactor Project.

85.     Upon information and belief, despite the statements in the WEC Report identifying risks associated with completing the Nuclear Reactor Project, neither Westinghouse, SCANA, nor the Individual SCANA Defendants disclosed these risks to SCPSC when filing Quarterly Reports or the annual application for increased rates to the Class.

**E.     The Bechtel Report**

86.     In 2014, SCANA and Santee Cooper hired the Bechtel Power Corporation ("Bechtel") to do an extensive review of the Nuclear Reactor Project.

87.     On or about February 5, 2016, Bechtel issued a report, detailing the inadequacies of the management of the Nuclear Reactor Project, including but not limited to:

a.  Contractors' construction plans were not specific to the Nuclear Reactor Project and, thus could not serve as a firm basis to calculate the Nuclear Reactor Project's cost or completion date;

b.  While the Consortium's engineering, procurement and construction plans and schedules are integrated, the plans and schedules are not reflective of actual project circumstances;

c.  The Consortium lacks project management integration needed for a successful project outcome;

d.  There is a lack of a shared vision, goals and accountability between SCANA and/or Santee Cooper and the Consortium;

e.  The Contract does not appear to be serving SCANA and/or Santee Cooper or the Consortium particularly well;

f.  The detailed engineering design is not yet completed which will subsequently affect the performance of procurement and construction;

g.  The issued design is often not constructible resulting in a significant number of changes and causing delays;

h.  The oversight approach taken by SCANA does not allow for real time appropriate cost and schedule mitigations;

i.  The relationship between the Consortium partners and Chicago Bridge & Iron is strained caused to a large extent by commercial issues;

j.  SCANA should hire an experienced management company instead of relying on their own staffs; and/or

k.  SCANA and Santee Cooper should sit down with contractors to reassess the Nuclear Reactor Project' goals and realistically forecast its remaining cost and completion date.

88.     The Bechtel Report went on to state that "[t]he number of issues identified during the current civil phase of the construction effort is significant" and "[t]he Project needs to experience some successes, no matter how small."

89.     Upon information and belief, neither SCANA, nor the Individual SCANA Defendants materially acted on the recommendations made by Bechtel to improve and/or salvage the Nuclear Reactor Project.

90.     Despite not materially acting on the recommendations made by the Bechtel Report to attempt to remediate the problems with the Nuclear Reactor Project, current and former SCANA executives and board members divested themselves of large portions of SCANA stock after receiving the Bechtel Report. These sales include, *inter alia*:

   a.  Defendant Martin "Marty" Phalen, former SCANA senior vice president of administration, sold 42,023 shares of SCANA stock that he indirectly controlled on May 1, 2017 for $65.49 per share for a profit of approximately $2.7 million;

   b.  Defendant Mark Cannon, former SCANA vice president and treasurer, sold 8,000 shares of SCANA stock that he directly owned on February 29, 2016 for $65.11 per share for a profit of approximately $520,000;

   c.  Defendant Russell "Rusty" Harris, president of SCE&G Gas Operations and SCANA senior vice president sold 2,500 shares that he indirectly controlled on February 26, 2016 for $65.26 per share for a profit of approximately $163,000; and,

   d.  Defendant James Micali, a former member of SCANA's board of directors, sold 1,000 shares of SCANA stock that he owned for $66.10 on February 23, 2016 for an approximate profit of $66,100.

91.     Upon information and belief, SCANA, and the Individual SCANA Defendants not only failed to disclose the Bechtel Report recommendations to the SCPSC, they actively concealed the existence of this report from the SCPSC and continued to request rate increases to cover the costs of the Nuclear Reactor Project.

   F.     **SCANA's False and Materially Misleading Misstatements to the SCPSC**

92.     At the time of its Base Load Application, SCANA and the Individual SCANA Defendants made several misrepresentations to Plaintiff and other customers by and through their filings with the SCPSC, including, but not limited to, the following:

a.  the Nuclear Reactor Project was necessary to meet the growing needs of its customers for electric power and to support the continued economic development of the state of South Carolina;[49]

b.  the anticipated commercial service date for Unit 2 of the Nuclear Reactor Project would be April 1, 2016;[50]

c.  the anticipated commercial service date for Unit 3 of the Nuclear Reactor Project would be January 1, 2019;[51]

d.  that the Nuclear Reactor Project would utilize a Westinghouse AP1000 reactor which represents an advanced nuclear generating design and received nuclear design certification from the NRC on September 13, 2004;[52]

e.  To ensure efficient construction and operation, the Units will be built using standardized designs pre-approved by the NRC and advanced modular construction 2 techniques;[53]

f.  SCE&G has chosen nuclear generating capacity to meet its base load requirements having carefully evaluated the life-cycle costs, reliability, the fuel, and environmental risks of other options;[54] and,

g.  would cost approximately $6,313,376,000.[55]

93.     However, at the time SCANA made the Base Load Applications, SCANA and the

Individual SCANA Defendants knew or should have known the following:

a.  the Westinghouse AP1000 had never been constructed before;

b.  The Nuclear Reactor Project was the first time Westinghouse had handled the engineering, purchasing and construction for a large-scale building project;[56]

c.  That while the Westinghouse AP1000 reactor had received design certification in

---

[49] Docket No. 2008-196-E-Order No. 2009-104 dated February 27, 2009, p. 2.
[50] Westinghouse/Stone & Webster contractually committed to have substantially completed Unit 2 by April 1, 2016 and Unit 3 by January 1, 2019. Order 2009-104(A) at 93. *Id.*
[51] *Id.*
[52] Docket No. 2008-196-E at ¶4.
[53] *Id.*
[54] *Id.* at ¶12.
[55] *Id.* at Ex. F.
[56] https://www.postandcourier.com/news/contractor-wasted-millions-on-unnecessary-supplies-for-s-c-s/article_43eeba82-ba6f-11e7-8065-2398b073b4e0.html

2004, Westinghouse submitted revisions to the AP1000 designs to the NRC on September 2008 and they had not yet been approved and continued to seek approvals through 2011;[57]

    d.    Westinghouse did not have a complete set of engineering drawings to construct the reactor;

    e.    Westinghouse was utilizing unlicensed engineers to craft blueprints and conduct complex engineering calculations when designing the Nuclear Reactor Project;[58]

    f.    At the time of the Base Load Application, the design of the Nuclear Reactor Project was incomplete, and the details of what bolts needed to be installed, where electrical wires would run, and how pipes would be configured, had yet to been completed;[59] and/or,

    g.    construction of the Nuclear Reactor Project included a substantial risk of failure due to the untested and unapproved designs of the Westinghouse AP1000 reactor.

94.    Throughout the SCPSC's review of the Base Load Application, SCPSC allowed third parties to file written submissions opposing the Nuclear Reactor Project. During this time, numerous groups opposed the Base Load Application, based upon, among other things, the projected costs and completion schedule for the Project.

95.    In furtherance of their fraudulent scheme to hide the true projected cost to complete the Project and that the completion schedule projected by the Defendants was false and unrealistic, SCANA and the Individual SCANA Defendants disputed in bad faith the concerns raised in these opposition papers relating to the Nuclear Reactor Project.

96.    As a result of the Defendants' fraudulent scheme, Defendants succeeded in using the BLRA to shift the financing and risk of constructing the Nuclear Reactor Project from

---

[57] 10 CFR Part 52, AP1000 Design Certification Amendment available at https://www.nrc.gov/docs/ML1134/ML113480014.pdf
[58] https://www.postandcourier.com/business/stamped-for-failure-westinghouse-and-scana-used-unlicensed-workers-to/article_3ea2046a-9d39-11e7-a186-cb396c86b8b9.html
[59] https://www.postandcourier.com/business/stamped-for-failure-westinghouse-and-scana-used-unlicensed-workers-to/article_3ea2046a-9d39-11e7-a186-cb396c86b8b9.html

SCANA onto Plaintiff and other members of the Class. Therefore, Defendants had a pecuniary interest in making these false or materially false allegations in its Base Load Application and future SCPSC filings.

97.    Upon information and belief, each of the Individual SCANA Defendants had a personal pecuniary interest in making these false and materially misleading allegations, and they expected to materially benefit from Defendants' fraudulent scheme, either through bonuses, increased salaries and other compensation and/or through the artificial inflation of their own SCANA stock holdings.

98.    Throughout the construction of Nuclear Reactor Project, SCANA filed annual applications to SCPSC which requested revised rates for customers in the Class. SCANA asked for (and obtained) additional rate increases from the SCPSC. SCANA imposed on Plaintiff  and other customers increased and approved revised rates, even after receipt of the Bechtel Report.

99.    The SCPSC approved SCANA's applications for revised rates based upon, and in reliance on, its fraudulent, false and/or misleading representations included in its SCPSC filings.

100.    Due to the false or materially misleading statements that SCANA made to the SCPSC between 2009 and 2012, SCANA was allowed to impose increased rates on their customers while the Nuclear Reactor Project was still on-going, and the two new nuclear reactors were still under construction.

101.    The Nuclear Reactor Project was plagued with design and construction issues that caused long delays and massive cost overruns. Notwithstanding Defendants' false and reassuring statements to the SCPSC, three months after construction began on Unit 2, delays and cost overruns on the Project had already begun to mount.

102.    Despite representations made to the SCPSC in its December 31, 2011 Quarterly report that progress on the Nuclear Reactor Project had been delayed because of redesign and production issues, upon information and belief, SCANA and the Individual SCANA Defendants were well aware that the redesign and production issues were not complete and were not stamped by an engineer licensed in South Carolina, which was in violation of the laws of the state of South Carolina.

103.    As early as 2012, SCANA knew or should have known that the Nuclear Reactor Project could not be completed for the amount they had forecasted, that the Project was wasteful, and that the projected deadlines could not be met. Instead, SCANA falsely represented to SCPSC that the Nuclear Reactor Project remained on schedule to complete all required milestones, as adjusted pursuant to the milestone schedule contingencies approved by the Commission in Order No. 2009-104(A).

104.    On a June 3, 2013 investor call, SCANA revealed to investors that there had been delays and problems with the ability of contractor Chicago Bridge & Iron Company to ship certain submodules to the V.C. Summer Site, and with the V.C. Summer Site's ability to receive them. As a result, SCANA said, a "new schedule" had been developed that pushed the likely in-service date for Unit 2 back from its original estimate of 2016 to as late as 2018. Further, SCANA disclosed that, as a result of these problems, costs on the Project would increase $200 million.

105.    Meanwhile, according to internal Santee Cooper documents recently released, Santee Cooper was, in 2014, already privately raising concerns about SCANA's ability to manage the Nuclear Reactor Project, and pressuring SCANA to hire an independent construction manager to get the project under control.

106.    The design and construction issues were reasonably foreseeable to SCANA and

the Individual SCANA Defendants in advance of applications to the SCPSC for funding through the BLRA.

107.    On or about February 14, 2014, SCANA revised the completion schedule to December 15, 2017 for one of the reactors covered by the Nuclear Reactor Project, and December 15, 2018 for the other.

108.    In September 2014, SCANA petitioned the SCPSC for a $66.2 million electric rate increase to help cover its rising costs.

109.    The following month, in October 2014, SCANA announced a likely year-long construction delay that could add an additional estimated $660 million to SCANA's portion of the construction budget. The expected delay again allegedly stemmed from difficulties Consortium members and their contractors were having fabricating the multi-ton modules that were to make up the structure of the nuclear plant.

110.    SCANA continued to bill customers in advance for the Nuclear Reactor Project, despite knowledge that the Project was unlikely to ever be completed.

111.    On July 31, 2017, SCANA issued a press release announcing that it would abandon the Nuclear Reactor Project. SCANA's justifications for the abandonment consisted largely of facts that Defendants had known or consciously disregarded more than a year earlier, including the "additional costs" to complete the project, the "uncertainty regarding the availability of production tax credits," the "amount of anticipated guaranty settlement payments" from Toshiba, as well as other considerations, including Santee Cooper's decision to suspend construction of the project.

112.    Notably, SCANA acknowledged that completion of the project would be "prohibitively expensive" and "would materially exceed prior Westinghouse estimates." The

Company further admitted that the project could not be completed prior to the January 1, 2021 deadline to receive $2 billion in production tax credits.

113.    The following day, on August 1, 2017, SCE&G again went before the SCPSC to petition for rate increases to cover costs incurred since June 30, 2016 that it said were not yet reflected in the then-current rates. At the hearing, SCPSC Commissioners excoriated the Company and its management. One called it a "grim day" and said that "public trust is at stake here," noting that Defendants appeared to have concealed information and that the "Commission was blindsided yesterday by this news."

114.    On August 15, 2017, amid a public outcry, SCANA announced that it would withdraw its Abandonment Petition before the SCPSC to seek rate increases under the BLRA.

115.    Upon information and belief, the Nuclear Reactor Project was only one-third complete as of August 2017 and would cost approximately $23 billion if completed.

116.    Yet —even while the Nuclear Reactor Project was headed for abandonment— SCANA rewarded its executives with substantial bonuses for work directly related to the disastrous Nuclear Reactor Project. According to SCANA's SEC filings:

   a.    Defendant Kevin Marsh, SCANA's Chief Executive Officer and Chairman of the Board, received a bonus of $3.3 million in 2016 in part for "oversight and support" of the Nuclear Reactor Project construction activities;

   b.    Defendant Jimmy Addison, SCANA's Chief Financial Officer, received a bonus of $620,000 in 2016 in part for efforts to secure financing relating to the Nuclear Reactor Project;

   c.    Defendant Stephen Byrne, SCANA's Chief Operating Officer, received a bonus of $620,000 in 2016 in part for his continuing oversight of various aspects the Nuclear Reactor Project construction activities;

   d.    Lesser bonuses were awarded to other SCANA employees which were, at least in part, related to construction of the Nuclear Reactor Project;

   e.    In 2014, SCANA's top executives, including the Individual SCANA Defendants

received "performance-based" bonuses equal to approximately 20% of their base pay for alleged "operational excellence" relating, at least in part, to the Nuclear Reactor Project;

f.   Defendant Stephen Byrne received a bonus in 2012 for $184,750 for his supposed "efforts and achievements" associated with the Nuclear Reactor Project;

g.   Overall, the pay of SCANA's top executives increased to $14 million in 2016 from $8.5 million in 2007; and,

h.   Since 2007, SCANA has paid its executives and employees about $25 million in "performance based" and discretionary bonuses related in whole or in part to the Nuclear Reactor Project.

117.   SCANA paid these bonuses with full knowledge of the mounting problems with the Nuclear Reactor Project, as detailed and described in the Bechtel Report.

118.   Westinghouse filed bankruptcy on or about March 27, 2017 in the U.S. Bankruptcy Court for the Southern District of New York.

119.   On or about July 31, 2017, SCANA and Santee Cooper announced they were abandoning the Nuclear Reactor Project, allegedly due to the delays in construction, escalating costs, and lower nuclear reactor projections for the energy needs of the Class.

120.   On or about July 21, 2017, the parent company of Westinghouse, Toshiba, announced it had reached a settlement with SCANA and Santee Cooper for $2.2 billion dollars for costs associated with Westinghouse's failure to perform.

121.   SCANA announced its intentions to charge the Class for costs associated with shutting down the Nuclear Reactor Project. Upon information and belief, this amount is approximately $2 billion spread over 60 years.

122.   On September 27, 2017. SCANA and Santee Cooper sold their settlement with Toshiba to Citibank for an immediate cash payment of approximately $1.84 billion.

### COUNT I

### Violation of the Civil RICO Statute (18 U.S.C. § 1961 et seq.)
### (Against SCANA and the Individual SCANA Defendants)

123.     Plaintiff repeats and realleges the allegations set forth above at paragraphs 1 through 123 as though fully set forth herein.

124.     SCANA, SCE&G, and the Individual SCANA Defendants ("the RICO Defendants") are "persons" within the meaning of 18 U.S.C.A. § 1961(3).

### The RICO Enterprise

125.     At all times relevant to this action, the Nuclear Reactor Project constituted an association-in-fact enterprise (hereinafter "the Enterprise," the Racketeering Enterprise" or "the Nuclear Reactor Project Enterprise") within the meaning of 18 U.S.C.A. § 1961(4), and said enterprise engaged in activities which have an impact on interstate commerce.

126.     At all times relevant to this action, the RICO Defendants were associated with the Nuclear Reactor Project Enterprise and, at the same time, were engaged in other activities which were separate and distinct from the Enterprise.

127.     In furtherance of the Nuclear Reactor Project Enterprise, the RICO Defendants engaged in two or more acts of racketeering by making, *inter alia,* the following false and/or fraudulent statements to the SCPSC, the members of the Plaintiff Class and other members of the public:

  a.  The cost estimates for the Nuclear Reactor Project made by the RICO Defendants on numerous separate occasions were intentionally false and misleading;

  b.  the time estimates for the completion of the Nuclear Reactor Project made by the RICO Defendants on numerous separate occasions were intentionally false and misleading;

  c.  the RICO Defendants falsely stated that they were not aware of Westinghouse's

33

inability to complete the Nuclear Reactor Project, when in truth and in fact, they were well aware of Westinghouse's glaring deficiencies and negligent conduct;

d.   the RICO Defendants falsely represented that they were controlling costs and properly supervising Westinghouse when, in fact, they knew or should have known that such was not true;

e.   the RICO Defendants falsely continued to represent that there was a need for the Nuclear Reactor Project, despite a decrease in electricity consumption and demand;

f.   the RICO Defendants continued to deny the existence of cheaper and readily available alternatives that could have met the demands for any actual increase in electricity consumption;

g.   the RICO Defendants hid or downplayed the fact that the Nuclear Reactor Project design was untested, and that such a factor would increase the likelihood of extra design and construction costs for the Nuclear Reactor Project;

h.   the RICO Defendants suppressed the fact that the Nuclear Reactor Project design as presented for approval to the SCPSC was likely going to change after construction began;

i.   the RICO Defendants intentionally failed to disclose that the proposed generating capacity for the Nuclear Reactor Project greatly exceeded the future anticipated electricity growth of their customer base;

j.   the RICO Defendants intentionally failed to disclose that the construction timeline estimates for the Nuclear Reactor Project were unreasonably optimistic;

k.   the RICO Defendants intentionally failed to disclose that construction delays were occurring, such that costs would necessarily increase and the timeline estimates could not be achieved;

l.   the RICO Defendants failed to disclose that they knew that Westinghouse's inability to complete the Nuclear Reactor Project on time and on budget would necessarily lead to substantial increases in construction related costs; and,

m.   the RICO Defendants failed to disclose that SCANA was paying substantial bonuses to its officers and employees relating to the Nuclear Reactor Project on the false premise that the Project was being well managed, while, at the same time, Defendants were planning to shift the costs of such management failures onto Plaintiff and other members of the Class.

128.   The RICO Defendants were all part of the Racketeering Enterprise, within the

34

meaning of 18 U.S.C. § 1961(4), which at all relative times possessed and continues to possess

an ongoing organizational structure with sufficient continuity and which Enterprise related to

the Nuclear Reactor Project in which the various RICO Defendants all played a role in

furtherance of the Defendants' overall scheme to defraud the SCPSC, the Plaintiff and other

members of the public into paying for the ongoing construction of the two nuclear reactors

through false and misleading statements regarding the projected costs of the Project and the

projected completion dates.

129.    At all relevant times, the Racketeering Enterprise's activities have affected and

continue to affect interstate and foreign commerce and have existed separate and apart from the

racketeering activity. For example, the lawful purpose of the Racketeering Enterprise was and is

to serve as the utility responsible for the provision to the Class of natural gas and electricity.

The Racketeering Enterprise collected an average of more than $150 million dollars a year in

revenues from the Ratepayer Class.

130.    Defendants are "persons" under the civil RICO statute because they knowingly

and willfully conducted and participated in the conduct of the Racketeering Enterprise's affairs,

directly or indirectly, through a pattern of racketeering activity in violation of 18 U.S.C. §

1962(c). Defendants engaged in such unlawful conduct by infiltrating and using the

Racketeering Enterprise to further their fraudulent scheme of giving, disseminating and

communicating false and deceptive testimony, reports, and projections to induce the SCPSC to

approve the Nuclear Reactor Project. The purpose of the Defendants' fraudulent scheme and

their infiltration and use of the Racketeering Enterprise was to fraudulently obtain billions of

dollars in proceeds and profits from their utility customers while misrepresenting and

concealing that Defendants knew that the cost and time estimates for completion of the Nuclear

Reactor Project made by the RICO Defendants on numerous separate occasions were intentionally false and misleading as alleged in paragraph 104, *supra*.

131.    Similarly, as a further part of their scheme, the RICO Defendants also used the Racketeering Enterprise to conceal the fact that they were knowingly and intentionally promoting and conducting their operations with proceeds and profits derived from the fraudulent inflated utility billing scheme. For example, the Defendants knew that Westinghouse's inability to complete the Nuclear Reactor Project on time and on budget would necessarily lead to substantial increases in construction related costs. Instead, the Defendants chose to derive more proceeds and profits by knowingly concealing the true facts from the SCPSC, the public and the Class.

132.    The RICO Defendants also wrongfully used the Racketeering Enterprise to further their fraudulent objectives by enriching the Individual SCANA Defendants and other SCANA officers and employees, through the payment of bonuses and increased compensation (as alleged *supra* in paragraphs 19 through 21, and 117).

133.    The RICO Defendants further used the Racketeering Enterprise to maintain a false and fraudulent public facade so that they could deceive the regulators and the public into believing that certain SCANA executives and employees were achieving "operational excellence" and had made noteworthy efforts relating, at least in part, to the Nuclear Reactor Project, and that such executives and employees deserved to receive payment of substantial bonuses and increases in compensation.

134.    The RICO Defendants thus infiltrated the Racketeering Enterprise in order to associate with and conduct or participate, directly or indirectly, in the conduct of the Racketeering Enterprise's affairs through the pattern of racketeering activity alleged herein. Among other

things, the Defendants systematically and fraudulently used the Racketeering Enterprise to disseminate fraudulent and misleading information to the SCPSC, the public and the Class.

135.    Furthermore, there is a substantial nexus between the Enterprise and the RICO Defendants' unlawful predicate acts in furtherance of their Racketeering Enterprise.

136.    As alleged herein throughout this Complaint, the RICO Defendants were well aware that their statements and representations concerning the projected costs and progress of the Nuclear Reactor Project were false and untruthful, and Defendants well knew that the Project could not be completed within the time frames set forth in their nine rate applications to the SCPSC.

137.    The RICO Defendants thus used the Enterprise as part of their scheme to defraud the public and Plaintiff into believing their false statements, and they further used the Enterprise to cover-up the falsity of their public misrepresentations concerning the Nuclear Reactor Project, which Defendants knew at the time could not be completed in the time frame set forth in their nine rate applications to the SCPSC, as described in detail, *supra,* at paragraphs 52 through 82.

138.    Moreover, the RICO Defendants knew that Westinghouse's inability to complete the Nuclear Reactor Project on time and on budget would necessarily lead to substantial increases in construction-related cost but, nevertheless, concealed their knowledge of the actual projected costs and time estimates for completion of the Nuclear Reactor Project from the SCPSC, the public and the Class, as further alleged in paragraphs 76, 86 and 92, *supra*.

139.    As part of their scheme to defraud, the RICO Defendants intended for the Enterprise to disseminate false, misleading, material misrepresentations through the mails and wires that omitted material information concerning the projected costs and completion schedule, as well as the substantial problems that the Project was experiencing. Similarly, Defendants used

the mails and wires in thousands of communications with the Plaintiff, other Class members, the regulators and the public, and the use of the mails and the wires contained numerous material misrepresentations and omissions of material facts, all in furtherance of their fraudulent scheme.

140.    The RICO Defendants intended that these false and misleading communications be disseminated through use of the mails and the wires in furtherance of their scheme to obtain billions of dollars in proceeds and profits therefrom.

141.    The RICO Defendants and the Enterprise transmitted the false and misleading information contained in said communications to the Plaintiff and members of the Class, who relied upon said false and misleading communications when paying their fraudulent inflated utility bills that form the subject matter of the economic injury to Plaintiff directly caused by Defendants' fraudulent scheme and unlawful acts in violation of the civil RICO statute.

142.    In approving SCANA's Base Load Review Applications for the right to bill the Class prior to the completion of the Nuclear Reactor Project, SCPSC relied on the Defendants' false representations and failures to disclose, as set forth in paragraphs through 52 through 82.

143.    In reliance on these misrepresentations by the RICO Defendants, and their intentional failure to disclose material facts, Plaintiff and other Class members made payments without protest of the bills for electric services sent to them, which bills included inflated charges to finance the Nuclear Reactor Project.

144.    The RICO Defendants instilled the fear of economic and personal harm, *inter alia*, the cessation of electricity services to the Class, to extort money from the Class, and these acts of economic extortion constitute racketeering activity. The Class had no choice but to comply with the extortionate demands of the RICO Defendants, in the face of the monopoly power they exercised over the Class within their service area.

145.    The RICO Defendants actively concealed and/or expended time and effort to diminish any reports that were critical of and/or highlighted the inadequacies of their planning and management of the Nuclear Reactor Project.

146.    The Defendants also intended to use the Racketeering Enterprise to conceal the fact that they were promoting their operations and associated conduct of financial transactions through increased proceeds and profits derived from knowingly making false and misleading statement to the SCPSC. The Defendants knew there were serious risks associated with their concealed decisions to derive increased proceeds and profits, rather than telling the truth concerning the progress of the Nuclear Reactor Project, which the Defendants knew they could not complete in the time frame set forth in their nine rate applications to the SCPSC.

**The RICO Predicate Acts**

147.    The RICO Defendants carried out their acts of racketeering by utilizing the mail and interstate wires to further their Nuclear Reactor Project scheme, *inter alia*, by authorizing and mailing bills to Class members for electricity services which included inflated charges to support the Nuclear Reactor Project and by using the financial system and wires of interstate commerce to obtain payments from the Class.

148.    The RICO Defendants gave, disseminated and communicated false and deceptive testimony, reports, and projections to induce the SCPSC to approve the Nuclear Reactor Project, and such conduct constitutes racketeering activity by the RICO Defendants.

149.    The RICO Defendants gave, disseminated and communicated false and deceptive testimony, reports, and Nuclear Reactor Project projections to induce the SCPSC to approve the charges for the Nuclear Reactor Project, thus rendering unlawful the defendants' electricity charges to the Class. SCPSC would not have approved the Nuclear Reactor Project and the various

Base Load Review Applications submitted to the SCPSC had the RICO Defendants told SCPSC the truth.

150.    The Defendants' repeated acts of racketeering, including each monthly electricity bill mailed to Plaintiff and other members of the Class that included charges for the Nuclear Reactor Project, constitute a pattern of unlawful conduct.

151.    For the purpose of devising and carrying out their scheme and artifice to defraud the public, the SCPSC, and the Plaintiff by means of false and fraudulent pretenses, representations and promises, the Defendants did place in an authorized depository for mail, or did deposit or cause to be deposited with private and commercial interstate carriers and knowingly caused to be delivered by the United States postal service, letters, memoranda, and other matters, in violation of 18 U.S.C. § 1341, or aided and abetted in such criminal acts by mailings to Plaintiff and other members of the Class of fraudulently inflated utility bills every month from in or about April 2009 to the present (and continuing), constituting more than one hundred predicate acts in furtherance of Defendants' Racketeering Enterprise.

152.    For the purpose of devising and carrying out their schemes and artifice to defraud Plaintiff by means of false and fraudulent pretenses, representations and promises, the Defendants caused to be transmitted by means of wire communication in interstate commerce, writings, signals and sounds, to wit, interstate electronic mail messages and/or facsimile in violation of 18 U.S.C. § 1343, or aided and abetted in such criminal acts as follows:

    a.    each utility bill wired to Plaintiff and other members of the Class every month from 2009 to the present (and continuing) constituted a predicate act in furtherance of Defendants' Racketeering Enterprise;

    b.    SCANA applied to the SCPSC for a rate increase on or about May 30, 2008 (as detailed in paragraph 52, *supra*), which requested the SCPSC to approve the first rate increase to fund the nuclear project, and to be signed by SCANA's Associate General Counsel, K. Chad Burgess.  Various submissions supporting this rate

application were wired to the SCPSC, such as a letter to the SCPSC electronically filed on April 1, 2008, (Notice of Intent to file Combined Application under the BLRA) and on August 20, 2008 electronically filing the testimony of several witnesses. The rate increase application never once disclosed the truth about the Nuclear Reactor Project, but falsely stated that the Nuclear Reactor Project was necessary to meet the growing needs of its customers for electric power and to support the continued economic development of the state of South Carolina; that the anticipated commercial service date for Unit 2 of the Nuclear Reactor Project would be April 1, 2016; that the anticipated commercial service date for Unit 3 of the Nuclear Reactor Project would be January 1, 2019; that the Nuclear Reactor Project would utilize a Westinghouse AP1000 reactor which represents an advanced nuclear generating design and received nuclear design certification from the NRC on September 13, 2004; that to ensure efficient construction and operation, the Units will be built using standardized designs pre-approved by the NRC and advanced modular construction 2 techniques; that SCE&G has chosen nuclear generating capacity to meet its base load requirements having carefully evaluated the life-cycle costs, reliability, the fuel, and environmental risks of other options; and, would cost approximately $6,313,376,000;

c.  SCANA caused a rate increase application dated May 29, 2009 to be submitted to the SCPSC (as detailed in paragraph 56, *supra*), and to be signed by SCANA's Associate General Counsel, K. Chad Burgess which requested the SCPSC to approve the second rate increase to fund the nuclear project. Various submissions supporting this rate application were wired to the SCPSC, such as a letter to the SCPSC electronically filed on August 28, 2009 which falsely stated and, or materially misled, *inter alia* as follows: that SCE&G agreed with a Regulatory Staff report finding that "the project is being constructed in accordance with the construction schedules and cumulative cost forecasts approved in Commission Order No. 2009-104(4)…" and a proposed order electronically filed on September 23, 2009. This rate increase application never once disclosed the truth about the Nuclear Reactor Project, but falsely stated that the that SCANA had met all current milestones approved by the Commission in Order No. 2009-104A for the project, as adjusted pursuant to the construction schedule contingencies authorized in that order, and that it had completed 28 of the 146 Commission-approved milestones being tracked; and further falsely represented to the SCPSC that construction of the Project was progressing on schedule to meet the Unit 2 & 3 Substantial Completion dates of April 1, 2016 and January 1, 2019 respectively;

d.  SCANA caused a rate increase application dated May 27, 2010 to be submitted to the SCPSC (as detailed in paragraph 58, *supra*), and to be signed by SCANA's Associate General Counsel Burgess which requested the SCPSC to approve the third rate increase to fund the nuclear project. Various submissions supporting this rate application were wired to the SCPSC, such as a letter to the SCPSC electronically filed on August 11, 2010, which falsely stated and, or materially misled, *inter alia* as follows: "SCE&G has carefully reviewed the ORS [South Carolina Office of Regulatory Staff] Report and concurs with the conclusions

41

and adjustments it contains." This rate increase application never once disclosed the truth about the Nuclear Reactor Project, but falsely stated that SCANA had met all current construction milestones approved by the Commission in Order No. 2010-12, as adjusted pursuant to contingencies authorized in Order No. 2009-104(A), and that 48 of the 146 milestones had been completed as of March 31, 2011, and further falsely stated that the Company was on track to complete the Units at the construction cost forecast of $6.3 billion dollars, and that construction of the project was progressing on schedule to meet the Unit 2 & 3 Substantial Completion dates of April 1, 2016 and January 1, 2019;

e.  SCANA caused a rate increase application dated May 27, 2011 to be submitted to the SCPSC (as detailed in paragraph 61, *supra*), and to be signed by SCANA's Associate General Counsel Burgess which requested the SCPSC to approve the fourth rate increase to fund the nuclear project. Various submissions supporting this rate application were wired to the SCPSC, such as a letter to the SCPSC electronically filed on August 30, 2011 which falsely stated and, or materially misled, *inter alia* as follows: "SCE&G has carefully reviewed the ORS Report and concurs with the conclusions and adjustments it contains. Specifically, ORS reports that is has examined SCE&G's actual construction expenditures related to V.C. Summer Nuclear Station Units 2 & 3 (together the "Units") and has determined that as of June 30, 2011, the Company has expended $1,100,237,000 in construction work in progress on the Units, and $436,766,000 of that amount is currently not reflected in rates." This rate increase application never once disclosed the truth about the Nuclear Reactor Project, but falsely stated that that SCANA had met all current construction milestones approved by the SCPSC, that 59 of the 146 milestones had been completed as of March 31, 2011, and that it was "on track to complete the Units at the capital cost forecast of approximately $4.3 billion as approved in Order No. 2011-345;"

f.  SCANA caused a rate increase application dated May 27, 2012 to be submitted to the SCPSC (as detailed in paragraph 64, *supra*), and to be signed by SCANA's Associate General Counsel Burgess which requested the SCPSC to approve the fifth rate increase to fund the nuclear project. Various submissions supporting this rate application were wired to the SCPSC, such as a letter to the SCPSC electronically filed on September 19, 2012 which falsely stated and, or materially misled, *inter alia* as follows: that "[i]n its comments, SCE&G stated that it concurred with ORS's findings and its conclusions as to the capital structure, allocation of additional revenue requirement, rate design and other matters contained in the ORS Report. The purpose of this letter is to confirm that SCE&G is in agreement with ORS's recommendation to adjust the incremental revenue requirement from $56,747,000 to $52,148,913." This rate increase application never once disclosed the truth about the Nuclear Reactor Project, but falsely stated that SCANA had met all current construction milestones approved by the Commission in Order No. 2010-12, as adjusted pursuant to contingencies authorized in Order No. 2009-104(A), that 72 of the 146 milestones had been completed as of March 31, 2012, that "as of March 31, 2012, the Company and its

contractors remain on schedule to complete all required milestones as adjusted pursuant to the milestone schedule contingencies approved by the Commission in Order No. 2009-104(A);"

g. SCANA caused a rate increase application dated May 31, 2013 to be submitted to the SCPSC (as detailed in paragraph 67, *supra*), and to be signed by Associate General Counsel K. Chad Burgess of SCANA which requested the SCPSC to approve the sixth rate increase to fund the nuclear project. Various submissions supporting this rate application were wired to the SCPSC, such as letters to the SCPSC electronically filed with the SCPSC on October 1, 2013, and on October 3, 2013. This rate increase application never once disclosed the truth about the Nuclear Reactor Project, but falsely stated that SCANA had met all current construction milestones approved by the Commission in Order No. 2012-884, as adjusted pursuant to contingencies authorized in Order No. 2009-104(A), that 84 of the 146 milestones had been completed as of March 31, 2013.  SCANA also informed SCPSC that "[t]he current cost estimates include no cost changes apart from changes in timing of costs and minor shifts in costs among cost categories that occur in the normal course of managing the project" and that "[t]he Project Licensing and Permitting, Engineering, Procurement and Construction work remains on schedule to meet the Units' Substantial Completion Dates taking into account the schedule contingencies approved in Order 2009-104(A);"

h. SCANA caused a rate increase application dated May 30, 2014 to be submitted to the SCPSC (as detailed in paragraph 69, *supra*), and to be signed by SCANA's Associate General Counsel Burgess which requested the SCPSC to approve the seventh rate increase to fund the nuclear project. Various submissions supporting this rate application were wired to the SCPSC, such as letters to the SCPSC electronically filed on October 1, 2014 and November 14, 2014. This rate increase application never once disclosed the truth about the Nuclear Reactor Project, but falsely stated that SCANA had met all current construction milestones approved by the Commission in Order No. 2012-884, as adjusted pursuant to contingencies authorized in Order No. 2009-104(A), that 96 of the 146 milestones had been completed as of March 31, 2014;

i. SCANA caused a rate increase application dated May 29, 2015 to be submitted to the SCPSC (as detailed in paragraph 72, *supra*), and to be signed by SCANA's Associate General Counsel Burgess which requested the SCPSC to approve the eighth rate increase to fund the nuclear project. Various submissions supporting this rate application were wired to the SCPSC, such as a letter to the SCPSC electronically filed on August 25, 2015, which falsely stated and, or materially misled, *inter alia* as follows: "SCE&G has carefully reviewed the ORS Report and concurs with the conclusions and adjustments it contains. This rate increase application never once disclosed the truth about the Nuclear Reactor Project, but falsely stated that SCANA had met all current construction milestones approved by the Commission in Order No. 2012-884, as adjusted pursuant to contingencies authorized in Order No. 2009-104(A), and that 105 of the 146 milestones had been

completed as of March 31, 2015;

j.  SCANA caused a rate increase application dated June 27, 2016 to be electronically filed with the SCPSC (as detailed in paragraph 75, *supra*), and to be signed by SCANA's Assistant General Counsel, Matthew W. Gissendanner, which requested the SCPSC to approve the ninth rate increase to fund the nuclear project. This rate increase application never once disclosed the truth about the Nuclear Reactor Project, but falsely stated that SCANA had met all current construction milestones approved by the Commission in Order No. 2015-661, as adjusted pursuant to contingencies authorized in Order No. 2009-104(A), that 110 of the 146 milestones had been completed as of March 31, 2016, and despite having received the Bechtel Report months earlier, SCANA failed to report any of the recommendations and conclusions made by the Bechtel Report to SCPSC. Instead, SCANA informed SCPSC that overall progress continues with approximately 3,700 contractor and subcontractor personnel on site daily, and cash flow forecasts provided by Westinghouse indicated that it should be able to complete constructing the Nuclear Reactor Project for $126 million less than the capital cost approved in Order No. 2015-661.

153.  As alleged *supra* in paragraphs 148-153, the RICO Defendants have engaged in an unlawful 18 U.S.C. § 1961(1) RICO predicate mail and wire fraud scheme. Defendant Marsh has aided and abetted SCANA in committing the RICO predicate acts and engaged in unlawful conduct under violation of 18 U.S.C. § 1962(c). Marsh has been the CEO of SCANA since November 30, 2011, its President and Chief Operating Officer since January 7, 2011 and the Chief Executive Officer of South Carolina Electric & Gas Company since 2011. As such, Defendant Marsh and the other SCANA Individual Defendants have been fully aware of and had full supervisory authority of SCANA's misrepresentations and omissions concerning the Nuclear Reactor Project and knew that the Project could not be completed in the time frame set forth in SCANA's nine rate applications to the SCPSC.

154.  Moreover, Defendant Marsh and the other SCANA Individual Defendants knew that Westinghouse was not able to complete the Nuclear Reactor Project on time and on budget and that such failures would necessarily lead to substantial increases in construction-related costs; nevertheless, he concealed his knowledge of the actual cost and time estimates for completion of

the Nuclear Reactor Project from the SCPSC, the public and the Class, and committed the further

acts of fraud as further alleged in paragraphs 86, 90 and 92-94, *supra*.

### The Pattern of Racketeering Activity

155.    The Defendants' previously alleged RICO predicate acts constituted a pattern of

racketeering activity within the meaning of 18 U.S.C. § 1961(5), in that the predicate acts are

related and continuous. Each predicate act had the same or similar purpose, which was to make

material misrepresentations, omissions and concealments of material fact as part of a scheme to

defraud the public, the Plaintiff and the Class into believing that the Project would be completed

within a reasonable period of time and involve reasonable costs, so that SCANA could

fraudulently obtain billions of dollars in proceeds and profits from its rate-overcharging scheme.

156.    This pattern of racketeering was separate and distinct from the legitimate purpose

of providing the energy needed by Plaintiff and the Class, and the funding, promotion and

operation of the Enterprise alleged herein.

157.    The Defendants were each associated with the Enterprise and did conduct or

participate, directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern

of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)(B) and 1961(5) and 1962(c),

to wit:

a. Multiple instances of mail fraud in violation of 18 U.S.C. § 1341; and,

b. Multiple instances of wire fraud in violation of 18 U.S.C. § 1343.

158.    Plaintiff has sufficiently alleged these predicate acts and pattern of racketeering to

state a claim under 18 U.S.C. § 1962 in paragraphs 52 to 82, and 93 to 116. As a proximate result

of said pattern of racketeering activity and RICO violations engaged in by Defendants, Plaintiff

and the other Class members have suffered economic injury and damages to their business and

property, as well as other economic damages.

### Continuity of The Racketeering Activity

159.    Continuity is demonstrated by the predicate acts alleged above, along with the related predicate acts described below. The pattern of racketeering involved multiple predicate acts that have taken place over many years, thus establishing both relatedness and continuity. These predicate acts illustrate a threat of continued racketeering activity and evince that the predicate acts constitute the regular manner that SCANA conducts business.

### The Related Predicate Acts

160.    SCANA's pattern of committing predicate acts of racketeering satisfies the "continuity" requirement of civil RICO, as demonstrated both by the alleged predicate acts, along with other related predicates including but not limited to each rate application as described in paragraphs 52 through 82, *supra*.

161.    As a direct result of Defendants' unlawful racketeering acts and violation of 18 U.S.C. § 1962(c), Plaintiff has been injured in his business or property and is entitled to recover treble damages and attorneys' fees under 18 U.S.C. § 1964(c).

162.    The actions of the Nuclear Reactor Project Enterprise—specifically the overcharging of the Class for the construction of nuclear reactors they did not need and which could not be constructed for the projected costs and could not meet the construction schedule that Defendants were falsely claiming they could meet -- are separate and apart from the activities for which SCANA and the Individual SCANA Defendants are entitled to lawfully engage.

163.    Based upon their fraudulent scheme and acts of racketeering, including their intentional decision not to publicly disclose the Bechtel Report, the RICO Defendants, during

46

2016, succeeded in obtaining approval from the SCPSC to bill Plaintiff and other members of the Class an additional approximate amount of $850 million relating to the Nuclear Reactor Project.

164.    SCANA would not have received approval to impose these additional charges upon the Class if the Bechtel report had been disclosed to SCPSC.

165.    SCANA officers and employees, including the Individual SCANA Defendants, individually profited from their participation in the Racketeering Enterprise and in the acts of Racketeering by and through, among other things, their receipt of bonuses and increased compensation as alleged above.

166.    Defendants' racketeering activities affected interstate commerce by, among other things, the purchase and funding of products outside of the state of South Carolina, which were then imported into South Carolina.

167.    Defendants' false and misleading representations to, and concealment of material facts from, the SCPSC, which resulted in the fraudulently inflated electric rates and bills received by Plaintiff and other members of the Class, were the proximate cause of injuries to the Class.

168.    The damages suffered by Plaintiff and other Class members is an amount to be established at trial.

## COUNT II

### RICO Conspiracy
### (Against SCANA and the Individual SCANA Defendants)

169.    Plaintiff repeats and realleges the allegations set forth above at paragraphs 1 through 169 as though fully set forth herein.

170.    As set forth in alleged in detail in paragraphs 52 to 123, SCANA and its co-conspirators engaged in a fraudulent scheme to defraud the public, the Plaintiff and the SCPSC

into believing the Nuclear Reactor Project was needed to fulfill the energy needs of the Plaintiff, and the members of the Class consisting of millions of residents and business in the state of South Carolina, and that they would complete the Nuclear Project on budget in the time frame set forth in their nine rate applications to the SCPSC.

171.    At all relevant times, the RICO Defendants were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

172.    At all relevant times, Defendants and the co-conspirators each met the definition of a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(d).

173.    At all relevant times, Defendants controlled the Racketeering Enterprise and engaged in racketeering activities for the purpose of defrauding the Plaintiff.

174.    At all relevant times, the Racketeering Enterprise was engaged in, and its activities affected, interstate commerce, within the meaning of RICO, 18 U.S.C. § 1962(c).

175.    As set forth in Count One, Defendants controlled the Racketeering Enterprise and the Nuclear Reactor Project with significantly overlapping ownership, and the Defendants and their co-conspirators conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. §1961(5), in violation of RICO, 18 U.S.C. § 1962(c).

176.    At all relevant times, Defendants and the co-conspirators each were associated with the enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c), *i.e.*, each agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

177.    Defendants and the other co-conspirators committed and/or caused to be committed a series of overt acts in furtherance of the Conspiracy and to affect the objects thereof,

48

including but not limited to the acts set forth above.

178.    As a result of the Defendants' and their co-conspirators' fraudulent misstatements (upon which the SCPSC, the public, Plaintiff, and the Class detrimentally relied), and the Defendants' other misconduct, Plaintiff was directly and proximately injured in his business or property by the predicate acts engaged in by the Defendants and their co-conspirators.

179.    As a result of Defendants' and the other co-conspirators' violations of 18 U.S.C. § 1962(c), Plaintiff and the Class lost the nearly $1.4 billion that they had "invested" in the fraudulent scheme.

180.    As a result of the RICO Conspiracy, Defendants and their co-conspirators are liable to the Plaintiff and the Class for their losses in an amount to be determined at trial, but no less than $1.4 billion.

181.    Pursuant to RICO, 18 U.S.C. § 1964(c), the Plaintiff and the Class are entitled to recover threefold their damages plus costs and attorneys' fees from the Defendants.

## JURY TRIAL DEMAND

182.    Plaintiff demands a trial by jury of all issues so triable.

WHEREFORE, Plaintiff, on behalf of the Class, respectfully request that judgment be

rendered against the Defendants as follows:

a.      Declaring this action to be a proper class action maintainable pursuant to Rules 23 (b)(1) and 23(b)(3) of the Federal Rules of Civil Procedure; and declaring Plaintiff to be a proper Class representative;

b.      Awarding Plaintiff and the other members of the Class treble the damages suffered as a result of the wrongs complained of herein in Count I of the Complaint, together with interest;

c.      Awarding Plaintiff and other members of the Class treble the damages suffered as a result of the wrongs complained of herein in Count II of the Complaint, together with interest;

d.      Awarding Plaintiff and the members of the Class their cost and expenses of this litigation, including reasonable attorneys' fees, expert fees and other costs and disbursements;

e.      Awarding prejudgment interest, post judgment interest, and costs; and,

f.      Awarding Plaintiff and other members of the Class such other and further relief as may be just and proper.

Dated: January 31, 2018

Speights & Solomons, LLC

By:/s/ A. Gibson Solomons, III
    Daniel A. Speights
    A. Gibson Solomons, III
    100 Oak Street, East
    Post Office Box 685
    Hampton, South Carolina 29924
    (803) 943-4444

Attorneys for Plaintiff

<u>Of counsel pending admission pro hac vice</u>:

Kenneth F. McCallion
McCallion & Associates LLP
100 Park Avenue – 16th floor
New York, New York 10017
(646) 366-0884

Thomas A. Holman
Holman Law, P.C.
99 Park Avenue, Suite 2600
New York, New York 10016
(212) 481-1336