**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**BEAUFORT DIVISION**

| | |
|---|---|
| TIMOTHY GLIBOWSKI, on behalf of himself and all others similarly situated, | |
| Plaintiff, | Case No. 9:18-273-TLW |
| v. | |
| SCANA CORPORATION, SOUTH CAROLINA ELECTRIC & GAS COMPANY, KEVIN MARSH, JIMMY ADDISON, STEPHEN BYRNE, MARTIN PHALEN, MARK CANNON, RUSSELL HARRIS, JEFFREY B. ARCHER, SARENA BURCH, W. KELLER KISSAM, RONALD T. LINDSAY, and JAMES MICALI, | |
| Defendants. | |

**DEFENDANT JEFFREY B. ARCHIE'S MEMORANDUM**
**IN SUPPORT OF MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

AND NOW COMES Defendant Jeffrey B. Archie ("Mr. Archie"), incorrectly designated in the Class Action Complaint ("Complaint") as Jeffrey B. Archer, by and through his undersigned counsel, and files this Memorandum in Support of Motion to Dismiss for Failure to State a Claim:[1]

**INTRODUCTION**

Plaintiff Timothy Glibowski ("Plaintiff") allegedly resides in South Carolina within South Carolina Electric & Gas Company's ("SCE&G")[2] service area.  (*See* Docket Entry # 1 ¶ 10).

---

[1]    Defendant Mr. Archer incorporates by reference, as if set forth herein, any Motions to Dismiss and supporting documents filed by any other party in this case, to the extent not inconsistent with anything stated herein.

[2]    In their Memorandum in Support of Motion to Dismiss, Defendants SCE&G and SCANA Corporation ("SCANA") suggest that Plaintiff may have named SCANA as a Defendant as to certain allegations in this case in error: "SCE&G and SCANA are legally distinct entities and SCE&G is the only entity operating as a public utility in South Carolina. It is SCE&G that obtained approval from the PSC for the Project, oversaw the development of the Project, and charged Plaintiff rates related to the Project." (*See* Docket Entry # 24-1, at 3 n.2).

Plaintiff does not directly allege that he purchased electricity from SCE&G, although he does assert that members of the putative class "purchased electricity from Defendants." (*See id.* ¶ 35). Plaintiff concedes that the South Carolina Public Service Commission ("PSC"), the state agency tasked with approving electricity rates, approved the rates that the putative class paid. (*See id* ¶¶ 54, 56, 59, 62, 65, 67, 70, 73, 76, 77). However, he contends that those rates were "fraudulently inflated" because SCE&G and the other Defendants allegedly made misrepresentations to the PSC. (*See id.* ¶¶ 2, 3, 92, 151, 167). Based on Defendants' alleged advocacy before the PSC for increased electricity rates, Plaintiff seeks treble damages, attorneys' fees, and prejudgment interest under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968. With regard to Mr. Archie, Plaintiffs allege in their Complaint that he is :

> Senior Vice President and Chief Nuclear Officer of SCE&G is also the Senior Vice President of SCANA, and has occupied these positions since at least February 24, 2012. As such, Archer [sic] was on site at VC Summer and knew or should have known of the imminent failure of the project, despite repeated public representations that the project was moving forward on schedule.

(*See id.* ¶ 24). Plaintiffs' Complaint includes two counts against Defendants: (a) Count I for violation of RICO and (b) Count II for RICO conspiracy. For the reasons that follow, Plaintiff's Complaint fails to state a claim under either theory as to Mr. Archie.

## ARGUMENTS

### I.    Standard of Review

Plaintiff's Complaint must set forth "a short and plain statement" showing he is entitled to relief. *See* Fed. R. Civ. P. 8(a)(2). Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955 (2007)). To "show" that the plaintiff is "entitled to relief," the Complaint must provide "more than labels and conclusions"; "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. While FRCP 8 marked "a notable and generous departure from the hyper-technical, code-pleading regime of a prior era," the

change did not "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Ashcroft*, 129 S. Ct. 1950.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id*. at 1949 (*quoting Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. The facts alleged "must be enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, and "must produce an inference of liability strong enough to nudge the plaintiff's claims 'across the line from conceivable to plausible.'" *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 256 (4th Cir. 2009) (*quoting Iqbal*, 129 S. Ct. at 1952). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.'" *Iqbal*, 129 S. Ct. at 1950 (*quoting* Fed. R. Civ. P., Rule 8).

"This basic deficiency should ... be exposed at the point of minimum expenditure of time and money by the parties and the court." *Twombly*, 550 U.S. at 558 (*quoting* 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1216, pp. 235-36 (3d ed. 2005)). In evaluating a motion to dismiss under FRCP 12(b)(6), the court "accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff ...." *Nemet Chevrolet*, 591 F.3d at 255. This rule is "inapplicable to legal conclusions." *Iqbal*, 129 S. Ct. at 1949. Moreover, "elements of a cause of action" and "bare assertions" do not qualify as well pled facts, and the court "need not accept as true unwarranted inferences, unreasonable conclusions or arguments." *See Nemet Chevrolet*, 591 F.3d at 255 (quotation marks and citations omitted). The court may take judicial notice of matters of public record. *See Secretary of State for Defence v. Trimble Navigation Ltd.,* 484 F.3d 700, 705 (4th Cir. 2007).

Under these standards, this Court must undertake a two-pronged approach to determining the sufficiency of Plaintiff's Complaint. First, while accepting as true the factual allegations in Plaintiff's Complaint, the Court must "segregate allegations that are factually supported from those

which are mere legal conclusions or naked assertions and not entitled to a presumption of truth." *In re § 1031 Exchange Litigation*, 716 F.Supp.2d 415, 421 (D.S.C. 2010); *Iqbal*, 129 S. Ct. at 1950. Second, after removing the mere legal conclusions and naked assertions, the Court "must determine whether the remaining factual allegations . . . state a plausible claim for relief, based on 'judicial experience and common sense.'" *Id.* (citation omitted).

Conclusory allegations are insufficient where, as here, the underlying claim is based in fraud. "With regard to both mail fraud and wire fraud claims, Rule 9(b) of the Federal Rules of Civil Procedure requires that allegations of fraud be pleaded with particularity." *Jones v. Ram Medical, Inc.*, 807 F. Supp. 2d 501, 513 (D.S.C. 2011) (Wooten, J.); *accord Strum v. Exxon Co.*, 15 F.3d 327, 331 (4th Cir. 1994). To meet "the heightened pleading standards of [Rule] 9(b)," *Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 776 (4th Cir. 2013), Plaintiff must plead the "who, what, when, where, and how of the alleged fraud." *United States ex. rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008). This includes, "at a minimum describ[ing] the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Id.* (internal quotations omitted). Moreover, the plaintiff must plead with particularity what is false or misleading about a statement. *See Cozzarelli v. Inspire Pharms.*, 549 F.3d 618, 629 (4th Cir. 2008). The purpose of this heightened scrutiny is to "provid[e] notice to a defendant of its alleged misconduct, . . . prevent [] frivolous suits, . . . eliminate[e] fraud actions in which all the facts are learned after discovery, and . . . protect [] defendants from harm to their goodwill and reputation." *See United States ex rel. Nathan v. Takeda Pharm. N. Am., Inc.*, 707 F.3d 451, 456 (4th Cir. 2013) (internal quotation marks omitted).

The Court should consider all allegations in the complaint because Plaintiff "can plead himself out of court by pleading facts that show that he has no legal claim." *Willoughby v. Henrico Cnty.*, 2014 WL 2925332, at *2 (E.D. Va. June 27, 2014) (attached hereto as Ex. A) (*quoting Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011)); *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 193 (D.C. Cir. 2006) (same).

## II.     Count I of the Complaint Fails to State a RICO Claim

RICO creates a civil cause of action for "[a]ny person injured in his business or property by reason of" a RICO offense.  *See* 18 U.S.C. § 1964(c).  RICO created "new criminal offenses" for the activities of "organized criminal groups."  *See RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090, 2096 (2016).  All RICO offenses encompass "racketeering activity," defined to include "dozens of state and federal offenses, known in RICO parlance as predicates."  *See id.* at 2096.  In general, these elements are common to all RICO claims:

> RICO's "prohibited activities" are described in 18 U.S.C.A. § 1962(a)-(d).  Section 1962(a) prohibits a person from investing in an enterprise any income derived from a pattern of racketeering activity; Section 1962(b) prohibits a person from using a pattern of racketeering to acquire or maintain control over an enterprise; Section 1962(c) prohibits a person from conducting the affairs of an enterprise through a pattern of racketeering; and Section 1962(d) makes it unlawful for a person to conspire to violate Sections 1962(a), (b) or (c).
>
> The elements common to all of these RICO violations are (a) "racketeering activity," (b) conducted through a "pattern," (c) affecting an "enterprise," (d) a culpable "person," and (e) an affect on interstate or foreign commerce.

*See* R. Douglas Rees and Jerold S. Solovy, 5 *Bus. & Comm. Litig. in Fed. Cts.* § 69.2 (2003) (footnotes omitted).  "These requirements are designed to prevent RICO's harsh sanctions, such as treble damages, from being applied to garden-variety fraud schemes."  *See Eplus Tech., Inc. v. Aboud*, 313 F.3d 166, 181 (4th Cir. 2002) (citation omitted).

### A.     Plaintiff Fails to Allege that Defendants Engaged in "Racketeering Activity" by Committing Underlying Predicate Acts

RICO defines "racketeering" as criminal conduct in contravention of enumerated statutes. *See* 18 U.S.C. § 1961(1)  Plaintiff alleges that Defendants committed mail and wire fraud.  The elements of mail fraud under 18 U.S.C. § 1341 are "(1) the existence of a scheme to defraud, and (2) the mailing of a letter, etc., for the purposes of executing the scheme."  *See United States v. Vinyard*, 266 F.3d 320, 326 (4th Cir. 2001) (quotation omitted).  Similarly, "[t]he essential elements of a wire fraud offense are '(1) the existence of a scheme to defraud and (2) the use of ... a wire communication in furtherance of the scheme.'"  *United States v. Jefferson*, 674 F.3d 332, 366 (4th Cir. 2012), as amended (Mar. 29, 2012) (*quoting United States v. Curry*, 461 F.3d 452,

457 (4th Cir. 2006)).  In order to establish a scheme to defraud, Plaintiff must prove that Defendant Mr. Archie acted with the specific intent to defraud.  *See United States v. Godwin*, 272 F.3d 659, 666 (4th Cir. 2001).   In a RICO action, the mailings or wirings "do not have to contain the misrepresentations that defrauded the plaintiff, but must merely be in furtherance of the fraudulent, material misrepresentation upon which the plaintiff justifiably relies to his or her detriment."  *See Day v. DB Capital Grp., LLC*, 2011 WL 887554, at *10 (D. Md. Mar. 11, 2011) (attached hereto as Ex. B) (*citing Chisolm v. TranSouth Fin. Corp.*, 95 F.3d 331, 337 (4th Cir. 1996)).

The Supreme Court has held that "materiality of falsehood" is also an element of mail and wire fraud.  *See Neder v. United States*, 527 U.S. 1, 25 (1999); *accord BMW of North America, Inc. v. Gore*, 517 U.S. 559, 579 (1996) ("[A]ctionable fraud requires a *material* misrepresentation or omission."); *United States v. Wynn*, 684 F.3d 473, 478 (4th Cir. 2012) ("[T]he mail fraud and wire fraud statutes have as an element the specific intent to deprive one of something of value through a misrepresentation or other dishonest method.").  Plaintiff must plead some underlying falsehood to which the mailing or wire is related.  *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647-49 (2008).  Without allegations of false representations, there can be no mail or wire fraud.  *United States v. Mallory*, 2012 WL 149797, at *5 (4th Cir. Jan. 19, 2012) (attached hereto as Ex. C) (affirming conviction of mail fraud due to  the "evidence of Mallory's knowledge of the falsity of the [relevant] documents").

If Plaintiff fails to specifically allege Mr. Archie committed one of those predicate acts of racketeering, his RICO claim cannot withstand a motion to dismiss.  *See Bast v. Cohen, Dunn & Sinclair*, P.C., 59 F.3d 492, 495 (4th Cir. 1995) ("Bast makes no allegation of racketeering activity.").  Plaintiff generically alleges that "Defendants" committed mail (18 U.S.C. § 1341) and wire (18 U.S.C. § 1341) fraud by utilizing the mail and interstate wires: (1) to convey false information to the South Carolina Public Services Commission to obtain approvals; and (2) to send inflated bills:

> 147. The RICO Defendants carried out their acts of racketeering by utilizing the
> mail and interstate wires to further their Nuclear Reactor Project scheme, inter alia,

by authorizing and mailing bills to Class members for electricity services which included inflated charges to support the Nuclear Reactor Project and by using the financial system and wires of interstate commerce to obtain payments from the Class.

148. The RICO Defendants gave, disseminated and communicated false and deceptive testimony, reports, and projections to induce the SCPSC to approve the Nuclear Reactor Project and such conduct constitutes racketeering activity by the RICO Defendants.

149. The RICO Defendants gave, disseminated and communicated false and deceptive testimony, reports, and Nuclear Reactor Project projections to induce the SCPSC to approve the charges for the Nuclear Reactor Project, thus rendering unlawful the defendants' electricity charges to the Class. SCPSC would not have approved the Nuclear Reactor Project and the various

(*See* Docket Entry # 1 ¶¶147-49; *accord* ¶¶ 150-152, 157)).  For the following reasons, Plaintiff's Complaint fails to properly allege racketeering predicate act as to Defendant Mr. Archie.

### 1. Plaintiff Does Not Allege Racketeering Activities by Defendant Mr. Archie

Plaintiff fails to plead with particularity what false statements Mr. Archie made or what "racketeering" activities that he engaged in.  Because his claims focus upon allegations of fraud, Rule 9(b) requires that Plaintiff allege "'the time, place, and contents of the false representations, *as well as the identity of the person making the misrepresentation and what he obtained thereby*.'" *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) (emphasis added) (*quoting 5* Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure: Civil* § 1297, at 590 (2d ed. 1990)).  Under this standard, Plaintiff cannot generically state that "Defendants" engaged in wrongful conduct without stating what each Defendant allegedly did to violate RICO.  "In the Fourth Circuit and elsewhere, courts have interpreted *Twombly* and *Iqbal* to mean that generic or general allegations about the conduct of 'defendants,' without more, fail to state a claim." *Marcantonio v. Dudzinski*, 155 F. Supp. 3d 619, 626 (W.D. Va. 2015) (noting that the complaint in that case "does supplement its generic or ambiguous references with several specific allegations against Defendants by name.").  Many courts have precluded parties from lumping all "Defendants" together as Plaintiff has done.  *See Schlossberg v. Madeoy (In re*

*Madeoy)*, 576 B.R. 484, 500 (Bankr. D. Md. 2017) ("Count 4 lumps all the defendants together and neither the court nor the Defendants can identify which Defendant made what misrepresentation."); *Davis v. Bowens*, 2012 WL 2999766, at *3 (M.D.N.C. July 23, 2012), *report and recommendation adopted,* 2012 WL 4462184 (M.D.N.C. Sept. 25, 2012) (attached hereto as Exs. D & E) ("Plaintiff frames all allegations in terms of actions taken by the 'Debt Collector Defendants' without distinguishing between Wells Fargo, Aurora, or Rogers Townsend & Thomas. . . . This approach renders this claim legally deficient."); *Bentley v. Bank of Am., N.A.*, 773 F. Supp. 2d 1367, 1374-75 (S.D. Fla. 2011) (dismissing claim "for improperly lumping together [defendants] such that [they] do not have fair notice of the precise nature of the violation that is claimed against them"); *Maid to Perfection Glob., Inc. v. Ensor*, 2010 WL 1254194, at *3 (D. Md. Mar. 29, 2010) (attached hereto as Ex. F) ("Plaintiff's Complaint does not specifically allege which of the Defendants made false representations but instead improperly claims fraud as to all Defendants generally. Thus, Plaintiff has not met the heightened pleading requirements for fraud cases."); *Classen Immunotherapies, Inc. v. Biogen IDEC*, 381 F. Supp. 2d 452, 455 (D. Md. 2005) ("Classen's general allegation fails to delineate the particular acts of infringement attributable to each Defendant; thus it does not provide facts sufficient to inform Chiron of the basis for Classen's claims.").

Plaintiff's Complaint does not state with any specificity what *Mr. Archie* did in violation of mail or wire fraud statutes. In fact, the Complaint only *twice* references Defendant Mr. Archie by name: (a) in an introductory paragraph identifying him as a Defendant; and (b) lumping him together with several co-Defendants as one of the "Individual SCANA Defendants." (*See* Docket Entry # 1 ¶¶ 24 & 29). Plaintiff never specifically states what Mr. Archie did to violate the law, as opposed to any other Defendant. Plaintiff's Complaint is deficient in this regard and fails to state a claim upon which relief may be granted. Plaintiff clearly fails to state a claim as to Mr. Archie because he does not allege specific conduct attributable to him. Therefore, this Court should dismiss Plaintiff's Complaint with prejudice.

2.     **Plaintiff Does Not Allege Racketeering Activities as to "Defendants"**

For the following reasons (even considering Plaintiff's vague, conclusory allegations against "Defendants), Plaintiff has not alleged racketeering activities relating to either: (a) misstatements to the PSC; and (b) the sending of fraudulently inflated electricity bills.

a.     **Communications to South Carolina Public Service Commission**

As to statements to the PSC, Plaintiff's Complaint lists numerous statements "Defendants" allegedly made to the PSC; however, virtually all of those statements were non-controversial, correct at the time or projections of future expectations:

- the Nuclear Reactor Project was necessary to meet the growing needs of its customers for electric power and to support the continued economic development of the state of South Carolina;

- the *anticipated* commercial service date for Unit 2 of the Nuclear Reactor Project would be April 1, 2016;

- the *anticipated* commercial service date for Unit 3 of the Nuclear Reactor Project would be January 1, 2019;

- that the Nuclear Reactor Project would utilize a Westinghouse AP1000 reactor which represents an advanced nuclear generating design and received nuclear design certification from the NRC on September 13, 2004;

- [t]o ensure efficient construction and operation, the Units will be built using standardized designs pre-approved by the NRC and advanced modular construction 2 techniques;

- SCE&G has chosen nuclear generating capacity to meet its base load requirements having carefully evaluated the life-cycle costs, reliability, the fuel, and environmental risks of other options; and

- that the Nuclear Reactor Project would cost *approximately* $6,313,376,000.

(*See* Docket Entry # 1 ¶ 52, 92). None of the alleged false statements, even if attributed to Mr. Archie, can support Plaintiff's RICO claims.

Many of these statements estimate or project future events and, as a result, are not fraudulent statements under RICO. *See Raab v. General Physics Corp.*, 4 F.3d 286, 290 (4th Cir. 1993) ("'[P]rojections of future performance not worded as guarantees are generally not actionable

under the federal securities laws.'") (*quoting Krim v. Banctexas Group, Inc.*, 989 F.2d 1435, 1446 (5th Cir. 1993)); *accord Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 117 (2d Cir. 1982) (stating that "[e]conomic prognostication, though faulty" was not fraud"). Mere predictions or prognostications regarding future events cannot support Plaintiff's RICO claims.

As to other statements, Plaintiff does not plead facts to support why the statements were false, as required by Rule 9(b). *Cozzarelli*, 549 F.3d at 629; *see also Breunig v. Town of Atlantic Beach*, 2010 WL 1433429, at *1 (D.S.C. April 8, 2010) (attached hereto as Ex. G) (Wooten, J.) ("[R]ecitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice"). For example, Plaintiff never contends that, in 2008, the Nuclear Reactor Project was *not* necessary to meet electricity demand. Nor does Plaintiff allege facts showing that, in 2008, the predicted completion dates of 2016 and 2019 were unrealistic. Moreover, Plaintiff concedes that "the Westinghouse AP1000 reactor had received design certification in 2004." (*See* Docket Entry # 1 ¶ 93). Plaintiff does allege that "the details of what bolts needed to be installed" had yet to be determined, along with "where electrical wires would run" and potentially "how pipes would be configured." (*Id.*). This does not contradict Defendants' alleged statements that they would use "standardized designs" and "advanced modular construction 2 techniques." (*See* Docket Entry # 1 ¶ 92). These statements were true when made, as the PSC concluded, and they remain true. *See generally, In re Combined Application of SCE&G*, Docket No. 2008-196-E − Order No. 2009-104(A) ("PSC Order Granting Combined Application") (PSC March 2, 2009).

The last set of allegedly false statements relate to the status of construction work. For example, Plaintiff relies on 2011 estimates by Defendant SCANA that its engineering and construction work remained on schedule. (*See* Docket Entry # 1 ¶ 61). Similarly, Plaintiff challenges as false various statements by Defendant SCANA that it completed certain milestones. (*See* Docket Entry # 1 ¶¶ 55, 58, 60, 63, 64, 66, 68, 71, 74). Plaintiff does not contest the accuracy of these statements. Plaintiff does not allege any facts suggesting that, in 2011, Defendants knew the project had fallen off schedule or that Defendants inaccurately recounted the number or nature of completed milestones. Plaintiff's allegations in this respect fall short of pleading "why the

statements that they cite . . . were false or misleading." *See Cozzarelli*, 549 F.3d at 629.

Plaintiff also tries to claim that Defendants should have disclosed more information to the PSC regarding the Project. However, claims of improper omission are exceedingly narrow. Fraudulent concealment only exists where a defendant engages in "active concealment" that creates "a false impression or representation" of material information. *See United States v. Colton*, 231 F.3d 890, 899 (4th Cir. 2000). Plaintiff does not allege, with any specificity (let alone what Rule 9(b) requires), that Defendants failed to disclose information that they were obligated to disclose. Plaintiff fails to allege *what* false impression or representation was made by any alleged concealment and *why* the impression or representation was false. These failures independently bar Plaintiff's omission claim.

Because Plaintiff fails to plead falsity — a crucial element of mail and wire fraud — the RICO claims should be dismissed. *See Gibson v. Confie Ins. Grp. Holdins, Inc.*, 2017 WL 2936219, at *10 (D.S.C. July 10, 2017) (attached hereto as Ex. H) (holding that an alternate basis for dismissing the plaintiff's RICO claim was failure to plead "why the representations were false as required by Rule 9(b)"); *Hedley v. ABHE & Svodoba, Inc.*, 2015 WL 4626880, at *4 (D. Md. July 31, 2015) (attached hereto as Ex. I) (dismissing complaint where plaintiff asserts that documents constituted false claims but "provide[s] no facts to support such a concluso[ry] statement" and "never explain[s] how or why the[] documents are false"); *McLain v. KBR, Inc.*, 2014 WL 3101818, at *4 (E.D. Va. July 7, 2014) (attached hereto as Ex. J) (dismissing claims under Rule 9(b) because the complaint did not identify false claims with particularity).

### b.    Mailing of Bills

As to claims relating to mailings or wires of bills to SCE&G customers, Plaintiff does not allege that Mr. Archie personally violated federal mail or wire fraud statutes by sending any bills. To the contrary, Plaintiff only alleges that SCE&G or SCANA did so.

Furthermore, Plaintiff overlooks that the PSC *approved* the rates he now challenges. While Plaintiff concedes that the PSC approved rates on utility bills, he contends that SCE&G or SCANA

- 11 -

should have informed Plaintiff of *a different* rate. This would have violated South Carolina law, which permits utilities only to charge approved rates. *See* S.C. Code Ann. § 58-27-830 ("No electrical utility shall directly or indirectly . . . charge, demand, collect or receive from any person . . . a greater or less compensation for any electric current or service . . . than that prescribed in the schedules of such electrical utility."). In other words, Plaintiff cannot allege that Defendants could or should have sent bills containing any rates other than what the PSC approved. Plaintiff has not pleaded actionable mail or wire fraud that could constitute a RICO predicate act.

### B.   Plaintiff Fails to Allege a "Pattern" of Racketeering Activity by Mr. Archie

Even if Plaintiff successfully pleaded a predicate act, his RICO claims fail because he does not allege a "pattern" of such activity. A "pattern of racketeering activity" requires "at least two acts of racketeering activity." *See* 18 U.S.C. § 1961(5). Although pleading two or more predicate acts is necessary, *merely showing two acts is not sufficient. See Al-Abood v. El Shamari*, 217 F.3d 225, 238 (4th Cir. 2000). Plaintiff must also show that the predicate "acts are related *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bel Telephone Co.*, 492 U.S. 229, 239 (1989) (emphasis in original).

> Continuity refers "either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id*. at 241, 109 S. Ct. 2893. Closed-ended continuity may be established by a "series of related predicates extending over a substantial period of time." *Id*. at 242, 109 S. Ct. 2893. "Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." *Id*. Open-ended continuity may be established where, for example, the "related predicates themselves involve a distinct threat of long-term racketeering activity," or where the predicate acts "are part of an ongoing entity's regular way of doing business ... or of conducting or participating in an ongoing and legitimate RICO enterprise." *Id*. at 242–43, 109 S. Ct. 2893. We are "cautious about basing a RICO claim on predicate acts of mail and wire fraud because it will be the unusual fraud that does not enlist the mails and wires in its service at least twice." [Citation omitted.] RICO liability is reserved for "ongoing unlawful activities whose scope and persistence pose a special threat to social well-being." [Citation omitted.]

*See GE Inv. Private Placement Partners II v. Parker*, 247 F.3d 543, 549 (4th Cir. 2001).

Conduct designed to bring about a singular goal cannot be a "pattern" of racketeering

activity. *See Dtex, LLC v. BBVA Bancomer, S.A.*, 405 F. Supp. 2d 639, 650 (D.S.C. 2005) ("The Fourth Circuit has consistently held that RICO's pattern requirement is not satisfied where , as here, the alleged scheme is narrowly focused on one goal and will end when and if that goal is accomplished"); *accord Register v. Cameron & Barkley Co.*, 467 F. Supp. 2d 519, 535 (D.S.C. 2006) ("This case presents, as Plaintiffs themselves describe it, an alleged scheme for the single goal of defrauding Plaintiffs of the value of the CSI stock during the merger and spinoff of the C & B ESOP."). It is not enough that the Defendants tried to achieve that goal through *multiple steps. See Flip Mortg. Corp. v. McElhone*, 841 F.2d 531, 538 (4th Cir. 1988) (finding no pattern even though conduct took place over seven years); *Foster v. Wintergreen Real Estate Co.*, 2010 WL 325959, at *4 (4th Cir. Jan. 29, 2010) (attached hereto as Ex. K) (affirming dismissal "[a]lthough Plaintiffs allege multiple instances of mail and wire fraud over the course of an arguably substantial period of time").

Where RICO claims are premised on mail or wire fraud, courts employ a higher degree of scrutiny to ensure that RICO's severe consequences are not imposed for "ordinary or garden-variety fraud." *Al-Abood*, 217 F.3d at 238; *see also Menasco v. Wasserman*, 886 F.2d 681, 685 (4th Cir. 1989) (purpose of pattern requirement is to "prevent . . . ordinary commercial fraud from being transformed into a federal RICO claim."). "The heightened civil and criminal penalties of RICO are reserved for schemes whose scope and persistence set them above the routine." *HMK Corp. v. Walsey*, 828 F.2d 1071, 1074 (4th Cir. 1987). "[I]t will be the unusual fraud that does not enlist the mail and wires in its service at least twice." *GE Inv.*, 247 F.3d at 549.

Plaintiff's theory is that Defendants (apparently including Mr. Archie) used mail and wires to convince PSC to approve the Nuclear Project and allow SCE&G to charge increased rates. (*See* Docket Entry # 1 ¶¶ 77, 96). Plaintiffs allege that Defendants intended the purported predicate acts to accomplish *a single goal*: obtaining PSC approval for higher rates.

In *GE Investment*, the court held that an alleged scheme "to defraud potential investors and . . . mislead[] them into believing that [the company] . . . was a thriving, financially successful business" was insufficient to establish continuity. 247 F.3d at 549. Rather, the statements were,

at most, part of a scheme "involving fraud related to the sale of a single enterprise"; such one-off objectives "do not constitute, or sufficiently threaten, the long-term criminal conduct that RICO was intended to address." *Id.* at 549-51 ("Defendants' conduct does not fall 'sufficiently outside the heartland of fraud cases to warrant RICO treatment.'").

Plaintiff's alleges that "Defendants" took numerous steps to mislead the PSC into believing that the Project could be completed at the cost and on the schedule presented. However, all of this alleged misconduct was directed toward *a single goal*: approval of the Project and the recoupment of SCANA's costs. This is not sufficient to allege a "pattern" of racketeering activity. Plaintiff fails to allege that Mr. Archie engaged in "ongoing unlawful activities whose scope and persistence pose a special threat to social well-being"; as a result, he has not alleged a RICO "pattern." *See Al-Abood*, 217 F.3d at 238 (*quoting Wasserman*, 886 F.2d at 684).

### C.    Plaintiff Fails to Allege an "Enterprise"

Even if Plaintiff alleges a "pattern" of racketeering activity, his Complaint does not pass muster because he does not allege an "enterprise":

> "[T]o establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161, 121 S. Ct. 2087, 150 L.Ed.2d 198 (2001). There must be a "person," alleged to have violated Section 1962(c) and to be liable to the claimant for damages, who is separate and distinct from the "enterprise," or tool, through which the RICO violation occurred. *See Busby*, 896 F.2d at 840–41. A "person" can be an individual or corporate entity. 18 U.S.C. § 1961(3). There may be multiple persons whose association with the same RICO enterprise gives rise to multiple violations of Section 1962(c). "Enterprise," as set forth in 18 U.S.C. § 1961(4), "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." A RICO enterprise is characterized by " 'continuity, unity, shared purpose and identifiable structure.'" *United States v. Fiel*, 35 F.3d 997, 1003 (4th Cir. 1994) (citation omitted).

*See Chambers v. King Buick GMC, LLC,* 43 F. Supp. 3d 575, 588–89 (D. Md. 2014). An "enterprise" under RICO requires: "(1) an ongoing organization; (2) associates functioning as a continuing unit; and (3) that the enterprise is an entity separate and apart from the pattern of activity

in which it engages." *Gibson*, 2017 WL 2936219, at *8; *United States v. Tillett*, 763 F.2d 628, (4th Cir. 1985) (enterprise exists "separate and apart from the pattern of racketeering in which it was engaged at any particular moment."); *accord Dickerson v. TLC Lasik Centers*, 2011 WL 382443, at *7 (D.S.C. Feb. 3, 2011) (attached hereto as Ex. L) ("The enterprise is not defined by the pattern of racketeering activity . . . ."). Stated otherwise, the enterprise must have a "degree of structure, continuity, and an existence distinct from the pattern of racketeering activity." *Tri-County Elec. Co., Inc. v. Dean*, 1994 WL 653489, at *3 (N.D. W. Va. Sept. 23, 1994) (attached hereto as Ex. M) (holding that "by defining these associated-in-fact enterprises as the racketeering activity, plaintiffs have necessarily failed to state a [RICO] claim"). The Supreme Court has clarified that an "'enterprise' is not 'the pattern of racketeering activity.'" *See United States v. Turkette*, 452 U.S. 576, 583 (1981).

Plaintiff alleges that " the Nuclear Reactor Project[3] constituted an association-in-fact enterprise . . . within the meaning of 18 U.S.C.A. § 1961(4), and said enterprise engaged in activities which have an impact on interstate commerce." (*See* Docket Entry # 1 ¶ 125). To allege a RICO claim, this "enterprise" must be *distinct from the "pattern"* of racketeering activity. Plaintiff avers that the purpose of the Nuclear Reactor Project Enterprise was to charge SCE&G's customers for construction of the two nuclear reactor units at V.C. Summer Station while making misrepresentations to the PSC and the public "to hide the true projected cost to complete the Project and that the completion schedule projected by the Defendants was false and unrealistic." (*See* Docket Entry # 1 ¶ 95; *accord id.* ¶ 130 ("purpose of the Defendants' fraudulent scheme . . . was to fraudulently obtain billions of dollars in proceeds and profits from their utility customers while misrepresenting and concealing that Defendants knew that the cost and time estimates for completion of the Nuclear Project . . . were intentionally false")). This is the same as the "pattern" Plaintiff alleges. Plaintiff does not allege that the Nuclear Reactor Project Enterprise existed for

---

[3]    The Complaint defines "Nuclear Reactor Project" as "the construction, and completion of two new 1,1l7-megawatt nuclear reactors at the V.C. Summer Generating Station." (*See* Docket Entry # 1 ¶ 15).

any purpose other than to execute on the underlying fraud of enriching Defendants by "bill[ing] customers in advance" for the Project. *Id.* ¶ 110; *see also id.* ¶¶ 30, 47, 52 (alleging SCANA lobbied for passage of BLRA to "bill ratepayers for the cost" and made "several false and misleading statements" to the PSC in Base Load Application for approval of Project).[4]  RICO requires more.  By alleging that the Nuclear Reactor Project Enterprise was solely focused on the alleged fraud, Plaintiff, in effect, "plead[ed] himself out of court by pleading facts that show that he has no legal claim." *See Atkins*, 631 F.3d at 832; *Trudeau*, 456 F.3d at 193.

The racketeering "pattern" is the same as the alleged Nuclear Reactor Project Enterprise, in that both consist of (1) communicating false and deceptive testimony and reports to the PSC to gain approval for the Project and the increased rates related to the Project, and (2) using the mail and interstate wires to mail bills containing charges to support the Project.  (*See* Docket Entry # 1 ¶¶ 147-49).  Because the racketeering activity that Plaintiff alleges consists of conduct that "is the same as that activity alleged to be the indicia of the" Nuclear Reactor Enterprise, Plaintiff fails to state a RICO claim. *See Spelman v. Bayer Corp.*, 2011 WL 4966298, at *4 (D.S.C. Oct. 19, 2011) (attached hereto as Ex. N) (dismissing RICO claim where enterprise — "created for the common purpose of gaining revenue from marketing Bayer products regardless of whether the claims made about those products are true" — was indistinct from alleged racketeering activity of marketing Bayer products"); *Tffi Corp. v. Williams*, 2016 WL 470865, at *10 (D. Md. Feb. 8, 2016) (attached hereto as Ex. O) (dismissing RICO claim because "record does not show that the enterprise existed for any purpose other than to execute the underlying fraud").

---

[4]    Plaintiff makes the conclusory allegation that the "Racketeering Enterprise's activities . . . have existed separate and apart from the racketeering activity" (Docket Entry # 1 ¶ 129), but does not offer any facts supporting this allegation.  Plaintiff claims that the enterprise's "lawful purpose" was to "serve as the utility responsible for the provision . . . of natural gas and electricity." *Id.* The utility responsible for providing natural gas and electricity to Plaintiff is SCE&G, not the Project.  Plaintiff alleges that the Project's conduct and purpose was to obtain approval to charge increased rates related to construction of nuclear reactor units which could never be constructed in accordance with the projected schedule and costs.  (*See* Docket Entry # 1 ¶¶ 125, 133, 134).

### D.    Plaintiff Fails to Allege that Mr. Archie Participated in Operation or Management of the Enterprise

Plaintiff fails to make any allegations connecting Mr. Archie to participation in the "operation or management" of the alleged enterprise. *See Reves v. Ernst & Young*, 507 U.S. 170 (1993) ("[W]e hold that 'to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs,' § 1962(c), one must participate in the operation or management of the enterprise itself."). "*[S]ome* part in directing the enterprise's affairs is required." *See id.* at 179 (emphasis in original).  "Mere participation in the activities of the enterprise is insufficient; the defendant must participate in the operation or management of the enterprise." *See Thomas v. Ross & Hardies*, 9 F. Supp. 2d 547, 554 (D. Md. 1998).  "Many courts have granted motions to dismiss" for failure to meet this requirement. *See Holland v. Cole Nat. Corp.*, 2005 WL 1242349, at *12 (W.D. Va. May 24, 2005), *report and recommendation adopted*, 2005 WL 1799540 (W.D. Va. July 28, 2005) (attached hereto as Exs. P & Q).

Plaintiff's only reference to the operation or management of the enterprise is the inclusion of the question in a list of alleged common legal questions.  (*See* Docket Entry # 1 ¶ 40 ("[W]hether SCANA, and the Individual SCANA Defendants have conducted or participated directly or indirectly, in a pattern of unlawful conduct in the operation, management or conduct of an enterprise in violation of 18 U.S.C. § 1962(c).").  Plaintiff only offers vague, insufficient conclusory allegations that Defendants participated in the enterprise.  (*See* Docket Entry # 1 ¶ 1).

In fact, Plaintiff does not even include Mr. Archie in the definition of "RICO Defendants," whom he accuses of " participation in an unlawful Racketeering Enterprise in violation of" RICO. (*See* Docket Entry # 1 ¶ 1).  Rather, Plaintiff merely alleges that that Mr. Archie was Senior Vice President and Chief Nuclear Officer of SCE&G and also Senior Vice President of SCANA, was on site at the nuclear construction location, and "knew or should have known of the imminent failure of the project."  (*See* Docket Entry # 1 ¶ 24).  Plaintiff's claims against Mr. Archie should be dismissed out of hand as there is no allegation that he was involved in the operation or management of the Nuclear Project Enterprise.

**E.** **Plaintiff's Alleged Injury Does Not Flow Directly from Any Alleged Predicate Act**

Plaintiff's RICO claim also fails because he does not allege an injury **directly** resulting from Mr. Archie's alleged racketeering. A RICO plaintiff "only has standing if, and can only recover to the extent that, he has been injured in his business or property by [reason of] the conduct constituting the violation." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). To satisfy RICO's stringent standing requirement, Plaintiff must plead a "*direct* relation between the injury asserted and the injurious conduct alleged." *See Holmes v. Secs. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992) ("indirect" link is insufficient) (emphasis added); *accord Walters v. McMahen*, 684 F.3d 45, 444 (4th Cir. 2012) (dismissing RICO claim where claimed injury was not "directly linked" to predicate act). Plaintiff must allege "some direct relation between the injury asserted and injurious conduct alleged. A link that is too remote, purely contingent, or indirect is insufficient." *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 9 (2010) (internal quotations and citations omitted). "[W]hile a RICO plaintiff and defendant may have a *direct* and not a *derivative* relationship, the causal link between the injury and the conduct may still be too weak to constitute proximate cause—because it is insubstantial, unforeseeable, speculative, or illogical, or because of intervening causes." *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 614 (6th Cir. 2004).

The sole specific injury Plaintiff alleges is an "economic injury" in the form of paying "fraudulent[ly] inflated utility bills." (*See* Docket Entry # 1 ¶ 141). The only alleged wrongdoing or fraud associated with the allegedly "inflated utility bills" is the making of allegedly false statements to the PSC to obtain rate approval. (*Id.* ¶¶ 30, 52–77 (alleging that each rate increase was based on misrepresentations to the PSC)). Indeed, Plaintiff contends that Defendants made representations "to Plaintiff and other customers *by and through their filings with the []PSC.*" (*See id.* ¶ 92 (emphasis added); *see also id.* ¶¶ 52-77). Because rate setting is fundamentally the PSC's decision, not the decision of any Defendant (particularly not Mr. Archie), Plaintiff's increased rates were not the *direct* result of *Defendants'* acts.

The "inflated" rates Plaintiff paid are the *direct* result of the PSC's decision-making as the

authority charged with regulating electrical power rates.  Even if the filed rate doctrine (discussed below) does not independently bar the claim, the PSC's decision to approve the rates and expressly require SCE&G to charge those rates, breaks any possible *direct* causal link between any alleged fraud and any harm.  *See Hemi Grp, LLC v. City of New York*, 559 U.S. 1, 11 (2010) (defendant's actions were not "direct" cause of harm where plaintiff's theory of liability "rest[ed] not just on separate *actions*, but separate actions carried out by separate *parties*"); *Walters*, 684 F.3d at 444 (injury was indirect when predicate act was "fundamentally [a] crime[] against the government of the United States" and not plaintiff); *Kimberlin v. Nat'l Bloggers Club*, 2015 WL 1242763, at *13 (D. Md. Mar. 17, 2015) (attached hereto as Ex. R) (holding that injuries "are far too attenuated to support his RICO claim" because "the direct victims" of predicate acts were individuals who "could pursue their own remedies under the law").  Where, as here, a government entity makes the final decision, there is no direct causal link between Defendants' acts and the alleged injury.  *See Marina Point Dev. Assocs. v. United States*, 364 F. Supp. 2d 1144, 1148 (C.D. Cal. 2005) ("It was governmental actions — specifically those of the Army Corps of Engineers — that directly injured Plaintiff, thus breaking the causal link between Steers's alleged actions and Plaintiff's alleged injury.").

This Court has held that plaintiffs do not suffer direct harm from alleged false or misleading information provided to a rate-setting bureau.  *See Lifschultz*, 805 F. Supp. at 1292-93.  There, Lifschultz alleged that competitors presented false or misleading information so that the Interstate Commerce Commission ("ICC") would set trucking rates that were above operating costs.  *Id.* at 1281-82.  Lifschultz asserted a RICO claim, claiming that this conduct forced him out of business.  *Id.* at 1291.  The court granted defendant summary judgment based, alternatively, on the fact that Lifschultz could not satisfy the RICO proximate cause requirement because "[t]he alleged predicate acts were all directed at third parties," *i.e.,* the rate bureau and ICC.  Lifschultz's harm was "contingent on how the rate bureaus and the ICC acted based on the alleged predicate acts."  *Id.*  Similarly, the predicate acts allegedly injuring Plaintiff were directed at third party PSC; Plaintiff's injury was "contingent on how the [PSC] . . . acted based on the alleged predicate acts."

*Id.* Because Plaintiff alleges no **direct** link between the alleged predicate acts and Plaintiff's injury, Plaintiff lacks RICO standing, and the Court should dismiss his RICO claim.

### III.     Count II of the Complaint Fails to State a RICO Conspiracy Claim

#### A.     There Is No Underlying Violation of RICO

To state a claim for RICO conspiracy pursuant to § 1962(d), Plaintiff "must allege that there was (1) an agreement to further or facilitate (2) an act that is independently wrongful under RICO." *Myers v. Lee*, 2010 WL 3745632, at *6 (E.D. Va. Sept. 21, 2010) (attached hereto as Ex. S) (*citing Beck v. Prupis*, 529 U.S. 494, 505 (2000)); *accord United States v. Abed*, 2000 WL 14190, at *10 (4th Cir. Jan. 10, 2000) (attached hereto as Ex. T) ("To prove a RICO conspiracy the [plaintiff] must establish (1) that two or more people agreed to commit a substantive RICO offense and (2) that the defendant knew of and agreed to the overall objective of the RICO offense."). As discussed above (and in the Motions to Dismiss that other Defendants have filed in this case), Plaintiff does not adequately allege an underlying RICO claim. As a result, Plaintiff's RICO *conspiracy* claim fails as a matter of law. *See GE Inv. Private Placement Partners II*, 247 F.3d at 551 ("Because the pleadings do not state a substantive RICO claim under § 1962(c), Plaintiffs' RICO conspiracy claim fails as well.").

#### B.     Any Alleged RICO Conspiracy Is Barred by the Intracorporate Conspiracy Doctrine

Plaintiff's RICO conspiracy claim also fails because Plaintiff does not allege facts supporting the assertion that any of the defendants "knew of and agreed to" the alleged objective of the RICO offense. *Abed*, 203 F.3d at *10. The sole allegation on this topic repeats the element in a conclusory fashion: "Defendants and the co-conspirators each were associated with the enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c), *i.e.*, each agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d)." (*See* Docket Entry # 1 ¶ 176). However, "a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). Indeed, "courts are not bound to accept as true

a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 2007 (internal quotation marks omitted); *Gibson*, 2017 WL 2936219, at *10 (dismissing complaint as insufficiently pleaded where it alleged defendants "conspired and agreed to conduct the affairs of the enterprise and did conduct the affairs of the enterprise through a pattern of racketeering activity.").

Plaintiff's pleading obligation is particularly important here because a conspiracy may not exist, as Defendants all are (or were) employed by SCANA or SCE&G. "The intracorporate immunity doctrine provides that a conspiracy cannot exist between the agents of a corporation and the corporation itself." *Detrick v. Panalpina Inc.*, 108 F.3d 529, 544 (4th Cir. 1997) (dismissing conspiracy claim where plaintiff "had merely alleged a conspiracy among the corporation and officers"). Mr. Archie cannot conspire with any of the other Defendants because they are all either SCE&G, SCANA or their employees, officers, and/or attorneys. As this Court has held:

> "A conspiracy by nature involves an agreement between two or more entities." *New Beckley Mining Corp. v. International Union, UMW of America,* 18 F.3d 1161, 1164 (4th Cir. 1994). . . .
>
> However, none of these allegations is sufficient to state a claim for a violation of § 1962(d) because, under the doctrine of intracorporate conspiracy, Feker cannot conspire with his corporations, his employee, Melinda McDonald, or with his attorney, Stephen Gardner. *See Huntingdon Life Sciences, Inc. v. Rokke*, 986 F. Supp. 982, 991 (E.D. Va. 1997); *Broussard v. Meineke Discount Muffler Shops, Inc.*, 945 F. Supp. 901, 911–12 (W.D.N.C. 1996), *rev'd on other grounds,* 155 F.3d 331 (4th Cir. 1998); *cf New Beckley Mining Corp. v. International Union, UMW of America*, 18 F.3d 1161, 1164–65 (4th Cir.1994) (holding that an international union could not conspire with its districts, locals, and members because "[a] conspiracy by nature involves an agreement between two or more entities"); *Buschi v. Kirven,* 775 F.2d 1240, 1251–53 (4th Cir.1985) (expounding on the intracorporate conspiracy doctrine and noting that it applies to employees and agents of the corporation); *In re American Honda Motor Co. Dealerships Relations Litig.*, 958 F. Supp. 1045, 1056 (D. Md. 1997) (noting that an argument that intracorporate conspiracy is insufficient to state a claim under § 1962(d) as a matter of law "might have merit").

*See Sadighi v. Daghighfekr*, 36 F. Supp. 2d 279, 296-97 (D.S.C. 1999); *see also Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 224 (4th Cir. 2004) (holding that "under the intracorporate immunity doctrine," defendant "lacked the legal capacity to conspire with the medical doctors on the MCAP," which was hospital's corporate agent). Plaintiff does not plead

any facts showing involvement by Mr. Archie (or any other person) in the purported "conspiracy" outside of his affiliation with SCE&G or SCANA.  Therefore, the intracorporate conspiracy doctrine bars Plaintiff's RICO conspiracy claim in this case.

## IV.   Alternatively, the "Filed Rate Doctrine" Precludes Plaintiff's Claims

Additionally, all of the claims alleged in this case are precluded under the "filed rate doctrine, which "bars any causes of action which necessarily require a court to determine a reasonable rate." *Edge v. State Farm Mut. Auto Ins. Co.*, 623 S.E.2d 387, 393 (S.C. 2005); *accord Bryan v. BellSouth Commc'ns, Inc.*, 377 F.3d 424, 429−30 (4th Cir. 2004) (explaining that doctrine does not "permit any claim to go forward that, if successful, would require an award of damages that would have the effect of imposing different rates").  Plaintiff's RICO claim hinges on three broad allegations: (1) Defendants submitted information to the PSC that they should have known was false, (2) in reliance on that information, the PSC set excessive electricity rates, and (3) customers paid "fraudulently inflated utility bills."  (See Docket Entry # 1  ¶¶ 2, 3, 35, 39).

The filed rate doctrine bars Plaintiff's RICO claims premised upon government-approved rates, even where Plaintiff contends that the rates were based on fraudulent information.  *See Lifschultz Fast Freight, Inc. v. Consolidated Freightways Corp. of Delaware*, 805 F. Supp. 1277, 1295 (D.S.C. 1992), *aff'd* 998 F.2d 1009, 1993 WL 241742 (4th Cir 2003) (attached hereto as Ex. U) (affirming the district court's "thorough and well reasoned" opinion); *Wah Chang v. Duke Energy Trading & Marketing, LLC*, 507 F.3d 1222, 1225 n.4 (9th Cir. 2007) (filed rate doctrine bars RICO claims); *Wegoland Ltd v. NYNEX Corp.*, 27 F.3d 17, 22 (2d Cir. 1994) ("[T]here is no fraud exception to the filed rate doctrine that would save this [RICO] suit from dismissal"); *H.J. Inc. v. Northwestern Bell Tel. Co.*, 954 F.2d 485, 486, 492 (8th Cir. 1992) (affirming dismissal of RICO claims); *Taffet v. Southern Co.*, 967 F.2d 1483 (11th Cir. 1992) (*en banc*) (same).

"The Filed Rate Doctrine stands for the proposition that because an administrative agency is vested with the authority to determine what rate is just and reasonable, courts should not adjudicate what a reasonable rate might be in a collateral lawsuit." *Temp. Servs., Inc. v. Am. Int'l*

*Grp., Inc.*, 388 S.C. 348, 350, 697 S.E.2d 527, 529 (2010); *accord* S.C. Code § 58-33-320 ("[N]o court of this State shall have jurisdiction to hear or determine any issue, case, or controversy . . . which was or could have been determined in a proceeding before the [PSC]."). The South Carolina Supreme Court has adopted the doctrine to preserve the integrity of rate decisions like those at issue here. *See Edge*, 623 S.E.2d at 392 ("We hereby adopt the filed rate doctrine.").

Even if South Carolina had not adopted the filed rate doctrine, federal law would govern because "authority lies in the power of the federal courts to interpret the limitations of causes of action arising under federal law." *See Clark v. Prudential Ins. Co. of Am.*, 2011 WL 940729, at *9 (D.N.J. Mar. 15, 2011) (attached hereto as Ex. V); *accord In re Penn. Title Ins. Antitrust Litig.*, 648 F. Supp.2d 663, 673 n.7 (E.D. Pa. 2009) ("because federal antitrust law, and not state law, provides the basis of plaintiffs' complaint," federal law governs doctrine); *In re Title Ins. Antitrust Cases*, 702 F. Supp. 2d 840, 861 (N.D. Ohio 2010) ("[A]s to the federal claims, it is irrelevant that the regulating agency in this case is a state, and not a federal agency."). The Fourth Circuit has held that the filed rate doctrine precludes claims, even where the defendant engages in fraudulent behavior. *See Marco Supply Co., Inc. v. AT&T Commc'ns, Inc.*, 875 F.2d 434, 436 (4th Cir. 1989) (affirming dismissal because "a customer does not have a claim for relief against a carrier [or utility] even if the latter's representation as to applicable rates is fraudulent").

Pursuant to the filed rate doctrine, federal courts have dismissed cases nearly identical to this one. In *Taffet*, the Eleventh Circuit considered whether a RICO suit could be brought against an electric utility for excessive charges resulting from fraudulent misrepresentations to a state rate-setting commission. *Taffet*, 967 F.2d at 1484. The court concluded that such a suit did not state a claim because the plaintiffs had no right to pay a rate other than the one set by the commission and suffered no injury from paying the filed rate. *See id.* at 1494 (*quoting Keogh v. Chicago & Northwestern Ry.*, 260 U.S. 156, 163 (1922) (internal citation omitted)). The court noted that in Alabama and Georgia (as in South Carolina), a consumer does not have a property right in a utility rate and elaborate administrative schemes exist to ensure just and reasonable rates and opportunities for ratepayers to be heard. *Taffet*, 967 F.2d at 1490; *Holt*, 370 F. Supp. 374, 377-79;

- 23 -

S.C. Code § 58-33-320. Thus, a RICO claim would "undermine[] the states' regulatory scheme" and infringe on fundamental principles of federalism and comity. *Taffet*, 967 F.2d at 1492. Accordingly, the court affirmed the dismissal of RICO claims. *Id.* at 1495.

In proceedings related to the Project, a state court recently denied SCANA's and SCE&G's motion to dismiss ratepayer claims and refused to apply the filed rate doctrine. However, that court's reasoning actually confirms that *RICO claims* based on allegedly fraudulent rates cannot survive the filed rate doctrine.[5] *See Cleckley v. South Carolina Electric & Gas Company*, No. 2017-CP-40-04833, Order Denying Defendant SCE&G's Motion to Dismiss (Ct. Common Pleas, Mar. 1, 2018). In *Cleckley*, the court considered the Second Circuit's decision to affirm the lower court's dismissal of RICO claims in *Wegoland* and concluded that the filed rate doctrine applied because the plaintiff's complaint "directly attacked defendant's rates as being inflated based on misleading financial information and an alleged scheme." *Id.* at 5-6. In distinguishing Cleckley's claims from the RICO claims barred by the filed rate doctrine in *Wegoland*, the *Cleckley* court explained that, unlike the RICO claims, "this action does not challenge the ratemaking process." *Id.* at 4. According to the court, the *Cleckley* claims were based on charges for rates "for a benefit that SCE&G failed to deliver." *Id.*

Putting aside the question of whether this distinction makes a difference in *Cleckley*,[6] it is irrelevant here. Plaintiff's RICO claim is premised on the allegation that the PSC ratemaking process was fraudulent and its result unlawful. (*See* Docket Entry # 1 ¶ 149 ("The RICO Defendants gave, disseminated and communicated false and deceptive testimony, reports, and Nuclear Reactor projections to induce the SCPSC to approve the charges for the Nuclear Reactor Project, thus rendering unlawful the defendants' electricity charges to the Class."); ¶ 150 (alleging

---

[5]     The *Cleckley* court construed the filed rate doctrine too narrowly. "The filed rate doctrine bars *any cause of action* which necessarily require a court to determine a reasonable rate." *Edge*, 623 S.E.2d at 393 (emphasis added). This includes causes of action in which the reasonableness of the rate is only relevant for calculating damages or restitution. *See Gulf States Utilities Co. v. Alabama Power Co.*, 824 F.2d 1465, 1471 (5th Cir. 1987) ("The district court may not compensate [the plaintiff] on the theory that it would have paid rates different than the filed rates.").

[6]     SCE&G has appealed the court's ruling in *Cleckley*.

that mailing "each monthly electric bill . . . that included charges for the Nuclear Reactor Project[] constitute[d] a pattern of unlawful conduct"); ¶ 155 (alleging that SCANA made material misrepresentations "so that SCANA could fraudulently obtain billions of dollars in proceeds and profits from its rate-overcharging scheme"); ¶ 162 (alleging that the Defendants "overcharge[ed] . . . the Class"). Plaintiff does not suggest that SCANA or SCE&G withheld any benefit or that he paid for electricity he never received. He does not allege a legal property interest in the completion of a nuclear power plant. Nor could he, considering that the BLRA contemplates and authorizes a utility's right to abandon construction. *See* S.C. Code Ann. § 58-33-280(K).

Plaintiff objects to the result reached through the PSC's administrative process, which has been deemed sufficient to determine electricity rates. The filed rate doctrine preserves the autonomy of this process and insulates it from intrusion via private lawsuit. The doctrine also requires those, like Plaintiff, who wish to challenge the result to resort to participation in the administrative or political process, rather than collaterally attack the process by private lawsuits.

The PSC decision is also shielded from judicial scrutiny because the Supreme Court has held that the First Amendment protects participation in such proceedings. *See California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972) ("Certainly the right to petition extends to all departments of the Government."). To safeguard the right to petition, the Court has held that laws of general applicability should be construed to avoid imposing liability on an individual's involvement in proceedings before the government. *See BE & K Const. Co. v. Nat'l Labor Relations Bd.*, 536 U.S. 516, 535-36 (2002) (construing NLRA not to impose liability for employer's involvement in court proceeding, even though unsuccessful lawsuit was retaliatory); *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 138 (1961) ("The right to petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to evade these freedoms."); *A Fisherman's Best, Inc. v. Recreational Fishing Alliance*, 310 F.3d 183, 189 (4th Cir. 2002) (*Noerr-Pennington* "doctrine provides immunity to those who petition the government for redress").

A plaintiff cannot recover under a general law, like RICO, for damages caused by agency

action.  *See Pennington*, 381 U.S. at 671 ("It is clear under *Noerr* that [plaintiff] could not collect any damages under the Sherman Act for an injury which it suffered from the action of the Secretary of Labor.").   Multiple federal appellate courts have applied *Noerr-Pennington* to limit RICO liability.  *See SOSA v. DIRECTV, Inc.*, 437 F.3d 923, 933 (9th Cir. 2006) (affirming dismissal of RICO claims); *Singh v. NYCTL 2009-A Trust*, 683 F. App'x 76, 78 (2d Cir. 2017) (attached hereto as Ex. W) (same); *cf. Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992) (comparing language in RICO and Sherman Act).

Plaintiff's primary allegation is that Mr. Archie and the other Defendants did not say the right thing to the PSC when SCANA/SCE&G sought rate increases.   However, just as "'communication[s] to [a] court' may be fairly described as 'petitions,'" so too are communications to an agency.  *See SOSA*, 437 F.3d at 933 (*quoting Freeman v. Lasky, Haas & Cohler*, 410 F.3d 1180, 1184 (9th Cir. 2005)).  The First Amendment protects Defendants' alleged communications to the PSC, and Plaintiff cannot state a claim under RICO for conduct protected by the First Amendment right to petition.

## CONCLUSION

For the foregoing reasons, Plaintiff's Complaint fails to state a claim upon which relief may be granted, and Defendant Mr. Archie respectfully requests that the Court dismiss Plaintiff's Complaint with prejudice.

Respectfully Submitted:

BY: s/ M. Dawes Cooke, Jr.
M. DAWES COOKE, JR.
Fed. Bar. ID: #288
JOHN W. FLETCHER
Fed. Bar ID: #9378
BARNWELL, WHALEY, PATTERSON, AND HELMS, LLC
P.O. Drawer H (29402)
288 Meeting Street, Suite 200
Charleston, SC  29401
(843) 577-7700

BY: s/ Christopher M. Hinnant
CHRISTOPHER M. HINNANT
BARNWELL, WHALEY, PATTERSON, AND HELMS, PLLC
Fed. Bar. ID: #10604
1427 Military Cutoff Rd., Suite #202
Wilmington, NC 28403
PHONE: (910) 679-1388
chinnant@barnwell-whaley.com

Dated: April 13, 2018          *Counsel for Defendant Jeffrey B. Archie, incorrectly designated in*
Charleston, South Carolina    *the Class Action Complaint as Jeffrey B. Archer*