**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**BEAUFORT DIVISION**

| | |
|---|---|
| TIMOTHY GLIBOWSKI, CHRISTINE DELMATER, STEPHANIE SPEICHER, JEFF SHELTON, DAVID DRAKE, CAROL S. ADAMS, AND TRAVIS HAMITER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>-against-<br><br><br>SCANA CORPORATION, SOUTH CAROLINA ELECTRIC & GAS COMPANY, SCANA SERVICES, INC., SOUTH CAROLINA PUBLIC SERVICE AUTHORITY, KEVIN MARSH, JIMMY ADDISON, STEPHEN BYRNE, MARTIN PHALEN, MARK CANNON, RUSSELL HARRIS, RONALD T. LINDSAY, JAMES MICALI, MARION CHERRY, MICHAEL CROSBY, AND LONNIE CARTER,<br><br>Defendants. | Civ. No. 9:18-273-TLW<br><br><br>**THIRD AMENDED CLASS ACTION COMPLAINT**<br><br>**CLASS CERTIFICATION REQUESTED**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs, by and through their undersigned attorneys, hereby file this Third Amended Complaint against defendants, and allege the following:

## INTRODUCTION

1.      This action concerns the demise of the project to construct 2 nuclear reactor units at the V.C. Summer Station in Jenkinsville, South Carolina, ("the Nuclear Reactor Project") and the deliberate concealment of this demise from the public by the project owners, which enabled the project owners to repeatedly pass along costs associated with this failing project to their

customers, and to reap significant financial windfalls associated with the project.

2.      This case is brought by Plaintiffs, who are citizens and residents of the state of South Carolina, on behalf of themselves and all other utility customers who are within the service areas of defendant South Carolina Public Service Authority ("Santee Cooper") and defendant SCANA's subsidiary South Carolina Electric & Gas Company ("SCE&G"), against Santee Cooper, SCANA, SCANA Services, SCE&G, the Individual SCANA Defendants Kevin Marsh, Jimmy Addison, Stephen Byrne, Martin Phalen, Mark Cannon, Russell Harris, Ronald T. Lindsay, and James Micali, and the Individual Santee Cooper Defendants Marion Cherry, Michael Crosby, and Lonnie Carter (collectively referred to as "the RICO Defendants"), for their participation in an unlawful Racketeering Enterprise in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), Title 18, United States Code, Section 1964 et seq.

3.      As set forth herein, the RICO Defendants, in furtherance of their Racketeering Enterprise, conducted a series and pattern of racketeering acts, including the mailing of fraudulently inflated charges to Plaintiffs and other members of the putative Classes of and other use of the mails and interstate wires to further a fraudulent scheme, in violation of the civil RICO statute, 18 U.S.C. § 1964.

4.      Plaintiffs also bring a claim against Defendant Santee Cooper for unlawful takings of Plaintiffs' property without just compensation, and unlawful transfer of Plaintiffs' property to private individuals.

## JURISDICTION & VENUE

5.      This Court has subject-matter jurisdiction over the claims in this lawsuit, pursuant to 28 U.S.C.A. § 1331.

6.      This Court has personal jurisdiction over defendants SCANA, SCE&G, SCANA Services, and Santee Cooper because they are organized under the laws of the state of South Carolina, have corporate headquarters within the State, and the events giving rise to the matter in controversy occurred within the State.

7.      This Court has personal jurisdiction over the individual defendants named and described below, as they are citizens and residents of the state of South Carolina.

8.      Venue is proper under 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965(a), as all relevant events occurred after the enactment of the Base Load Review Act of 2007, S.C. Code Ann. § 58-33-210, et. seq. ("the BLRA") and, upon further information and belief, defendants' actions giving rise to the claims occurred in this District.

9.      Venue is proper in this division pursuant to Local Civil Rule 3.01.

## PARTIES

10.     Plaintiff Timothy Glibowski is a citizen and resident of the state of South Carolina, and, at all times relevant to this complaint, was a customer of Defendant SCE&G.

11.     Plaintiff Christine Delmater is a citizen and resident of the state of South Carolina, and, at all times relevant to this complaint, was a customer of Defendant SCE&G.

12.     Plaintiff Stephanie Speicher is a citizen and resident of the state of South Carolina, and, at all times relevant to this complaint, was a customer of Defendant SCE&G.

13.     Plaintiff Jeff Shelton is a citizen and resident of the state of South Carolina, and at all times relevant to this complaint, was a customer of Defendant SCE&G.

14.     Plaintiff David Drake is a citizen and resident of the state of South Carolina, and at all times relevant to this complaint, was a customer of Defendant SCE&G.

15.     Plaintiff Carol S. Adams is a citizen and resident of the state of South Carolina,

and at all times relevant to this complaint, was a customer of Defendant SCE&G.

16.     Plaintiff Travis Hamiter is a citizen and resident of the state of South Carolina, and at all times relevant to this complaint, was a customer of Defendant Santee Cooper.

17.     At all times relevant to this Complaint, Defendant SCANA has been a holding company engaged through its principal subsidiaries, including Defendants SCE&G and SCANA Services, in electric and natural gas utility operations and other energy-related businesses in South Carolina, North Carolina and Georgia. Formed on December 31, 1984, SCANA is incorporated in South Carolina and maintains its principal executive offices at 100 SCANA Parkway, Cayce, South Carolina 29033. SCANA, SCE&G, and SCANA Services are an amalgamation of interests, entities, and activities so as to blur the legal distinction between SCANA, and its activities and the activities of its subsidiaries SCE&G and SCANA Services. In January 2019, SCANA was acquired by Dominion Energy, Inc., and is now a part of Dominion Corporation's Southeast Energy Group.

18.     At all times relevant to this Complaint, SCE&G was regulated by the South Carolina Public Service Commission ("PSC"), and knew that its behavior would be subject to monitoring by the PSC and had a monetary interest in the information presented to the PSC.

19.     At all times relevant to this complaint, Defendant SCANA Services, Inc., has been a South Carolina Corporation, and a primary subsidiary of Defendant SCANA, and employed the professional staff at the V.C. Summer project, including one or more Individual SCANA Defendants.

20.     At all times relevant to this complaint, Defendant SCE&G, SCANA's principal subsidiary, has been engaged in the generation, transmission, distribution and sale of electricity

and transportation of natural gas to customers.[1]

21.    SCE&G is a publicly authorized monopoly with the exclusive right to provide electricity within its service areas. At all times relevant to this complaint, Class members whose property was located within the SCE&G service territory had no choice but to purchase electricity from SCE&G.

22.    At all times relevant to this complaint, the South Carolina Public Service Authority ("Santee Cooper") has been a public corporation, "an independent, quasi-municipal corporation designed and created with the idea that it will be self-satisfying in terms of financial operation and internal management".[2] Santee Cooper owns the electricity transmission lines in its service area and has the exclusive right to provide electricity within its service areas as well as pursuant to a contract with Central Electric Power Cooperative, Inc., ("CEPCI").

23.    Santee Cooper distributes any excess revenue from its operations to the general funds of the South Carolina treasury. S.C. Code § 58–31–110. Otherwise, Santee Cooper is financially independent of the state. Its budget and the rates it charges customers are not subject to the approval of any state agency. Additionally, a twelve-person board of directors governs Santee Cooper ("the Santee Cooper Board"). The Board members are appointed for fixed seven-year terms and are removable only for cause. S.C. Code § 58–31–20. The state of South Carolina does not possess a sufficient degree of control over Santee Cooper for it to be considered an arm or the alter ego of the state of South Carolina.

24.    At all times relevant to the complaint, Defendant Kevin Marsh ("Marsh") was

---

[1] Unless noted otherwise, all references to "SCANA" herein denote SCANA, SCE&G, and SCANA Services, Inc., and all legal and factual allegations made against SCANA are specifically lodged against SCANA, SCE&G, and SCANA Services.

[2] See April 1, 1999 Letter from Attorney General Condon to Senator Larry Grooms at 4; available at http://2hsvz0l74ah31vgcm16peuy12tz.wpengine.netdna-cdn.com/wp-content/uploads/2013/11/99apr1grooms.pdf.

the Chief Executive Officer and Chairman of the Board of SCANA and enriched himself at the expense of SCE&G and Santee Cooper customers while committing numerous breaches of his fiduciary duty. Among other things, in 2016 Defendant Marsh received a bonus of $3.3 million, in part for "oversight and support" of the Nuclear Reactor Project.

25.    At all times relevant to the complaint, Defendant Jimmy Addison ("Addison") was the Chief Financial Officer for SCANA and enriched himself at the expense of SCE&G and Santee Cooper customers, committing numerous breaches of his fiduciary duty. For example, in 2016 Addison received a bonus of $620,000, in part for his efforts to secure additional financing relating to the failed Nuclear Reactor Project at the V.C. Summer Nuclear Generating Station.

26.    At all times relevant to the complaint, Defendant Stephen A. Byrne ("Byrne") was the Executive Vice President of SCANA and held the position of President for Generation and Transmission and Chief Operating Officer of SCE&G. Defendant Byrne enriched himself at the expense of SCE&G and Santee Cooper customers and, in the process, committed numerous breaches of his fiduciary duty. For example, in 2016 Byrne received a bonus of $620,000, in part for his oversight role with regard to the Nuclear Reactor Project.

27.    At all times relevant to the complaint, Defendant Martin Phalen ("Phalen") was a SCANA senior vice president of administration, retiring on or about December 31, 2016.

28.    At all times relevant to the complaint, Defendant Mark Cannon ("Cannon") was a SCANA vice president and treasurer, retiring on or about February 29, 2016.

29.    During the relevant time frame beginning in 2013, Defendant Russell Harris ("Harris") served as both President of SCE&G Gas Operations and SCANA's senior vice president.

30.    During the relevant time frame beginning on or around February 24, 2012,

Defendant Ronald T. Lindsay ("Lindsay") has served as the Senior Vice President, General Counsel and Assistant Secretary of SCANA.

31.    During the relevant time frame, Defendant James Micali ("Micali") served as a member of SCANA's board of directors.

32.    Defendants Marsh, Addison, Byrne, Phalen, Cannon, Harris, Lindsay, and Micali are hereinafter collectively referred to as the "Individual SCANA Defendants."

33.    At all times relevant to this complaint, Defendant Lonnie Carter[3] ("Carter") was the chief executive officer of Santee Cooper.[4] Carter is a citizen and resident of the State of South Carolina. At all times relevant herein, Carter committed Santee Cooper to involvement in the Nuclear Reactor Project for his personal gain and enrichment at the expense of SCE&G and Santee Cooper customers.

34.    At all times relevant to this complaint, Defendant Marion Cherry ("Cherry") has been a citizen and resident of the State of South Carolina. Cherry served as the site representative for Santee Cooper at the Project, and was a Santee Cooper employee.

35.    At all times relevant to this complaint, Defendant Michael Crosby ("Crosby") has been a citizen and resident of the State of South Carolina. During the relevant time period,

---

[3] At the behest of SCANA and the Individual SCANA Defendants, without approval from the Santee Cooper Board of Directors, Carter authorized Santee Cooper to use approximately $9 million of its customers' money for Project-related bonuses for SCANA executives. Santee Cooper continued to pay bonuses for SCANA executives until August 31, 2017. *See* https://www.thestate.com/news/politics-government/article210782644.html.

[4] Defendant Carter is not entitled to claim qualified immunity as a quasi-government official. (Dkt. Doc. No. 54, Plaintiffs' Response in Opposition to Santee Cooper and Lonnie Carter's Motion to Dismiss.) Carter is not a governmental or quasi-governmental official. Even if he were, his conduct violated clearly established statutory and constitutional rights of which a reasonable person would or should have known. Moreover, Carter acted outside the scope of his authority and his actions, described herein, were intended to benefit and enrich himself at the expense of Santee Cooper and its customers. Defendants Cherry and Crosby (identified in paragraphs 33 and 34) are likewise not entitled to qualified immunity.

7

Crosby served as Senior Vice President for Nuclear Energy at Santee Cooper.

36.    Santee Cooper, Carter, Cherry, and Crosby are hereinafter collectively referred to as the "Santee Cooper Defendants."

37.    Defendants Carter, Cherry, and Crosby are hereinafter collectively referred to as the "Individual Santee Cooper Defendants."

38.    At all times relevant to the Complaint, the RICO Defendants, collectively as owners of the Nuclear Reactor Project, as well as individually, had a duty to act in good faith, with loyalty to, and for the benefit of SCANA and Santee Cooper and the respective energy utility customers of each utility.

39.    The fraudulent and deceitful conduct of the RICO Defendants harmfully impacted, and continues to impact, the Classes and the public at large by causing the Classes and public to pay for fraudulent charges associated with the construction of the Nuclear Reactor Project.

## CLASS ACTION ALLEGATIONS

40.    Plaintiffs bring this action as a class action pursuant to Rules 23(a), 23(b)(1), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure on behalf of a class consisting of

    a)    all South Carolina customers of SCANA who have been charged, and paid those charges, for costs associated with the construction of two new nuclear power reactors at V.C. Summer Nuclear Power Station in South Carolina, which the RICO Defendants have now abandoned; the class period runs from 2007 to present (the "Class Period") and includes all persons who sustained damage by paying the inflated charges as alleged herein (the "SCANA Customer Class"),[5] and

---

[5] In *Lightsey v. SCE&G*, 2017CP-35-335, a class action settlement was given final approval on June 11, 2019 by the Honorable John C. Hayes, III, Circuit Court Judge, and pursuant to the settlement the claims of the SCANA Customer Class against the SCANA defendants (SCANA, SCE&G, SCANA Services, Marsh, Addison, Byrne, Phalen, Cannon, Harris, Lindsay, and Micali)("the released defendants") have been released. Nothing in this complaint should be deemed to constitute a claim by the SCE&G customer class against the released defendants. However, the SCE&G customer class continues to assert claims against Santee Cooper and the

b) all South Carolina customers of Santee Cooper and any other local electric cooperatives who have been charged, and paid those charges, during the Class Period for costs associated with the construction of two new nuclear power reactors at V.C. Summer Nuclear Power Station in South Carolina, which the RICO Defendants have now abandoned, and includes all persons who sustained damage by paying the inflated charges as alleged herein as a result of such advance charges purchased from Santee Cooper (the "Santee Cooper Customer Class").

Reference to "the Class" herein refer to these two classes collectively unless otherwise indicated.

41.     Excluded from the Class are the Justices of the United States Supreme Court, the Justices of the South Carolina Supreme Court, the Judges of the Fourth Circuit Court of Appeals, the Judges of the United States District Court of South Carolina, the Defendants, members of Defendants' immediate families, and the legal representatives, affiliates, heirs, successors or assigns of any of Defendants.

42.     Class certification pursuant to Rule 23(b)(1) is appropriate because the prosecution of separate actions by individual members of the class would create the risk of inconsistent or varying adjudications with respect to individual members of the class and could substantially impede the ability of other members to protect their interests.

43.     Class certification pursuant to Rule 23(b)(3) is appropriate because class action treatment is a superior method for the fair and efficient adjudication of the controversy. Common issues predominate over individual issues, and there is no interest by members of the class in individually controlling the prosecution of separate actions.

44.     Should it be deemed appropriate, this action may be maintained as a class action

---

Individual Santee Cooper Defendants. In addition, nothing herein should be construed as a release of the claims of the Santee Cooper customer class against SCANA, SCE&G, SCANA Services, Marsh, Addison, Byrne, Phalen, Cannon, Harris, Lindsay, Micali, and against Santee Cooper (and the Individual Santee Cooper Defendants).

with respect to particular issues pursuant to Rule 23(c)(4), including but not limited to the questions of law and fact enumerated in paragraph 50, *infra*.

45.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class paid fraudulent construction financing costs associated with the wrongful conduct of SCANA, Santee Cooper, the Individual Santee Cooper Defendants, and the Individual SCANA Defendants in violation of the laws described herein.

46.    The size of the Class renders joinder impracticable, and failure to certify the Class will likely prevent individuals who have been damaged by Defendants' fraudulent scheme from pursuing their claims. Without a class action, individual class members would face burdensome litigation expenses, deterring them from bringing suits that would adequately protect their rights. Whatever difficulties may exist in the management of the class action are greatly outweighed by the class action procedure that would provide claimants with a method for the redress of claims that they may not otherwise be capable of pursuing. The class action device is superior to individual litigation under the circumstances of this case because it provides the benefits of unitary adjudication, judicial economy and economies of scale. The class action device in this civil RICO action provides access to the courts and a measure of justice and accountability for the individual and business claimants whose incomes, business and properties have been damaged by Defendants' fraudulent and unlawful conduct.

47.    The Plaintiffs and all Class members seek treble damages for their injuries, as provided under 18 U.S.C. § 1964(c), including but not limited to economic damages for injury to their income, business, and property (including diminution of property values), cost of the suit, attorney's fees, injunctive relief and any other relief to which they may be entitled in law and/or equity.

48.     The size of the class comprises hundreds of thousands of utility customers, both individuals and businesses, served by Defendants across every county in the State of South Carolina.

49.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained competent counsel, experienced in class action litigation and litigation involving RICO, and the specific legal and factual issues addressed herein. Plaintiffs are members of the Class and do not have interests antagonistic to or in conflict with the other members of the Class.

50.     There are numerous questions of law and fact common to the Class that predominate over any questions affecting individual members of the Class, including:

a.   whether the RICO Defendants have violated the laws of the United States;

b.   whether the RICO Defendants knew or should have known that design issues would impact the cost, and completion of, construction of the Nuclear Reactor Project;

c.   whether the RICO Defendants acted in a commercially reasonable, prudent and competent manner in the selection, design, supervision and administration of the contract(s) to construct the Project;

d.   whether the RICO Defendants engaged in acts of mail fraud, wire fraud or other RICO predicate acts in direct violation of the federal RICO statute;

e.   whether the RICO Defendants have engaged in a pattern of unlawful conduct;

f.   whether the RICO Defendants have conducted or participated, directly or indirectly, in a pattern of unlawful conduct in the operation, management or conduct of an enterprise in violation of 18 U.S.C. § 1962(c);

g.   whether the RICO Defendants have violated 18 U.S.C. § 1962(d) by conspiring to or attempting to conduct or participate, directly or indirectly, in a pattern of unlawful conduct in the operation, management or conduct of an enterprise in violation of 18 U.S.C. § 1962(c);

h.   whether Plaintiffs and the proposed members of the Class were injured by reason of the RICO predicate acts of the named Defendants, and, if so, the appropriate

class-wide measure of damages;

i. whether publicly disseminated documents and statements issued during the Class Period omitted and/or misrepresented material facts concerning the RICO Defendants' business, finances, future business prospects and future prospects for success in the construction of the Nuclear Reactor Project; and

j. whether the RICO Defendants participated in and pursued the common course of conduct complained of.

**JOINT AND SEVERAL LIABILITY**

51.     Throughout their involvement with the Project, the RICO Defendants repeatedly made material misstatements and omissions of fact and used the mails and interstate wires in furtherance of the RICO Enterprise.

52.     The RICO Defendants are jointly and severally liable for all material misrepresentations, omissions, fraudulent conduct, or other tortious acts or omissions done in furtherance of the RICO Enterprise.

53.     Each RICO Defendant served as an agent for the others while engaged in the RICO Enterprise. Knowledge possessed by one RICO Defendant about a matter within the scope of the RICO Enterprise is attributable to every other RICO Defendant. Likewise, representations as to one Defendant are attributable to all Defendants, and, collectively, enabled the RICO Defendants to perpetuate the scheme against Plaintiffs and the Class.

54.     Upon information and belief, the RICO Defendants had a pecuniary interest in making these false and materially misleading allegations, as the RICO Defendants intended to benefit from their fraudulent scheme, through bonuses, increased salaries and other increased compensation, and through the artificial inflation of stock holdings, and the issuance of attractive bonds, all of which would not have existed but for the Nuclear Reactor Project.

# FACTUAL ALLEGATIONS

## A.     RICO Defendants Push for Legislation to Enable a Runaway Project.

55.     In February 2007, the South Carolina Legislature passed the BLRA. Ostensibly, the BLRA was designed to incentivize nuclear construction by investor-owned utilities in South Carolina. Though the cost of nuclear construction had been historically expensive, under the BLRA, a regulatory structure was put in place, allowing utilities to pass financing charges for nuclear construction onto customers in advance of a nuclear plant becoming commercially operable.

56.     According to observers who followed passage of the BLRA at the time—including the president of the S.C. Small Business Chamber of Commerce—SCANA was among the bill's major backers and lobbied heavily for the bill.[6]

57.     Ultimately, SCANA was the only investor-owned utility to take advantage of the BLRA.

## B.     SCANA and Santee Cooper Plan to Expand the V.C. Summer Nuclear Site.

58.     In 2006, SCANA entered into an agreement with Santee Cooper that enabled Santee Cooper to act as a 45% owner of a project to construct two nuclear reactors.  Pursuant to the initial agreement between the owners, Santee Cooper would share in a proportionate percentage of the production tax credits SCANA would realize upon the completion of the

---

[6] Although lobbying records are not readily available for 2007, SCANA is known to have spent a total of $1.5 million lobbying South Carolina legislators since 2009. SCANA also spent $63,000 in campaign contributions during the 2006 South Carolina state election cycle, making it the eleventh largest overall contributor that year. In 2008, that number more than doubled to $168,605, making SCANA the sixth largest donor in the state. SCANA has been in the top-ten South Carolina state election spenders in every election cycle since—most recently spending $224,644 in the 2016 cycle. (data compiled from https://www.opensecrets.org).

project. These credits would purportedly total nearly $2 billion. In SCANA's Q1 2007 earnings conference call on April 27, 2007, a SCANA executive stated that "along with our partner, Santee Cooper, we currently expect to file a joint application with the Nuclear Regulatory Commission later this year, for a combined construction and operating license which will cover two units ..." SCANA further stated that they expected to recover capital costs for the project from customers under the BLRA.

59.    Indeed, a major component of SCANA's plan regarding the Project was the ability to charge customers for construction rather than incurring the costs themselves. This model was adopted by Santee Cooper.

60.    In March 2008, SCANA and Santee Cooper jointly filed an application with the federal Nuclear Regulatory Commission ("NRC") for a license to build two nuclear reactors.

61.    In May of 2008, SCE&G, on behalf of itself and Santee Cooper, signed an Engineering, Procurement and Construction contract (the "EPC Contract") with Westinghouse Electric Company ("Westinghouse") and Stone & Webster, Inc. to act as prime contractors to build two Westinghouse AP1000[7] nuclear reactors at the V.C. Summer Site.[8] (Westinghouse, Stone & Webster and all other construction contractors for the Nuclear Reactor Project are hereinafter collectively referred to as "the Consortium.") SCANA and Santee Cooper were 55% and 45% owners of the project, respectively, and are referred to collectively as "Owners."[9]

62.    The ownership interest was set forth in both the Nuclear Regulatory Commission

---

[7] "AP" means "advanced passive," which refers to the alleged capability of the reactor to shut down without direction from a human operator in response to a safety event. "1000" refers to the 1000-megawat capability of the reactor.

[8] The agreement may be found on the website of the South Carolina Public Service Commission, at https://dms.psc.sc.gov/Attachments/Matter/f12aebd6-b1ed-4c2d-b064-96899c5400b6. It is incorporated into this Third Amended Complaint by reference.

[9] February 27, 2009 Order Approving Combined Application, Order No. 2009-104, page 2.

application and SCANA's initial PSC application for a Certificate of Need. Furthermore, the ownership interest was expressly contemplated in a 2006 amendment to Santee Cooper's enabling Act, S.C. Code Ann. § 58-31-200.

63.     From 2006 onward, the Owners entered into a series of agreements, ("Bridge Agreements"), which would later become the Design and Construction Agreement that expressly set forth the Owners' various obligations to the project.  These roles included oversight of the design, engineering and construction associated with the project, and assuring that the project remained on budget and on schedule.

64.     In addition, throughout the pendency of the project, Defendants Santee Cooper and SCE&G would execute a series of limited agency agreements, whereby Defendant SCE&G was authorized to act on behalf of the Santee Defendants.

65.     SCE&G signed the EPC contract with the Consortium "for itself and as agent for the South Carolina Public Service Authority, a body corporate and politic created by the laws of South Carolina." The EPC Contract was kept confidential and was not available to the public until after the Project collapsed in 2017.

**C.     The RICO Defendants Secure PSC Approval for the Project.**

66.     On or about May 30, 2008, SCANA, in furtherance of the Nuclear Reactor Project, filed a Combined Application with the PSC, pursuant to the BLRA, seeking a Certificate of Environmental Compatibility and Public Convenience and Necessity and for a Base Load Review Order to construct and operate a two-unit, 2,234 net megawatt nuclear facility, i.e. the Nuclear Reactor Project (the "Base Load Application").

67.     In connection with proceedings before the PSC, and at all times relevant to this Complaint, SCANA acted for itself and as the agent of Santee Cooper. The involvement of

Santee Cooper in the Nuclear Reactor Project was indispensable to SCANA's Base Load Application and the joint ownership was touted as a significant benefit to the Nuclear Reactor Project.

68.    In its Base Load Application, the RICO Defendants made numerous material statements to the PSC, and to the Class, which Defendants knew or should have known were false and misleading, or which Defendants made with a reckless disregard as to their veracity. These misleading statements included the following:

    a.  the Project was necessary to meet the growing needs of its customers for electric power and to support the continued economic development of the state of South Carolina;[10]

    b.  SCANA and Santee Cooper chose nuclear generating capacity to meet base load requirements having carefully evaluated the life-cycle costs, reliability, the fuel, and environmental risks of other options;[11]

    c.  SCE&G "will oversee quality assurance and quality control closely" in connection with the Project and "is also putting in place a well-staffed construction management oversight group [that] will support comprehensive oversight of the project construction and administration of the EPC contract;"[12]

69.    During his testimony in the 2008 PSC Proceeding, Defendant Marsh addressed how the Owners would collectively manage significant risks related to cost overruns and delays on the project, stating:

The business processes and structures for this oversight group are being formalized at this time. In all, we estimate more than 50 people will be assigned to this task. At the center of this structure will be a dedicated group of SCE&G personnel that will monitor each aspect of the construction process on a day-to-day basis and will report progress, issues and variances to an executive steering committee that includes me as SCE&G's president, and a senior executive from Santee Cooper and to the SCANA board of directors.[13]

---

[10] Docket No. 2008-196-E-Order No. 2009-104 dated February 27, 2009, p.2.
[11] *Id.* at ¶12.
[12] Testimony of Kevin Marsh to Public Service Commission, December 1, 2008.
[13] Direct Testimony of Kevin B. Marsh on Behalf of South Carolina Electric & Gas Company,

70.    The foregoing statements constituted fraudulent misrepresentations and misleading half-truths and involved material omissions of fact. At the time these misrepresentations and half-truths were made in connection with SCANA's Base Load Application, the RICO Defendants knew or should have known:

a. SCANA and Santee Cooper did not need the generation capacity that would purportedly be supplied by the AP1000 reactors to meet demand;

b. Westinghouse had never before handled the engineering, purchasing and construction for a large-scale building project;[14]

c. The AP1000 design had not been finalized;[15]

d. Westinghouse did not have a complete set of engineering drawings to construct the reactor. In fact, a final design and complete set of engineering drawings never existed;

e. Westinghouse was utilizing unlicensed engineers to craft blueprints and conduct complex engineering calculations when designing the Nuclear Reactor Project;[16]

f. Construction of the Nuclear Reactor Project included a substantial risk of failure due to the untested and unapproved designs of the Westinghouse AP1000 reactor (which were undertaken despite the existence of a proven design in the reactor at Unit 1 on the site, which has operated reliably, without major incident for nearly 35 years);

g. The design of Units 2 and 3 was not at all similar to that of Unit 1;

h. SCANA and Santee Cooper were making cost and time estimates on the basis of a generic construction schedule provided by Westinghouse that was not site-specific, and thus could not serve as a legitimate basis for cost and time estimates; and

i. Although the RICO Defendants publicly represented an "oversight group" would

Docket No. 2008-196-E, https://www.nrc.gov/docs/ML0910/ML091060781.pdf.
[14] https://www.postandcourier.com/news/contractor-wasted-millions-on-unnecessary-supplies-for-s-c-s/article_43eeba82-ba6f-11e7-8065-2398b073b4e0.html
[15] 10 CFR Part 52, AP1000 Design Certification Amendment available at https://www.nrc.gov/docs/ML1134/ML113480014.pdf
[16] https://www.postandcourier.com/business/stamped-for-failure-westinghouse-and-scana-used-unlicensed-workers-to/article_3ea2046a-9d39-11e7-a186-cb396c86b8b9.html

review every aspect of the project, the EPC Contract materially limited the ability of SCANA and Santee Cooper to perform quality assurance and oversight.

71.     Each of the aforesaid fraudulent misrepresentations were advanced by the RICO Defendants acting as a continuing unit.

72.     All RICO Defendants agreed that the objective of the scheme was to personally enrich themselves at the expense of customers of SCANA, SCE&G, and Santee Cooper, and the actions alleged herein were undertaken to further that objective.

73.     Each RICO Defendant had a duty to refrain from making any misrepresentations to the PSC, the Santee Cooper Board, and the public, and to correct any statements made that were untrue or only partially true. Each and every RICO Defendant breached that duty.

74.     In furtherance of their fraudulent scheme to hide the true projected cost and schedule to complete the Project, the RICO Defendants disputed in bad faith each and every concern raised in opposition papers filed by objectors to the Nuclear Reactor Project.

75.     At the conclusion of the Baseload application process, and based upon Defendants' representations throughout that process, PSC issued an order granting the Owners' application for a certificate of public need and an initial base load order.

76.     Upon issuance of the PSC order, the RICO Defendants immediately commenced to shift the financing and risk of constructing the Nuclear Reactor Project from SCANA and Santee Cooper onto the Plaintiff Class. As such, the RICO Defendants collectively shared a pecuniary interest in the false and materially misleading allegations made in the application process overseen by the PSC.

77.     Upon information and belief, each of the Defendants had a pecuniary interest in making these false and materially misleading allegations, as the RICO Defendants expected to

benefit from their fraudulent scheme, through bonuses, increased salaries and other compensation, and through the artificial inflation of stock holdings, and the issuance of attractive bonds.

78.     The Individual Santee Cooper Defendants had knowledge of the false and misleading statements made to the PSC by SCANA and the individual SCANA Defendants. The Individual Santee Cooper Defendants remained silent despite this knowledge. The Individual Santee Cooper Defendants owed a duty of candor and to act in good faith towards utility customers, but consistently failed in fulfilling that duty.

79.     On May 30, 2008, in combination with its application to construct the nuclear facility, SCANA requested approval from the PSC for the first of nine rate increases to customer charges for the purpose of funding the Nuclear Reactor Project. The proposed average increase to the residential class was 0.52%; to the small general service class was 0.48%; to the medium general service class was 0.51% and to the large general service class was 0.44%.[17]

80.     On or about March 2, 2009, pursuant to the BLRA as provided by Order No. 2009-104(A) and relying on the RICO Defendants' false and misleading representations and material omissions, including but not limited to those set forth in ¶¶ 68 and 70, *supra*, PSC approved SCANA's proposal to construct the Nuclear Reactor Project and to increase amounts charged to the residential class, the general service class, the medium general service class and the large general service class.

81.     On May 29, 2009, pursuant to S.C. Code Ann. § 58-33-280, SCANA submitted its second request for the approval of revised rates and advance charges subsequent to the initial revised rates approved on March 2, 2009 in Commission Order No. 2009-104(A), Docket No.

---

[17] Order 2009-104, p. 2.

2008-196-E. The proposed average increase to the Residential class was 1.21%; to the Small General Service class was 1.07%; the Medium General Service class was 1.13%, and to the Large General Service class was 0.95%.[18]

82.     In its May 29, 2009 application, SCANA falsely represented to the PSC that construction of the Project was progressing on schedule to meet the "guaranteed" Unit 2 & 3 Substantial Completion dates of April 1, 2016 and January 1, 2019 respectively.[19]

83.     In addition, SCANA represented it had met all current milestones approved for the project. However, meeting milestones did not mean the project was meeting targets in the schedule.  Instead, milestones triggered payments to contractors, and, at times, milestones were completed prematurely requiring the milestones to be redone, costing more to Class members.[20]

84.     On September 30, 2009, based upon the false and misleading statements made in SCANA's May 29, 2009 application for the approval of revised rates and advance charges, PSC approved SCANA's application.

85.     On March 3, 2010, a progress report from Bechtel indicated that "the project is not currently working to a schedule." The RICO Defendants were aware of this assessment but chose against disclosure.

86.     As of March 3, 2010 (if not earlier), the RICO Defendants were functioning as a continuing unit either by actively concealing or by passive omission of the Project's true state of affairs in order to personally enrich themselves.

87.     As of March 3, 2010 (if not earlier), the RICO Defendants knew and agreed to a

---

[18] Docket No. 2009-211-E, ID 216999, Ex. A at 19, *available at* https://dms.psc.sc.gov/Attachments/Matter/8e1e50e2-b385-0f12-b2b5f1caee5040f8.
[19] *Id.* at 20.
[20] It should be noted that milestones were used to trigger payments in the contract and, often times, construction was accelerated to meet milestones, only to have to be re-done when the construction schedule caught up to the milestone, increasing the cost of the Project.

common objective that the Project's true state of affairs had to be concealed from the general public, customers, investors, regulators, and/or government officials in order to carry out the scheme to enrich themselves.

88.     As of March 3, 2010, the fraudulent acts described herein constituted a pattern of racketeering on the part of the RICO Defendants.

89.     The fraudulent acts described herein continued and were ongoing as alleged, *infra*, until the public exposure in July, 2017of the numerous issues that plagued the Nuclear Reactor project.

90.     The RICO Defendants knowingly and willfully agreed with each other that the true state of affairs would be fraudulently concealed from the PSC, other regulators, the Class, and the public.

91.     This agreement among the RICO Defendants to fraudulently conceal the true state of affairs as alleged herein from the PSC, other regulators, the Class, and the public from the PSC, other regulators, the Class, and the public was essential to carrying out their scheme to personally enrich themselves.

92.     The fraudulent acts, concealing the true state of affairs from the PSC, other regulators, the Class, and the public, have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events. In particular, the Class are the same victims. The purpose of these fraudulent acts were to continue the Nuclear Reactor project.

93.     RICO Defendants knew that revealing the truth about the Nuclear Reactor project would have led to the Project being terminated.

94.     RICO Defendants knew and agreed to continue to make false statements

regarding the Project so that they could enrich themselves.

95.    On May 27, 2010, pursuant to S.C. Code Ann. § 58-33-280, SCANA submitted its third request for the approval of revised rates and advance charges. The proposed average increase to the Residential class was 2.82%; to the Small General Service class was 2.71%; to the Medium General Service class was 2.82%, and to the Large General Service class was 2.55%.[21]

96.    In Exhibit A to its May 27, 2010 application, SCANA falsely represented that the Company was on track to complete the Units at the construction cost forecast of $6.3 billion dollars, and that construction of the project was progressing on schedule to meet the Unit 2 & 3 Substantial Completion dates of April 1, 2016 and January 1, 2019.[22]

97.    On September 30, 2010, based upon the false and misleading statements made in SCANA's May 27, 2010 application for the approval of revised rates and advance charges, PSC issued an Order Approving Revised Rates.[23]

**D.    Westinghouse Issues Internal Report on Risks Associated with AP1000 Projects, the Text and Substance of Which Was Kept Secret from Regulators and the Public.**

98.    In August 2011, Westinghouse circulated an internal report entitled "The Case for Paradigm Shift: An assessment of project delivery risk against the backdrop of industry practice," which detailed risks associated with the AP1000 projects (the "WEC Report").

99.    The WEC Report identified multiple risks associated with the AP1000, and consequently, the Nuclear Reactor Project, including, but not limited to:

      a.  the AP1000 Design was not complete, even though it is currently under construction which virtually assures large numbers of changes will occur to both systems and structures;

---

[21] Docket No. 2010-157-E at 5.
[22] *Id.* at Ex. A, p. 9.
[23] Docket No. 2010-157-E, Order No. 2010-625.

      b.   issuing an incomplete design CFC to the field virtually assures numerous Construction Change Order Requests which are likely to result in Delay Claims and Liquidated Damages;

      c.   the AP1000 Construction Packages differ from typical construction industry standard packages;

      d.   the cost risks associated with potential division of responsibility errors, omissions, and uncertainty regarding agreement on scope and responsibility can be significant;

      e.   the Construction Packages contain design drawings which utilize what are called 'standard details,' but they have not been collected in a ready-to-reference Standard Detail Library;

      f.   the AP1000 construction documents do not currently include a Master Spec nor follow the Construction Specifications Institute Format model which is the industry standard; and,

      g.   the AP1000 designs are not sealed by a professional engineer, in contravention to state law.

100.    Upon information and belief, the RICO Defendants had knowledge of the Westinghouse White Paper.

101.    Yet, upon information and belief, none of the RICO Defendants acted on the White Paper, or otherwise notified the public or regulators of the significant issues associated with the AP1000 design.

**E.    2011–2014: RICO Defendants Increase Costs to Customers based upon Material Misrepresentations and Omissions to Regulators and the Public, While Concealing Growing Problems with Project Construction.**

102.    On May 27, 2011, pursuant to S.C. Code Ann. §58-33-280, SCANA submitted its fourth request for the approval of revised rates and advance charges. The proposed average increase to the Residential class was 2.83%; to the Small General Service class was 2.67%; to the Medium General Service class was 2.67%, and to the Large General Service class was

2.49%.[24] In Exhibit A to its application, SCANA stated that the Company had met all current construction milestones approved by the Commission in Order No. 2010-12, as adjusted pursuant to contingencies authorized in Order No. 2009-104(A) and that 59 of the 146 milestones had been completed as of March 31, 2011.[25] SCANA also falsely represented that it was "on track to complete the Units at the capital cost forecast of approximately $4.3 billion as approved in Order No. 2011-345."[26]

103.     In Exhibit A to its May 27, 2011 application, SCANA stated that construction of the Units was progressing on schedule, but a delay in the issuance of the Combined Operating License would not allow Unit 2 to be completed by the substantial completion date set forth in the EPC Contract.[27] SCANA then went on to falsely state: "[t]he Project Licensing and Permitting, Engineering, Procurement and Construction work remains on schedule to meet the Units' Substantial Completion dates."[28]  At this time, the Owners were aware that the delay in issuance of the Combined Operating License was caused by significant problems in competence and efficacy of the submodule fabricators.  Yet, the RICO Defendants did not disclose these issues.

104.     Likewise, Carter falsely stated in a June 24, 2011 television interview on the Carolina Business Review, "Our plans on the new nuclear unit, Summer Units 2 and 3 with SCANA, are going very well. Uh, they are on schedule."[29] This interview was published to YouTube on October 8, 2012.

105.     Despite Defendant Carter's public assertions in 2011—over six years before

---

[24] Docket No. 2011-207-E.
[25] *Id.* at Ex. A.
[26] *Id.* at Ex. A.
[27] Docket No. 2011-207-E at Ex. A, p. 6
[28] *Id.* at Ex. A, p. 18.
[29] See https://www.youtube.com/watch?v=CvRAAAo4ja0

SCANA and Santee Cooper abandoned the Project—the RICO Defendants had already identified serious problems with the Project that made timely and cost-effective completion impossible.

106.    A May 6, 2014 joint letter from Carter and Marsh to Philip K. Asheman (then-CEO of Chicago Bridge & Iron) and Daniel L. Roderick (then-CEO of Westinghouse)—which the RICO Defendants withheld from state and federal regulators and the public until the Project's failure—enumerated numerous failures of the Consortium and its contractors, including the following:

- "To meet these [substantial completion] dates [for modules 1 and 20 and Unit 2], it was essential that the Consortium timely complete module fabrication delivery, and assembly. The Consortium selected Shaw Modular Solutions, LLC ('SMS') an affiliate of the Consortium, as the module fabricator. <u>Problems with SMS's work began almost immediately.</u>" (emphasis added)

- "The NRC attempted to inspect the SMS facility between January 10 and 12, 2011…To the NRC's apparent surprise, SMS had not yet made enough progress to make an inspection worthwhile."

- SMS stated it "expects to be at a high level of production of structural modules in early June 2011" and "expects that shipment of the first structural submodule will occur [at] the end of June 2011." However, "SMS did not meet these module production and shipment dates."

This letter, which is incorporated by reference into this 3rd Amended Complaint, and will be referred to herein as the "Round Up Letter," documents the RICO Defendants' longstanding knowledge regarding serious obstacles to completion of the Nuclear Reactor Project.

107.    On October 20, 2011, SCANA and Santee Cooper entered into a binding agreement, the Design and Construction Agreement ("DCA"), in connection with the Nuclear Reactor Project. Santee Cooper and SCANA agreed that, under the DCA, SCANA was to act as Santee Cooper's limited agent with respect to "all aspects of the acquisition, design,

engineering, licensing and construction of the Project, including the negotiation, execution and performance of the obligations and enforcement of the rights of the Parties under the EPC Agreement." However, Santee Cooper retained significant rights and responsibilities with respect to the project, including the right to serve on the Executive Steering Committee charged with project oversight.

108.    On May 27, 2012, pursuant to S.C. Code Ann. § 58-33-280, SCANA submitted its fifth request for the approval of revised rates and advance charges. The proposed average increase to the Residential class was 2.69%; to the Small General Service class was 2.55%; to the Medium General Service class was 2.46%, and to the Large General Service class was 2.28%.[30]

109.    In Exhibit A to its May 27, 2012 application, SCANA stated that it anticipated the gross construction costs to be $156 million over the projected costs on December 31, 2011.[31] SCANA then falsely represented that the project was moving according to schedule.

110.    However, as set forth in the Round Up Letter, "[b]y July 7, 2012, only 21 of 72 CA-20 sub-modules had been delivered to the site." In the same letter, Carter and Marsh called this "poor progress."[32]

111.    Moreover, the COL license from the NRC to construct and operate the plant was issued on March 30, 2012, rather than the originally scheduled date of July 1, 2011.  Thus, as of March 30, 2012, nuclear construction on-site had not even commenced.

112.    On September 28, 2012, based upon the false and misleading statements made in SCANA's May 27, 2012 application for the approval of revised rates and advance charges, PSC

---

[30] Docket No. 2011-207-E.
[31] *Id.* at Ex. A, p. 3.
[32] Docket 2017-370-E, ID #278515, ORS Exhibit GCJ - 2.10, at 4, *available at* https://dms.psc.sc.gov/Attachments/Matter/728981d2-35cb-4859-8ce0-6226a342656b.

issued an Order Granting Request for Approval of Revised Rates.[33]

113.    March 9, 2013 marked the first nuclear concrete pour of the Nuclear Island foundation on Unit 2, more than 6 months behind schedule. Prior to this time, critical path activities could not commence on the project.

114.    According to Gary Jones, an independent Engineer retained by ORS as a consultant, as of 2013, "the WEC design was not as complete as advertised and had not been properly reviewed for constructability by the Consortium or SCE&G. The module fabrication facilities promoted by Shaw to be state-of-the-art industrial complexes failed to achieve both quality and productivity, resulting in significant Project delays... The EPC contracting approach appeared to be driven more by cost reduction concerns than by quality and productivity and created deep animosity among the Consortium partners and the Owners."[34]

115.    Despite these delays and constructability issues, all of which were known by Defendants Marsh and Carter, Defendants praised the Consortium's efforts in a March 11, 2013 press release celebrating the first major concrete installation at the site. Marsh stated, "[w]e recognize the significance of this event and appreciate the strong commitment to safety and collaboration demonstrated by all involved in reaching this milestone." Carter stated, "[w]e've come to this point through the diligent and conscientious attention to task by everyone involved, from our crews to the NRC."

116.    On May 31, 2013, pursuant to S.C. Code Ann. § 58-33-280, SCANA submitted its sixth request for the approval of revised rates and advance charges. The proposed average increase to the Residential class was 3.10%; the Small General Service class was 3.04%; the

---

[33] Docket No. 2012-186-E, Order No. 2012-761, September 28, 2012.
[34] Docket No. 2017-370-E, ID #278508, Testimony of Gary Jones, September 24, 2018, at 7, *available at* https://dms.psc.sc.gov/Attachments/Matter/728981d2-35cb-4859-8ce0-6226a342656b.

Medium General Service class was 3.07%, and the Large General Service class was 2.66%.[35]

117.    SCANA also informed PSC that "[t]he current cost estimates include no cost changes apart from changes in timing of costs and minor shifts in costs among cost categories that occur in the normal course of managing the project"[36] and that "[t]he Project Licensing and Permitting, Engineering, Procurement and Construction work remains on schedule to meet the Units' Substantial Completion Dates taking into account the schedule contingencies approved in Order 2009-104(A)."[37]

118.    As of March 1, 2013, the RICO Defendants knew that it would be impossible to achieve the initial substantial completion dates without exorbitant increases in the project costs.

119.    Beginning in early summer of 2013, SCANA, on behalf of the Owners, stated repeatedly it intended to provide a revised fully integrated construction schedule to ORS. This schedule is the only means by which a project can be tracked accurately.  SCANA's statements were false and were a deliberate attempt to mislead the PSC and ORS about the fact that the true completion dates of the Project were unknown and not capable of being ascertained.  This deliberate effort by the RICO Defendants to conceal the non-existent Project schedule was guided solely by the RICO Defendants' desire to continue reaping the benefits of subsequent and continued increases to customer bills

120.    On June 4, 2013, Marsh sent an email to Paula Rowland, requesting it be forwarded to SCANA Directors.  The email stated that Chicago Bridge & Iron ("CB&I") "have given us their revised schedule, and based on that schedule the completion of Unit 2 will slide from March 2017 until late 2017 or the first quarter of 2018"—as compared with the modified

---

[35] Docket No. 2013-150-E at 6.
[36] *Id.* at Ex. A, p. 2.
[37] *Id.* at Ex. A, p. 19.

schedule filed on November 15, 2012 that anticipated commercial operation of Unit 2 on March 15, 2017.[38] "Completion of Unit 3 will also need to move, but they have not focused their efforts on that calculation at this time," Marsh added.[39] This email also stated (1) the Consortium "has failed numerous times in providing an accurate schedule"; (2) "[t]he impact on cost has not been determined and will certainly be a challenge given our previous settlement with Shaw that we would not incur any additional costs related to module delivery"; and (3) "[w]hile we cannot determine the actual cost of delay at this point we are doing our best to define some preliminary boundaries on the cost of the delay to keep the market from assuming the worst."[40] On information and belief, this communication was sent to SCANA directors. The RICO Defendants did not communicate this email or its substance to the PSC, regulators, or the public.

121. On August 23, 2013, Defendant Carter wrote a letter to Defendant Marsh stating, "[f]or almost two years Santee Cooper and SCE&G have been working with the Consortium (WEC and CB&I) to correct submodule delivery issues from the Lake Charles fabrication facility… Although early indications seemed positive that CB&I executive management were engaged in improving the performance at Lake Charles, the delivery record unfortunately demonstrates otherwise, putting the project schedule in jeopardy once again."[41] Carter continued, "[t]he Consortium's inability to deliver submodules has been a major source of concern for this project for a long time. . . .Our view is that the Consortium's inability to fulfill

---

[38] Docket 2017-370-E, ID #279348, ORS Exhibit GCJ – 2.2.A, June 4, 2013, at 1, *available at* https://dms.psc.sc.gov/Attachments/Matter/c378ed1f-7c5e-4921-948f-4f617d9abd33.
[39] *Id.*
[40] *Id.*
[41] Docket 2017-370-E, ID #278515, ORS Exhibit GCJ - 2.3, at 1, *available at* https://dms.psc.sc.gov/Attachments/Matter/c378ed1f-7c5e-4921-948f-4f617d9abd33.

their contractual commitments in a timely manner places the project's future in danger."[42] (emphasis added). The RICO Defendants did not disclose this letter and its substance to the PSC, other regulatory entities, the Class and the public.

122.    On September 5, 2013, Defendant Marsh emailed Roderick and Asherman, stating: "The Consortium is now in its third year of unsuccessful attempts to resolve its manufacturing problems at the facility which continues to impact our project negatively. Your missed deadlines put potentially unrecoverable stress on the milestone schedule approved by the SC PSC."[43] The RICO Defendants did not disclose this letter and its substance to the PSC, other regulatory entities, the Class and the public.

123.    On September 27, 2013, based upon the false and misleading statements made in SCANA's May 31, 2013 application for the approval of revised rates and advance charges, and with no knowledge of issues addressed in Defendant Carter's August 23, 2013 letter to Marsh and Defendant Marsh's September 5, 2013 letter to Roderick and Asherman, PSC issued an Order Granting Request for Approval of Revised Rates.[44]

124.    In an October 21, 2013 inter-office memo to his executive team, documenting a VC Summer Consortium meeting on September 18, 2013, Defendant Carter stated, "Kevin [Marsh] and I went on to note that we have received so many new schedules that they are meaningless. We have no real confidence to provide modules as scheduled."[45] The text and substance of this memo were not revealed to the PSC, other regulatory entities, the Class and the public.

---

[42] *Id.*
[43] Docket 2017-370-E, ID #278515, ORS Exhibit GCJ - 2.5, at 2, *available at* https://dms.psc.sc.gov/Attachments/Matter/c378ed1f-7c5e-4921-948f-4f617d9abd33.
[44] Docket No. 2013-150-E, Order No. 2013-680, September 27, 2013.
[45] Docket 2017-370-E, ID #278515, ORS Exhibit GCJ - 2.5, at 1, *available at* https://dms.psc.sc.gov/Attachments/Matter/c378ed1f-7c5e-4921-948f-4f617d9abd33.

125.    Instead, the RICO Defendants' public disclosures painted a different picture. On November 4, 2013, SCANA transmitted a press release celebrating the nuclear island basemat for Unit 3, which expressly praised the RICO Defendants' and the Consortium's performance. In the press release, Defendant Marsh stated, "This is another example of our outstanding collaboration with Santee Cooper, CB&I, WEC, and many other stakeholders who play a role in providing South Carolina with the best solution for meeting the long-term need for clean, safe, and reliable power."[46] In the same press release, Defendant Carter also lauded the project progress, claiming the projected had come "a long way…" and that "this milestone gets us one step closer to the finish line and the many benefits these units will provide for our state."[47]

126.    However, during the same timeframe, Defendants' May 6, 2014 Round Up Letter itemized the Consortium's history of poor performance throughout the project.[48] In addition to an itemized airing of the Owners' grievances, the letter stated that the delays had cost $150 million to date.[49]

127.    Despite the language of the Round Up letter, on May 22, 2014, the Owners transmitted a press release via the internet and, upon information and belief, by email, lauding the placement of a containment vessel bottom head on Unit 3. In the SCANA press release, Defendant Marsh is quoted as stating, "Placement of the Unit 3 Containment Vessel Bottom Head is <u>one of many examples of progress occurring daily on our nuclear site.</u>"[50] Defendant Carter is also quoted in the press release stating, "We are now far enough into this project that

---

[46] Docket 2017-370-E, ID #278515, ORS Exhibit GCJ - 2.6, at 1, *available at* https://dms.psc.sc.gov/Attachments/Matter/c378ed1f-7c5e-4921-948f-4f617d9abd33.
[47] *Id.*
[48] Docket 2017-370-E, ID #278515, ORS Exhibit GCJ - 2.10, *available at* https://dms.psc.sc.gov/Attachments/Matter/728981d2-35cb-4859-8ce0-6226a342656b.
[49] *Id.* at 13
[50] Docket 2017-370-E, ID #278515, ORS Exhibit GCJ - 2.11, at 1, *available at* https://dms.psc.sc.gov/Attachments/Matter/728981d2-35cb-4859-8ce0-6226a342656b.

we are <u>seeing a steady march of progress</u> toward new nuclear power for South Carolina. I congratulate the folks who are working hard on site for accomplishing another key milestone."[51] (Emphases added).

128.    SCANA's seventh request for the approval of revised rates and advance charges, submitted on May 30, 2014, (after issuance of the Round Up Letter) failed to disclose problems with the project.[52] The proposed average increase to the Residential class was 3.09%; to the Small General Service class was 3.08%; the Medium General Service class was 3.07%, and to the Large General Service class was 2.70%.[53]

129.    In Exhibit A to its May 30, 2014 application, SCANA reported that Westinghouse was in the process of assembling a Revised Fully-Integrated Construction Schedule that would provide a more detailed evaluation of the engineering and procurement activities necessary to accomplish the schedule.[54] However, SCANA informed PSC that the revised construction schedule would affect cash flow estimates, but that the Owners had not accepted responsibility for any of the additional estimated costs as a result of revisions to the schedule.[55]

130.    On June 19, 2014, Ron Jones, a vice president at SCANA, wrote a letter to Chris Levesque at Westinghouse ("the Ron Jones letter") that stated, in part, "The Consortium is in the process of preparing another re-baseline of the project work schedule. You had previously promised to provide that document on May 30, 2014, but we now understand that you anticipate taking an additional 6 weeks to prepare it. . . .We also wish to remind you that the current

---

[51] *Id.*
[52] Docket No. 2014-187-E.
[53] *Id.* at 6.
[54] *Id.* at Ex. A, p. 3.
[55] *Id.* at Ex. A, p. 4.

progress payment schedules are out of sync with the currently anticipated dates for units 2 and 3 substantial completion. . . . The Consortium have found it necessary to again re-baseline the work schedule <u>because of the Consortium's own performance deficiencies</u>."[56] (Emphasis added.)

131.    The RICO Defendants withheld the text and substance of the Ron Jones letter from the PSC, regulatory entities, the Class and the public.

132.    On September 8, 2014, Defendant Carter emailed Defendant Marsh: "[M]y sense is that neither the Owners nor the Consortium have any real confidence that the proposed rollout schedule that the Consortium shared with the Owners on August 1st is achievable. <u>I am concerned that we have become tied to artificial dates, both past and future, often driven by disclosure considerations.</u>"[57] (Emphasis added.) Defendant Carter withheld the text and substance of this correspondence from the PSC, regulatory entities, the Class and the public.

133.    On September 27, 2014, based upon the false and misleading statements made in SCANA's May 30, 2014 application for the approval of revised rates and annual charges, and the aforementioned material omissions of fact, PSC issued an Order Granting Request for Approval of Revised Rates.

134.    In an earnings call on October 30, 2014, Defendant Byrne stated he anticipated Unit 2 would be completed late 2018 or the first half of 2019 (with substantial completion of Unite 3 about 12 months later)[58], and anticipated a cost increase of $660 million (in 2007 dollars) "principally related to these delays to achieve the late 2018 substantial completion date

---

[56] Docket 2017-370-E, ID #278515, ORS Exhibit GCJ - 2.12, at 1, *available at* https://dms.psc.sc.gov/Attachments/Matter/728981d2-35cb-4859-8ce0-6226a342656b.
[57] Docket No. 2017-370-E, ID #278563, ORS Exhibit GCJ – 4 at 1, *available at* https://dms.psc.sc.gov/Attachments/Matter/86c75b5c-3b52-4190-81ff-e2e25d8c499d.
[58] Docket No. 2017-370-E, ID #278518, ORS Ex. GCJ – 2.18 at 8, *available at* https://dms.psc.sc.gov/Attachments/Matter/f34a2e3e-e734-49bd-a280-3a898b0112f2.

for unit 2."[59]. Byrne also stated during this call that ratepayers would be responsible for cost overruns.[60]

135.    However, an undisclosed November 2014 internal Santee Cooper estimate of project completion anticipated a 27 month delay on Unit 2 (a delay from March 2017 to June 2019) and a 25 month delay on Unit 3 (delay from May 2018 to June 2020).[61]

136.    Around roughly the same time, an internal SCANA report prepared by SCANA Services employees also estimated completion would cost more than twice as much as the Westinghouse estimate of $660 million.

137.    Neither the SCANA report nor the Santee Cooper estimate of project completion was ever made public during the pendency of the project.

**G.    2014–2015: As Project Trajectory Worsens, RICO Defendants Continue a Pattern of Material Misrepresentations and Omissions, and Intentionally Fail to Disclose the Existence of an Independent Assessment by the Bechtel Corporation to Regulators, Investors, and the Public.**

138.    In August 2014, WEC provided an initial amended Estimate at Completion, "EAC", stating it would cost an additional $600 million to complete the Project on time. This number was based upon an as-yet unachieved level of employee productivity.

139.    On September 3, 2014, Defendant Marsh emailed Defendant Carter stating SCANA was ready to engage an outside expert to assist with the project schedule and status review.

140.    On January 28, 2015, Bechtel personnel met with Defendants Carter and Crosby to develop a proposal for an assessment of the Project construction and management. Bechtel emailed a draft proposal to Santee Cooper executives which estimated a cost of $1,000,000 for

---

[59] *Id.*

[60] *Id.* at 20.

[61] ORS Exhibit GCJ - 2.49, Docket No. 2017-370-E, September 24, 2018, 9:09 PM, at 21 n.1.

the assessment to be conducted by a staff of ten senior Bechtel employees.

141.    On February 11, 2015, Carlette Walker, who served as SCANA's Vice President of Nuclear Finance Administration, emailed Evelyn Varn at SCANA. Referring to the Reactor Project, Walker stated, "I will say this project and my role is really stressing me to the max. I don't want to go to prison over this stupid job and I know I wouldn't get any backing if it came down to someone making me one of the fall guy(s)."[62] (Emphasis added).

142.    On February 17, 2015, Santee Cooper executives recommended the engagement of Bechtel at a meeting with SCANA executives. The RICO Defendants did not publicly disclose their discussions with Bechtel, or the concerns the RICO Defendants shared over the WEC EAC, nor did the RICO Defendants provide information to regulatory entities about engaging a consultant to perform a project assessment.

143.    During a February 19, 2015 earnings call, Steve Byrne expressed optimism that cost overruns would be approved by PSC, stating, "It would have to really be imprudent before they would deny it and imprudency on the part of us, the utility, which I think would be very difficult for anybody to prove." (Emphasis added).

144.    According to a March 16, 2015 article in a publication of Moody's, "SCANA and SCE&G are completely exposed to and dependent on the BLRA. The utility has exhausted its financial cushion, is over-budget and still years away from commercial operation."[63]

145.    On March 12, 2015, SCANA submitted to the PSC a filing to obtain an order to Update Capital Cost and Schedule.[64] Gary Jones concluded in pre-filed testimony dated September 24, 2018, that this filing was "seriously deficient and presented unsubstantiated,

---

[62] Docket 2017-370-E, ID #279348, ORS Exhibit GCJ 2.20.A, at 1, *available at* https://dms.psc.sc.gov/Attachments/Matter/3660e68a-0454-4ae8-9b70-e545f425f5a7.
[64] SCE&G March 12, 2015 filing under [PSC] Docket No. 12 2015-103-E
[64] SCE&G March 12, 2015 filing under [PSC] Docket No. 12 2015-103-E

misleading and baseless estimates of the revised Project construction schedule and costs." [65]

146.    As Jones further testified, "SCE&G itself did not believe the cost and schedule it submitted to the PSC, but rather only sought the approval of those revisions as a means to gain a rate increase." [66]

147.    Jones also stated in his pre-filed testimony that "…members of the Consortium knew or should have known the Project was in jeopardy and should have been thoroughly reviewed relative to factors contributing to significant and increasing delays in construction and budget and cost overruns and that a revised resource-loaded fully integrated schedule should be developed and implemented."[67] However, notwithstanding Defendants' knowledge, the Project continued unabated.

148.    During the PSC hearing on docket 2015-103-E, SCANA testified that it intended to hold the Consortium to the guaranteed substantial completion dates of March 15, 2017 for Unit 2 and May 15, 2018 for Unit 3, as provided by Order No. 2012-884.

149.    However, in a revised EPC contract, executed just months after the 2015 hearing, SCANA sought to modify the substantial completion dates proposed to the Commission to June 19, 2019 for Unit 2 and June 16, 2020 for Unit 3.

150.    These requests to modify the project schedule enabled SCANA to request a revised rate increase without a general rate case.  Indeed, this same tactic was employed on four previous occasions throughout the Project.

151.    According to the sworn testimony of Carlette Walker in 2018, Defendants Marsh, Byrne, and Addison pressured her to lie in her 2015 written and sworn testimony before

---

[65] Docket No. 2017-370-E, ORS Testimony of Gary C. Jones, September 24, 2018, https://dms.psc.sc.gov/Attachments/Matter/3e6b1499-a97f-4fc8-aca4-874b2b7bd314
[66] *Id.*
[67] *Id.*

the PSC. Prior to submitting her testimony, Walker calculated the remaining project cost was over $1 billion.  But "Kevin [Marsh] made the decision that he was going to go with the low [Westinghouse] number. It was a number he could point to that Westinghouse had given him as the price tag to finish the project."[68] At roughly the same time, Ms. Walker took a brief period of leave from work to care for her sick husband. When she returned, she discovered that the testimony filed by SCE&G bearing her name included the estimated completion cost she vehemently opposed.

152.    Upon information and belief, during the 2015 hearing, Defendant Byrne falsely testified that the schedule presented to the PSC in connection with the 2015 rate case represented a "revised, fully integrated construction schedule." In fact, such a schedule did not exist.

153.    Even though the Owners did not trust the accuracy of the schedule and cost values provided by the Consortium, they nevertheless submitted these schedules in the March 12, 2015 PSC filing, and publicly insisted that the project could be completed within the projected dates.On April 6, 2015, Defendant Crosby emailed Defendant Byrne and Jeffrey B. Archie, a Senior Vice President and Chief Nuclear Officer of SCE&G, a chart he described as "a good visual aid which projects the end view total target cost impact of the Consortium's poor management and productivity of labor ratios."[69] (Emphasis added).

154.    Meanwhile, following an April 7, 2015 presentation Defendant Marsh approved the decision to hire Bechtel subject to the approval of the SCANA Board. Ultimately, SCANA's and Santee Cooper's boards approved the Bechtel hiring.

---

[68] Docket 2017-370-E, ID # 279640, Deposition Transcript of Carlette Walker, Volume 1, https://dms.psc.sc.gov/Attachments/Matter/37936bce-d479-46b3-a9ca-450c3fb3c35d
[69] Docket 2017-370-E, ID #278522, ORS Exhibit GCJ – 2.24 at 1, *available at* https://dms.psc.sc.gov/Attachments/Matter/2a39943b-4488-41d7-bee7-00f5813981b8.

155.    The RICO Defendants did not disclose that the Owners were considering hiring Bechtel to assess the Project. As Gary Jones testified to the PSC, "[k]nowledge of this pending assessment would more than likely result in postponement of the review of SCE&G's March 12, 2015 filing until the review was completed and results were available."[70]

156.    The RICO Defendants nevertheless proceeded with the March 12, 2015 petition.

157.    On May 29, 2015, pursuant to S.C. Code Ann. § 58-33-280, SCANA submitted its eighth request for the approval of revised rates and advance charges.[71] The filing disclosed a significant change:  the commercial operation date for Unit 2 was now postponed to June 19, 2019. The proposed average increase to the Residential class was 2.80%; to the Small General Service class was 2.89%; to the Medium General Service class was 3.00%, and to the Large General Service class was 2.57%.[72]

158.    In Exhibit A to its May 29, 2015 application, SCANA reported that while construction was slightly delayed, the increase in delayed milestones was the result of the Revised, Fully-Integrated Construction Schedule.[73]  However, at the time of this application, Defendants were aware that no such schedule existed.

159.    Contemporaneous with Defendants' 2015 engagement of Bechtel for purposes of a project assessment, the RICO Defendants continued to publicly claim  the Project was achieving good progress and represented good public policy.

160.    For example, in a July 23, 2015 press release transmitted by SCANA celebrating the installation of the CA01 module, Defendant Marsh stated, "[s]uccessful placement of this

---

[70] Docket No. 2017-370-E, ID #278508, Testimony of Gary Jones at 11, *available at* https://dms.psc.sc.gov/Attachments/Matter/3e6b1499-a97f-4fc8-aca4-874b2b7bd314.
[71] Docket No. 2015-160-E
[72] *Id.* at 6.
[73] *Id.* at Ex. A, p. 3.

major <u>module demonstrates the progress being made with our new nuclear units</u> that are under construction at V.C. Summer . . . Adding more nuclear energy to our generation mix <u>is the best solution</u> for providing South Carolina large-scale energy that is clean, safe, and reliable." In the same release, Defendant Carter stated, "[t]he successful placement of the CA01 module <u>marks a significant milestone</u> for this project. The nuclear units at V.C. Summer <u>remain a critical component</u> of Santee Cooper's long-term plan to diversify our generation mix and to continue to provide <u>low-cost</u>, reliable and environmentally-sound electricity to our customers."

161.    Bechtel's engagement on the Project began on August 10, 2015.

162.    During a September 2015 conference call, Santee Cooper executives discussed whether to disclose the engagement of Bechtel to investors. Notes taken from the meeting pose the question, "POS/OS Mini-Bond," "Bechtel Assessment," "Disclose or Not?"[74]

163.    Carter and other Santee Cooper executives attended this meeting. Following this meeting, and until suspension of construction on the Project, none of the RICO Defendants ever disclosed the existence of the Bechtel assessment.

164.    In September 2015, SCANA executive James Swan IV wrote fellow executives, "FYI—Deloitte will be asking about whether (or why not) we mention the Bechtel consulting engagement. The initial thinking I believe is that we will not mention it. … Stay tuned."

165.    Ronald Lindsay expressed in an email around this same time that SCANA's executives were in "complete agreement that no disclosure should be made." A few days later, SCANA's outside counsel expressed that Jimmy Addison "didn't want to volunteer anything

---

[74] *See* Thad Moore, "During Nuclear Audit, Santee Cooper Executives Faced a Question: 'Disclose or Not?' *The Post and Courier* (Aug. 27, 2018),
https://www.postandcourier.com/business/during-nuclear-audit-santee-cooper-executives-faced-a-question-disclose/article_ee13b992-a7de-11e8-87d7-2ba1c923965f.html.

about it" in an SEC filing.[75]

166.    SCANA officials encouraged Santee Cooper executives not to disclose the existence of the Bechtel audit. SCANA attorney Alvis Bynum wrote in an email to Defendants Byrne, Addison, and other SCANA executives, "[t]hey [Santee] are debating whether to mention the Bechtel study. I am not clear how you would feel or if Santee Cooper is even asking our opinion."

167.    SCE&G and SCANA Senior Vice President Archie responded by email, telling SCANA's team he would speak with Michael Crosby and emphasize the "problem that [disclosure] creates for us."[76]

168.    On September 10, 2015, based upon the false and misleading statements made by SCANA in its May 26, 2015 application for the approval of revised rates and advance charges, and the RICO Defendants' withholding of material information, set forth above, PSC issued Order No. 2015-661 approving SCANA's petition to update and revise the project costs and schedule. PSC approved an increase of the base project cost of $698.2 million (over 2007 dollars), and an extension of the commercial service deadline of Unit 2 to June 19, 2019 and Unit 3 to June 16, 2020. Though SCANA reduced its return on investment from 11% to 10.5%, this return on investment remained well above the industry average.

**H.     2015–2016: RICO Defendants Concealed and Sought to Suppress Bechtel's Dire Assessment of the Project and Forecast of Schedule Delays, While Continuing to Obtain Rate Increases and Investment in the Project.**

169.    Santee Cooper executives were the first to learn the results of Bechtel's assessment of the Project. On October 14, 2015, Defendant Crosby forwarded to Defendant

---

[75] https://www.postandcourier.com/business/scana-decided-not-to-disclose-critical-review-of-sc-nuclear/article_41f8e652-cd84-11e8-b232-0b0f1c3de3a4.html.

[76] https://www.postandcourier.com/business/scana-decided-not-to-disclose-critical-review-of-sc-nuclear/article_41f8e652-cd84-11e8-b232-0b0f1c3de3a4.html.

Carter an October 13 email sent to Crosby from Carl Rau of Bechtel. Crosby wrote, "Carl has

provided (you/me) preliminary bullet notes from the Assessment (see below) …SCE&G has not

seen this yet.  I do not see any real surprises … the Bechtel projection on commercial operation

dates is sobering." (Emphasis added.) Rau referred to the content of his October 13 email to

Crosby as a "Preliminary Assessment, which will form the basis of our presentation to the

execs." Among many pertinent findings, Bechtel noted:

a. The "Scope of the Assessment" was to "[e]valuate the status of the project to assess
   the Consortium's ability to complete the project on the forecasted schedule…Focus
   was not on cost."

b. "The project management approach used by the Consortium does not provide
   appropriate visibility and accuracy on project progress and performance. There is a
   lack of accountability in various departments in both the Owner's and Consortium's
   organizations… The current hands-off approach taken by the Owners toward
   management of the Consortium does not allow for real-time, appropriate cost and
   schedule mitigation. The WEC-CB&I relationship is extremely poor caused to a
   large extent by commercial issues. The overall morale on the project is low."

c. Bechtel projected that the commercial operation date of Unit 2 would be extended
   "18-26 months beyond the current June 2019 commercial operation date," and the
   commercial operation date of Unit 3 would be extended "24-32 months beyond the
   current June 2020 commercial operation date," with a probability of "50-75%."
   (Emphasis added.)

d. "The Consortium's forecasts for schedule durations, productivity, forecasted
   manpower peaks, and percent complete are unrealistic."

e. "The Owners do not have an appropriate project controls team to assess/validate
   Consortium reported progress and performance."

f. "Construction productivity is poor."[77]

Many of Bechtel's findings regarding productivity were consistent with the October 2014

---

[77] Docket 2017-370-E, ID #278525, ORS Exhibit GCJ 2.36 at 2–3, *available at*
https://dms.psc.sc.gov/Attachments/Matter/0c13a2d3-b4ce-43c0-88ab-ae9d6ad4750d.

findings of SCANA's own internal review team.

170.    Bechtel presented its initial findings to Santee Cooper and SCANA executives at SCANA headquarters on October 22, 2015 ("the Bechtel initial assessment"). These findings were consistent with and a restatement of its initial assessment communicated to Crosby. Bechtel's presentation included numerous recommendations, such as to develop an "Owner's Project Management Organization"—which resulted from its determination that the Owners failed to fulfill their oversight and accountability function. Other notable findings included:

   a.   "Based on our assessment, <u>the current schedule is at risk.</u>"

   b.   "<u>The Project needs to experience some successes, no matter how small.</u>"

   c.   "There is <u>a lack of accountability</u> in various Owner and Consortium departments."

   d.   "The approach taken by the Owners <u>does not allow for real-time, appropriate cost and schedule mitigation.</u>"

   e.   "The Consortium does not appear to be commercially motivated to meet Owner goals."

   f.   "Engineering staffing remains extremely high . . . for the reported percent complete of the design; however, <u>it appears that the staffing is needed to complete the design.</u>"

   g.   "The Consortium's forecasts for schedule durations, productivity, forecasted manpower peaks, and percent complete <u>do not have a firm basis.</u>"

   h.   "<u>The Owners do not have an appropriate project controls team to assess/validate Consortium reported progress and performance.</u>"

(Emphases added).[78]

171.    The Bechtel initial assessment to Santee Cooper and SCANA executives estimated a commercial operation date of December 2020 to August 2021 for Unit 2 and June

---

[78] Docket 2017-370-E, ID #278525, ORS Exhibit GCJ - 2.37 at 3, 9–31, *available at* https://dms.psc.sc.gov/Attachments/Matter/0c13a2d3-b4ce-43c0-88ab-ae9d6ad4750d.

2022 to June 2023 for Unit 3. The assessment added years to the already delayed dates for substantial completion, and were based on generous assumptions, including that "[a]ll modules and material will be available to support the assessed construction dates," "[n]o construction equipment limitations," and "[d]esign and work packages are available to support construction need dates."[79] According to Bechtel, "[i]ncreasing schedule confidence to 75% <u>increases the schedule duration by 8 months</u>" beyond the August 2021 date for Unit 2 and June 2022/2023 date for Unit 3.[80] (Emphasis added.)

172.    Bechtel concluded that "the V.C. Summer Units 2 and 3 project suffers from various fundamental EPC and major project management issues that must be resolved for project success."[81]

173.    On October 27, 2015, five days after Bechtel delivered its initial assessment, SCANA, on behalf of itself and Santee Cooper, signed an Agreement with Westinghouse that significantly revised the EPC Contract for the Project.[82] The revision extended the Unit 2 completion date to August 31, 2019 and the Unit 3 completion date to August 31, 2020.[83] CB&I withdrew from the Consortium and its interest was transferred to Westinghouse.[84] Fluor Corporation was added as a construction subcontractor reporting directly to Westinghouse.[85] The Amendment also established a Dispute Resolution Board ("DRB") to resolve issues with

---

[79] *Id.* at 24.
[80] *Id.*
[81] *Id.*
[82] Agreement ("October 2015 EPC Amendment"), Oct. 27, 2015, *available at* https://www.sec.gov/Archives/edgar/data/91882/000075473715000076/a20150930-exhibit1005.htm.
[83] *Id.* at 3.
[84] *Id.* at 1.
[85] *Id.*

milestone payments.[86]

174.    According to the sworn testimony of Westinghouse representative Joni Faliscino, the October 2015 contract amendment increased the contract price by approximately $300 million, with an option to convert target pricing to a fixed price. The amendment also included payments of $100 million per month for five months to Westinghouse, until a revised milestone payment schedule was obtained.[87] These payments frontloaded cost that might otherwise have been avoided by the RICO Defendants.

175.    With regard to the October, 2015 amendment, Gary Jones testified before the PSC, " it seems likely that negotiations resulting in this revised contract must have been on-going for some time, although ORS was not advised that these negotiations were underway. Such a massive change would have warranted reconsideration of SCE&G's petition and SCE&G's failure to inform the PSC of the potential agreement that would affect the pending petition indicates further that SCE&G valued the increased revenue from revised rates over candor to the PSC."[88]

176.    Following execution of the EPC Amendment, the Owners made an additional $100 million payment to Westinghouse beyond the five agreed-upon payments.

177.    At no time during the remaining months of the project did the RICO Defendants disclose the outcome of the Bechtel initial assessment even after ORS questioned SCANA about whether a Bechtel report existed. SCANA told Gary Jones at the October 27-28, 2015 regular monthly construction meeting that "Bechtel's scope and findings were unknown to those present, that the assessment had been performed under the direction of upper level executives and would not be available to those present or ORS and that no written report existed."

---

[86] *Id.* at 3–6 and Ex. E.
[87] PSC Docket 2017-305-E, Exhibit 7.
[88] Docket 2017-370-E, ID #278508, Direct Testimony of Gary C. Jones, P.E., Sept. 24, 2018, at 17, *available at* https://dms.psc.sc.gov/Attachments/Matter/3e6b1499-a97f-4fc8-aca4-874b2b7bd314.

178. In subsequent conversations, SCANA falsely told Jones that "nothing new was found by Bechtel during their assessment and that [Jones] was already aware of all the issues which they had identified."

179. On November 9, 2015, Bechtel issued its draft report, which incorporated and expanded upon the conclusions and recommendations provided in its October 13 email from Rau and its October 22 presentation to SCANA/Santee Cooper executives ("Bechtel Report").

180. On November 12, 2015, Bechtel delivered its draft report to George Wenick, an attorney who represented SCANA and Santee Cooper. Attorney George Wenick, who represented both Santee Cooper and SCE&G, relayed to Bechtel that the language in the draft report criticizing project management, and predicting substantial delays to the completion deadlines, should be redacted or omitted from the report. (August 2021 for Unit 2, June 2022/June 2023 for Unit 3.)[89]

181. Despite its knowledge of the Bechtel report, and the historical performance problems plaguing the Project, Defendant Santee Cooper nevertheless knowingly allowed SCANA to submit misleading and inaccurate requests for annual rate and advance charge increases to the PSC. For 18 months after they received the Bechtel Report, SCANA and Santee Cooper continued to spend an estimated $120 million a month on a project that was falling further behind schedule and further over budget, most or all of which Defendants sought to pass onto South Carolina ratepayers. *See* https://www.thestate.com/opinion/opn-columns-blogs/cindi-ross-scoppe/article175448686.html.

---

[89] Docket 2017-370-E, ID #278511, ORS Exhibit GCJ - 2.9 at 4, *available at* https://dms.psc.sc.gov/Attachments/Matter/e3261799-6763-4ddb-89dd-3dcbad1daf9f; Docket 2017-370-E, ID #278566, ORS Exhibit GCJ – 9 at 1, *available at* https://dms.psc.sc.gov/Attachments/Matter/5f81e629-e6a3-482a-92dd-0e1349521250; ID #278540, ORS Exhibit GCJ – 2.42 at 1, *available at* https://dms.psc.sc.gov/Attachments/Matter/e99d055d-b3af-4ebe-bd80-e677cb4da697.

182.    Defendant Santee Cooper based its bond issuances on the PSC's determinations that the Project could continue.

183.    In November 2015, Defendant Lindsay, Santee Cooper's General Counsel, and others traveled from South Carolina to Atlanta to meet with attorney Wenick for a review of the Bechtel Report.[90] The participants in this meeting agreed that the commercial operation dates projected by Bechtel and the Project construction schedule should be redacted from the report.

184.    In subsequent email correspondence, the RICO Defendants, other SCANA and Santee Cooper executives, along with outside counsel Wenick, conspired to keep the report from the public under the auspice of the attorney-client privilege.

185.    In withholding the Bechtel Report from the public, the RICO Defendants intended both to continue passing along increased costs to the Class, and to shield the project from regulatory and public scrutiny.

186.    In December 2015, Ty Troutman, a Bechtel employee, expressed that the proposed redactions "defeat the purpose of the assessment and report."[91] Nonetheless, the RICO Defendants insisted that Bechtel remove the revised commercial operation dates from the report along with the discussion of the absent Project construction schedule.[92]

187.    Bechtel's assessments of the Project schedule were included in a separate "Schedule Assessment Report," which was not disclosed to the PSC, state and federal regulators, the Class or the public until August 2018.[93]

_____

[90] Ex. GCJ 2.51, Docket No. 2017-370-E, filed September 24, 2018.
[91] Docket 2017-370-E, ID #278540, ORS Exhibit GCJ – 2.42 at 1, *available at* https://dms.psc.sc.gov/Attachments/Matter/e99d055d-b3af-4ebe-bd80-e677cb4da697.
[92] *See generally* Docket 2017-370-E, ID #278540, ORS Exhibit GCJ – 2.46, *available at* https://dms.psc.sc.gov/Attachments/Matter/e99d055d-b3af-4ebe-bd80-e677cb4da697.
[93] *See* Docket 2017-370-E, ID #278508, Direct Testimony of Gary C. Jones, P.E., Sept. 24, 2018, at 20, *available at*  https://dms.psc.sc.gov/Attachments/Matter/3e6b1499-a97f-4fc8-aca4-

188.    In January 2016, Carlette Walker, who by then had resigned as SCANA's Vice President of Nuclear Finance Administration, left a lengthy voicemail for Santee Cooper executive Defendant Marion Cherry stating:

a. "I just wanted to let you know that um I know the truth now and I don't want you and um Santee to get screwed anymore by um the executives of SCE&G and SCANA, um Kevin Marsh is not the guy that everybody thinks he is, um, he is a liar, and he's just like um Steve and Jeff and Jimmy and Marty Phalen they're all of the same cloth. They all think they are the um smartest guys in the room but they're on the frigging take."

b. "[N]obody knows this but I went to a lawyer yesterday and they have broken every frigging law that you can break, I could shut SCANA down today if I wanted to."

c. "[B]ut you know Michael and um Lonnie and you need to push back and don't let them continue to mismanage that project, just don't let them, don't sign anything, refuse to pay, don't pay SCANA, push back and just say no, we're not going to do it because they are mismanaging that project and it's at y'all's expense."

d. They're doing it because they want to make money and they're propping up earnings to be able to make their … bonuses and it's going to be at your expense so if y'all haven't signed that agreement on the purchase price, call whoever you need to call and tell them don't sign anything with that management team."[94]

(Emphases added.)

189.    Upon information and belief, Walker's voicemail was shared with Defendant Carter and other Santee Cooper executives.

190.    Defendant Santee and the individual Santee Defendants did not publicly disclose Ms. Walker's voicemail, nor did they investigate further into the contents of the voicemail regarding the purportedly criminal behavior of SCANA's executives.

191.    In a 2018 deposition, Walker testified that Defendants Marsh, and Addison

---

874b2b7bd314.
[94]Deposition of Carlette Walker, Exhibit 3, *available at* https://dms.psc.sc.gov/Attachments/Matter/37936bce-d479-46b3-a9ca-450c3fb3c35d.

"knowingly lied to the public about that fixed-price contract and lied about being able to complete that project on time."[95] She further testified that she approached Marsh with her concerns about the project in 2015. Marsh dismissively brushed her off, stating that he "didn't want to hear what [Walker] had to say" and then retaliated against her by placing her on involuntary "special medical leave" for three months.[96]

192.    On February 5, 2016, the Final Bechtel Schedule Assessment Report and the Final Bechtel Report were issued. The final report was consistent with Bechtel's preliminary assessment, but conspicuously omitted reference to the project schedule, and revised substantial completion dates. However, the report maintained more knowledgeable management than the SCANA team was required, and that the Owners needed to take a more hands on approach with the construction team for the Project to succeed.

193.    The Final Bechtel Report asserted that "[t]he number of issues identified during the current civil phase of the construction effort is significant."[97]

194.    Upon information and belief, the RICO Defendants failed to implement Bechtel's recommendation that someone other than the Owners was needed to oversee Project management.

195.    Moreover, following issuance of the report, current and former SCANA executives and board members unlawfully divested themselves of large portions of SCANA stock. These sales include, *inter alia*:

   a. Defendant Martin "Marty" Phalen, former SCANA senior vice president of administration, sold 42,023 shares of SCANA stock that he indirectly controlled on May 1, 2017 for $65.49 per share for a profit of approximately $2.7 million;

---

[95] Deposition of Carlette Walker, Vol. 1, Apr. 24, 2018, at 117:25–118:3, *available at* https://dms.psc.sc.gov/Attachments/Matter/37936bce-d479-46b3-a9ca-450c3fb3c35d.
[96] *Id.* at 46:4–17.
[98] Deposition of George Wenick, at 250:6–7

b. Defendant Mark Cannon, former SCANA vice president and treasurer, sold 8,000 shares of SCANA stock that he directly owned on February 29, 2016 for $65.11 per share for a profit of approximately $520,000;

c. Defendant Russell "Rusty" Harris, president of SCE&G Gas Operations and SCANA senior vice president sold 2,500 shares that he indirectly controlled on February 26, 2016 for $65.26 per share for a profit of approximately $163,000; and,

d. Defendant James Micali, a former member of SCANA's board of directors, sold 1,000 shares of SCANA stock that he owned for $66.10 on February 23, 2016 for an approximate profit of $66,100.

I. **2016–2017: RICO Defendants Fraudulently Conceal Findings of Bechtel Reports and Financial Condition of Westinghouse While Continuing to Obtain Rate Increases and Issue Bonds.**

196.    Attorney Wenick testified in deposition that he received a "very clear direction" from Defendant Carter not to provide Carter with a final copy of the Bechtel Report.[98] Upon information and belief, Defendant Carter's instruction was a critical basis for the decision not to release the report publicly.

197.    The Bechtel Report and Bechtel Schedule Assessment Report were the product of a two-month review by fourteen highly qualified nuclear professionals with over 500 years of combined experience and over 300 years of EPC experience on more than 85 projects. Both the Report and Schedule Assessment were based on a rigorous methodology. The reports, and particularly how they criticized the project's lack of schedule, and inability to truly assess substantial completion, would have guided regulatory entities in their monitoring and oversight of the Project and should have been material evidence in the rate cases involving the Project. However, the information contained in the Reports was never disclosed to the public.

198.    In February 2016, a "Bechtel Report Action Plan" was written by a Santee

---

[98] Deposition of George Wenick, at 250:6–7

Cooper executive in response to directives from SCANA to prevent distribution of the report. The "Action Plan" including the following statements:

    a. "What mitigation effort is required to defend potential shareholder suit-Now that SCE&G is specifically aware of problems raised in report, <u>failure to act may result in O&D liability</u>."

    b. "<u>What bond disclosures are required-</u> This same concern applies to Santee Cooper, disclosures should be similar."[99]

    c. "<u>We will continue to cooperate, within the law with SCE&G's efforts to avoid disclosures</u> on the condition that SCE&G will agree to use the document as a template for project administration changes to be jointly decided."

    d. "First step, determine from Al Bynum [of SCANA] what ORS disclosures are contemplated, this will substantially drive all other disclosures."[100]

(Emphases added.) Following review of this action plan, the RICO Defendants decided not to disclose this report to the public.

    199.    Between 2015 and 2016, and after issuance of the Bechtel report, Santee Cooper sold nearly $2.1 billion in bonds to banks, major financial institutions, and the public to fund the Project. The bonds issued to fund the Project ("the bond offerings") included the following:

    a. 2015M1 bonds, totaling $36,136,600;

    b. 2015C bonds, totaling $270,170,000;

    c. 2015E bonds, totaling $300,000,000;

    d. 2016A refunding bonds, totaling $543,745,000;

    e. 2016M1 bonds, totaling $42,142,700;

    f. 2016B bonds, totaling $503,705,000;

---

[99] No bond disclosures were made.
[100] Docket 2017-370-E, ID #278546, ORS Exhibit GCJ – 2.47, *available at* https://dms.psc.sc.gov/Attachments/Matter/b14b3fa5-6114-4c95-84dd-17e01d80a324.

g.  2016D taxable bonds, totaling $322,650,000; and,

h.  2016C refunding bonds, totaling $52,400,000

Santee Cooper executives, including Carter, did not disclose the existence of the Bechtel assessment or any of Bechtel's findings or conclusions in any prospectuses or other documents disseminated in connection with the bond offerings.

200.    In addition, as Santee Cooper issued additional bonds related to the project, it intended that the obligation to repay the bondholders would be shifted onto its customers and was further aware that increased project costs for itself had a direct impact on SCANA's project costs.

201.    On March 4, 2016,[101] Defendant Marsh received a letter from Santee Cooper entitled "V.C. Summer – Units 2 & 3 Santee Cooper Recommendation." The letter stated in part that "there is a window for the Owners to impose project changes designed to offset current critical path material delays and poor construction performance attributed to inadequate project integration and management, incomplete engineering, and rework associated with ongoing design alteration."[102]

202.    The document also stated, "Over the past seven years, the Consortium's inability to coordinate itself and complete engineering, procurement, and construction work …has come at a high cost to Owners. For each month of project delay, Santee Cooper estimates its share of project cost to be $35 million."[103] (Emphasis added).

203.    The document indicated that contractors were not being paid strictly in

---

[101] Docket 2017-370-E, ID #278546, ORS Exhibit GCJ – 2.51 at 4, *available at* https://dms.psc.sc.gov/Attachments/Matter/b14b3fa5-6114-4c95-84dd-17e01d80a324.
[102] Docket 2017-370-E, ID #278546, ORS Exhibit GCJ – 2.49, *available at* https://dms.psc.sc.gov/Attachments/Matter/b14b3fa5-6114-4c95-84dd-17e01d80a324.
[103] Docket 2017-370-E, ID #278546, ORS Exhibit GCJ – 2.49, *available at* https://dms.psc.sc.gov/Attachments/Matter/b14b3fa5-6114-4c95-84dd-17e01d80a324.

accordance with the milestone payment schedule, sometimes in advance of achieving a milestone.[104]

204.    Following this letter, and despite SCANA's awareness of the cost to Santee Customers, the Owners' management of the Project did not materially change. In addition, Defendant Carter did not disclose these concerns or knowledge regarding project management to the Class or to the public.

205.    On May 26, 2016, the Owners jointly elected to enter into a fixed-price contract with Westinghouse and filed documents with the PSC[105] to update the Project's capital cost and schedule. The filing was submitted electronically, and ORS was served with a copy via first-class mail. In that filing, SCANA represented that the Project would enter commercial operation on August 31, 2019 (Unit 2) and August 31, 2020 (Unit 3). By this time, Bechtel's assessment had already demonstrated these completion dates could not be achieved.

206.    Despite having received the Bechtel Report months earlier, SCANA informed PSC that overall progress was continuing, and that cash flow forecasts provided by Westinghouse indicated that it should be able to complete constructing the Nuclear Reactor Project for $126 million less than the capital cost approved in Order No. 2015-661.[106]

207.    At the same time, beginning in or around June, 2016, emails between and among the RICO Defendants indicated awareness of the possibility of a Westinghouse bankruptcy.

208.    Despite this exchange, the RICO Defendants publicly continued to express that they were unaware of any financial difficulties Westinghouse might be facing. For example, in an email from ORS Executive Director Dukes Scott to his staff on June 22, 2016, he states,

---

[104] *Id.*
[105] Docket No. 2016-223-E.
[106] *Id.* at p. 6.

"[SCE&G] denies any knowledge of Westinghouse cash flow issues."

209.    On June 27, 2016, pursuant to S.C. Code Ann. § 58-33-280, SCANA submitted its ninth request for the approval of revised rates and advance charges.[107] The proposed average increase to the Residential class was 3.10%; to the Small General Service class was 2.99%; to the Medium General Service class was 3.25%, and to the Large General Service class was 2.96%.[108]SCANA did not provide any information about the Bechtel report in this application.[109]

210.    In November of 2016, Defendant Carter emailed a timeline to Defendant Marsh, which stated that during July and August 2016, a newly established "Construction Oversight Review Board" (CORB), an internal management group belatedly established to improve Project execution, performed "a high-level review of the project schedule, construction, construction to startup turnover planning, engineering, startup, project management, procurement, document control, vendor supplied equipment, and component testing."[110] Several conclusions were reached at an August 18 executive level exit meeting, which according to Defendant Carter's timeline included:

- "Schedule has too many activities . . .

- Subcontracts are not in schedule

- Engineering is impeding construction

- Engineering not in schedule -being handled by lists

---

[107] Docket No. 2016-224-E.
[108] *Id.* at 6.
[109] *Id.* at p. 6.
[110] Docket 2017-370-E, ID #278546, ORS Exhibit GCJ - 2.51 at 6, *available at* https://dms.psc.sc.gov/Attachments/Matter/b14b3fa5-6114-4c95-84dd-17e01d80a324.

- Project Management – must get aggressive to hold EPC accountable. **Team will not make it without some help.**"[111]

(Emphasis added). The timeline concluded:

> SCANA's project management team has many areas of strength (nuclear safety culture, operations, NRC management) but does not have the comprehensive skills and depth of experience necessary in engineering, scheduling, project controls and construction to manage a large new build project laced with complexities. Those complexities being (1) a first of a kind nuclear technology (2) being deployed by an over-extended equipment manufacturer (Westinghouse), (3) backed by an incompetent engineering firm responsible for project integration (Stone & Webster now WECTEC), and (4) a Contractor that has been disingenuous on multiple issues. The Project would be greatly benefitted by infusing the current project management team with a framework of qualified EPC managers charged with working collaboratively with the Owner and Consortium to identify areas for improvement, suggest proven solutions, and to provide an independent perspective on actual progress—the effort aimed at increasing the accountability of the Consortium and the success of the project. After three years of project delays, and now another five months of Unit 2 delay realized in 2016— there should be no shame in reaching out for qualified assistance.[112]

Despite these conclusions, the RICO Defendants did not change the management of the Project.

211.     Instead, SCANA and Santee continued to publicly proclaim substantial progress on the project. For example, in an August 31, 2016 press release, SCANA and Santee touted the placement of the reactor vessel of Unit 2. Defendant Marsh stated, "Successful placement of the Unit 2 reactor vessel is a very significant milestone on our path to completing the construction of the two new nuclear units. . . "This accomplishment is representative of the collaboration among many people who are working hard every day to provide a clean and reliable energy future for South Carolina." Carter is quoted in the release: "The Westinghouse-Fluor team has hit several important milestones this summer, and I congratulate them for the good progress they are achieving. When these units come online, the customers of Santee Cooper and SCE&G will enjoy clean, non-emitting and reliable electricity for decades to come." (Emphases added).

212.     On September 16, 2016, the CORB issued its first report, which came to many of the same conclusions found in the Bechtel Report. Among other observations, the CORB report

---

[111] *Id.*
[112] *Id.* at 7.

highlighted the significant risks and impediments to completing the Nuclear Project on time. For example, the CORB noted that "the Unit 2 & Unit 3 project schedules include significant risks to achieve substantial completion" and "project schedule uncertainty is impacting the efficient assignment of oversight resources." The CORB report also noted that the schedule being used by SCANA did not even include "all work to complete the project that should be in the schedule," meaning that additional time would have to be added to account for the work identified by the CORB report, including "subcontractor tasks," "engineering punch-lists," "test progress," and "licensing inspections, tests, analyses, and acceptance criteria."[113]

213.    Moreover, the CORB report concluded that "[t]he current schedule for Unit 2 has slipped 5 months in a 6-month period." This meant that the Nuclear Project was not progressing at all, and, for every month that passed, the Nuclear Project schedule lost an additional month.[114]

214.    By August 2016, according to the CORB report, even SCANA's own internal schedule, had moved Unit 2's completion date from August 2019 into 2020, a fact never disclosed to the public. Indeed, at this time Defendants insisted that Unit 2 would be completed by August 31, 2019.[115]

215.    Yet the RICO Defendants continued to make false and misleading representations to the public and regulators regarding the Project's progress and projected completion. For example, five days <u>after</u> issuance of the first CORB report, Defendant Carter and various SCANA executives appeared at "V.C. Summer Media Day" held at the Project site in Jenkinsville, SC to highlight the putative progress of the project. At this event, Carter stated:

---

[113] Docket 2017-370-E, ID #278522, ORS Exhibit GCJ – 2.61, *available at* https://dms.psc.sc.gov/Attachments/Matter/99d54a6d-f790-4ea0-88d0-840a5bd843a8.
[114] *Norman v. SCANA Corp.*, 3:17CV2616, Dkt, Doc. No. 72, ☐☐ 167-170.
[115] *Id.*

I've had the good fortune of being associated with this project since 1983 and I can say this therefore with some authority that we are all very fortunate as South Carolinians to have a <u>very professional team in the SCEG employees</u> that both operate the existing facility and that are constructing these new facilities on our behalf so that we do have what is very safe clean and reliable nuclear energy. <u>And as you have already heard, we've covered a number of very important milestones this summer with Units 2 and 3</u> and we are glad of course to have those behind us but <u>I don't believe we can overstate the importance that these two units have for our state</u>....."[116]

(Emphases added).

216.    On October 26, 2016, based upon the false and misleading statements made in SCANA's June 27, 2016 application for the approval of revised rates, PSC issued an Order granting SCANA's Request for Approval of Revised Rates.

217.    In its 2016 Request for a Schedule Modification before the PSC, SCANA petitioned to [117] revise the substantial completion date of Unit 2 to August 31, 2019 and Unit 3 to August 31, 2020—substantially sooner than the dates estimated by Westinghouse, Santee Cooper, and Bechtel, and to raise rates to increase the base project cost by approximately $831 million. PSC Docket 2016-223-E.

218.    Based on the RICO Defendants' misrepresentations and material omissions, set forth above, the PSC approved this schedule change and rate increase by Order No. 2016-794, dated November 28, 2016.

219.    On October 28, 2016, Alvis Bynum of SCANA sent an email to Santee Cooper's General Counsel, stating, "<u>Kevin [Marsh] is under the impression that you agreed not to disclose</u> [the Bechtel report.] The report is still a draft." Bynum made this statement despite his knowledge that the final version of the report had been issued in February 2016. Santee

---

[116]Carter's comments were recorded, broadcasted, and published to YouTube at https://www.youtube.com/watch?v=RVs94EUz-Ac.
[117] Docket No. 2016-223-E.

Cooper's General Counsel replied via email on October 28, 2016, "Al, we agreed that we would attempt to avoid disclosure and successfully did so. That was before Central learned of the report through the PSC intervention process."

220.    In a November 28, 2016 email between Defendants Carter and Marsh, Carter stated, among other things:

    a.    Our separate, collective and independent analysis suggests that the fixed price option offered by WEC is likely significantly less than the cost WEC will incur to complete the Project. This is the very reason that we selected the fixed price. Regrettably, we must anticipate WEC having financial difficulty completing the Project, particularly in a timely manner.

    b.    Release of the Bechtel Report to the Cooperatives—We are backed into a corner on this. Our largest customer, having learned of it through intervention in SCE&G's fixed price petition, demands a copy of the report. Our requests to your legal team to put some parameters around the disclosure has been met with the response that we should not release it. Not releasing this information will likely bring formal requests that will be an untenable position for both our companies.[118]

(Emphases added).

221.    On February 13, 2017, Defendant Carter sent an inter-office memo to the Santee Cooper Board in preparation for an upcoming board meeting. The memo states in part, "[a]s we approach the joint Board meeting, please allow me to share a few thoughts. First, as background for the meeting, the following facts are pertinent:

    a.    Money paid to WEC thus far (100%): $**6.6 billion.**

    b.    Remaining funds to be paid under $6.082 billion fixed price option (100%): **$4.2 billion.**

    c.    Current contract completion dates: Unit Two—**August 31, 2019** Unit Three—

---

[118] Docket 2017-370-E, ID #278511, ORS Exhibit GCJ - 2.9 at 1–2, *available at* https://dms.psc.sc.gov/Attachments/Matter/e3261799-6763-4ddb-89dd-3dcbad1daf9f.

**August 31, 2020.**

d.    PTC [production tax credit] deadline date under current law: **December 31, 2020.**

e.    WEC estimated schedule variance prior to Toshiba announcement: Unit Two—**163 days (February 10, 2020)** Unit Three—**26 days ahead (August 5, 2020). Owners deem these figures unreliable.**

f.    Current work productivity factor average for last 3 months: **.7% monthly Project completion for Oct-Dec of 2016, currently taking 3 hours of activity to complete 1 hour of work.**

g.    Owners' completion calculation using above productivity factor: **69.1% of Project remains to be completed. Project construction progress must increase to 2.3% per month to meet current contract completion dates."[119]**

(Emphases in original).

222.    Yet despite these pertinent facts reported internally to the Santee Cooper Board, Defendant Carter failed to inform the public of the strong likelihood construction would not be complete by the deadline to receive production tax credits; nor was the public informed of the dire nature of Westinghouse's monetary issues.

**J.    Knowledge of SCANA and Santee Cooper and the Demise of the Nuclear Project**

223.    As early as 2010, Santee Cooper was in active negotiations to relieve itself of over 50% of its ownership interest in the Nuclear Project.

224.    As early as 2011, SCANA and Santee Cooper knew the Project was suffering from fabrication delays, a delay in issuance of the COLA, and prospective costs associated with design deficiencies. These issues would result in a 2012 request for a schedule modification, at an added cost of $250 million.

---

[119] Docket 2017-370-E, ID #278611, ORS Exhibit GCJ - 2.71 at 1, *available at* https://dms.psc.sc.gov/Attachments/Matter/1f42e296-df97-45cc-8629-af4546b26335.

225.    On a June 3, 2013 investor call, SCANA revealed to investors that there had been delays and problems with the ability of contractor Chicago Bridge & Iron Company to ship certain submodules to the V.C. Summer Site, and problems with the V.C. Summer Site's ability to receive them. As a result, SCANA said, a "new schedule" had been developed that pushed the likely in-service date for Unit 2 back from its original estimate of 2016 to as late as 2018. Further, SCANA disclosed that, as a result of these problems, costs on the Project would increase by $200 million.

226.    Meanwhile, according to internal Santee Cooper documents, in 2014, Santee Cooper was privately raising concerns about SCANA's ability to manage the Nuclear Reactor Project, and pressuring SCANA to hire an independent construction manager.

227.    The design and construction issues were therefore known to the RICO Defendants in advance of applications to the PSC for funding through the BLRA, and in advance of approval by the Santee Cooper board of increased rates associated with the Project.

228.    Yet, with knowledge that the Nuclear Reactor Project was plagued with design and construction issues from inception, the RICO Defendants repeatedly and falsely assured the public that the project was being constructed according to schedule, and on budget. The RICO Defendants made these misrepresentations through quarterly reports, annual Integrated Resource Plans, status updates to ORS, webpages dedicated to nuclear project status updates, press events, press releases, and monthly bill inserts to customers, among other sources.

229.    On or about February 14, 2014, SCANA revised the completion schedule to December 15, 2017 for Unit 2, and December 15, 2018 Unit 3.

230.    In October 2014, SCANA announced a likely year-long construction delay that could add an estimated $660 million to SCANA's portion of the construction budget, with a

commensurate burden added onto Santee Cooper. The expected delay was allegedly caused by continued difficulties Consortium members and their contractors were having fabricating the multi-ton modules that were to make up the structure of the nuclear plant.

231.    From 2008 until 2017 SCANA and Santee Cooper continued to bill customers financing costs of the Nuclear Reactor Project, despite knowledge that the Project was unlikely to ever be completed.

232.    Throughout this timeframe, from 2008 until 2017, the actions of the RICO Defendants depended on the continued collaboration of the two entities, without which the project would have collapsed years before abandonment.

233.    Throughout the project the SCANA Defendants knew that every delay, postponement and increased cost shifted to SCE&G Customers would require a contemporaneous increase in the costs incurred by Santee Customers.

234.    On July 31, 2017, SCANA issued a press release announcing that it would abandon the Nuclear Reactor Project. SCANA cited myriad reasons for its decision, including Santee Cooper's decision to suspend construction of the project.

235.    On the same day, Santee Cooper also issued a press release confirming that it too was abandoning the Nuclear Reactor Project for reasons substantially similar to the ones advanced by SCANA.

236.    Notably, SCANA acknowledged that completion of the project would be "prohibitively expensive" and "would materially exceed prior Westinghouse estimates." The Company further admitted that the project could not be completed prior to the January 1, 2021 deadline to receive up to $2 billion in production tax credits.

237.    As set forth above, the July 31, 2017 admissions of the RICO Defendants were

all material facts known to the Defendants for years prior to the date of abandonment.

238.    Upon information and belief, as of August 2017, after nearly a decade of work, the Nuclear Reactor Project was only one-third complete. Estimates calculated that the total cost of the reactors, if completed, would exceed $23 billion.

239.    During the course of the project, SCANA rewarded its executives with substantial bonuses and salary increases for work directly attributed to the Nuclear Reactor Project. According to SCANA's SEC filings:

a.  Defendant Kevin Marsh, SCANA's Chief Executive Officer and Chairman of the Board, received a bonus of $3.3 million in 2016 in part for "oversight and support" of the Nuclear Reactor Project construction activities;

b.  Defendant Jimmy Addison, SCANA's Chief Financial Officer, received a bonus of $620,000 in 2016 in part for efforts to secure financing relating to the Nuclear Reactor Project;

c.  Defendant Stephen Byrne, SCANA's Chief Operating Officer, received a bonus of $620,000 in 2016 in part for his continuing oversight of various aspects the Nuclear Reactor Project construction activities;

d.  Lesser bonuses were awarded to other SCANA employees which were, at least in part, related to construction of the Nuclear Reactor Project;

e.  In 2014, SCANA's top executives, including the Individual SCANA Defendants received "performance-based" bonuses equal to approximately 20% of their base pay for alleged "operational excellence" relating, at least in part, to the Nuclear Reactor Project;

f.  Defendant Stephen Byrne received a bonus in 2012 for $184,750 for his supposed "efforts and achievements" associated with the Nuclear Reactor Project;

g.  Overall, the pay of SCANA's top executives increased by almost $6 million during the project; and

h.  Since 2007, SCANA has paid its executives and employees about $25 million in

"performance based" and discretionary bonuses related in whole or in part to the Nuclear Reactor Project.

240.     SCANA paid these bonuses with full knowledge of the mounting problems with the Project, and supported these bonuses through fraudulently inflated costs shifted to SCE&G and Santee Cooper customers.

241.     Westinghouse filed bankruptcy on or about March 27, 2017 in the U.S. Bankruptcy Court for the Southern District of New York.

242.     On or about July 21, 2017, Toshiba, the parent company of Westinghouse, announced it had reached a settlement with SCANA and Santee Cooper for $2.2 billion dollars for costs associated with Westinghouse's failure to perform. This amount was reached despite the fact that the actual project costs were more than three times that amount. None of the funds received via the Toshiba settlement have ever been returned to customers.

243.     On September 27, 2017, SCANA and Santee Cooper sold their settlement with Toshiba to Citibank for an immediate cash payment of approximately $1.84 billion.

244.     On September 26, 2017, the South Carolina Law Enforcement Division ("SLED") opened a criminal investigation against SCANA for possible criminal fraud related to the nuclear program.

245.     In his September 24, 2018 pre-filed testimony, Gary Jones concluded: "there is no doubt that SCE&G intentionally concealed, omitted, misrepresented and failed to disclose material facts in its filings with the PSC and correspondence and interaction with ORS and that SCE&G failed to exercise proper oversight of their contractor to assure prudent management and oversight as required by the Act."[120]

---

[120] 2017-370-E, Testimony of Gary C. Jones, September 24, 2018,
https://dms.psc.sc.gov/Attachments/Matter/3e6b1499-a97f-4fc8-aca4-874b2b7bd314

246.    Jones further testified that "the Company's major failure, and the one that should void their attempt to recover all the abandoned cost of the Units, is the intentional and material misrepresentations, omissions and deception SCE&G perpetrated on the PSC, ORS and SCE&G customers."[121]

247.    Pursuant to agreements by and between SCANA and Santee Cooper, every action undertaken by SCANA was taken on behalf of itself and as the agent of Santee Cooper.

248.    Moreover, SCANA and SCE&G understood that every action taken with regard to the Nuclear Reactor Project would financially impact the Class.

249.    In October 2017, SCANA received a subpoena from the SEC related to the Project. SCANA is presently the target of a federal grand jury investigation and a state criminal probe, both concerning the Project. Santee Cooper is also the target of an SEC investigation concerned with its conduct respecting the Project.

250.    In the wake of the Project's failure, Defendants Carter and Marsh resigned. At the time of his departure, Defendant Carter's annual salary was $540,929. He is anticipated to receive $1 million in his first year of retirement, $800,000 for the following 20 years, and $345,000 annually for the rest of his life.

251.    Upon information and belief, SCANA has raised the rates of SCANA Customer Class members nine times to fund the Nuclear Reactor Project.[122] These advanced charges were solely attributable to nuclear construction and were levied regardless of a customer's electricity usage.

252.    At the height of the project, approximately 18% of the power bill for the average SCANA customer went toward the Nuclear Reactor Project, and the SCANA Customer

---

[121] *Id.* at 32.
[122] *Id.* at Ex. A, p. 3.

Class Members contributed over $2 billion towards the Project. In addition, customers, including Santee Customers,  will continue to pay costs associated with the project for decades to come.

253.    Santee Cooper has raised its rates five times for costs associated with the Nuclear Reactor Project. Santee Cooper customers have paid 8% of their bills toward the Nuclear Reactor Project and have contributed over $530 million thus far. In 2017, Santee Cooper reduced the rate paid by its customers toward the Nuclear Reactor project to 4.5%. However, Santee Cooper maintains that its customers are obligated to continue to pay for the costs of the failed Project on a monthly basis, for decades into the future.[123]

254.    Were it not for the concerted actions of the Defendants in their capacity as Owners, the Nuclear Reactor Project costs could not have been assessed against customers of Defendants SCANA and Santee.

255.    On January 14, 2019 the PSC unanimously adopted a motion to "make a clear and unequivocal finding [that] the Company[SCE&G] acted imprudently by not disclosing material, and even potentially decisive, information to ORS and the Commission. Due to the lack of transparency - the lack of forthrightness - with regard to reports and studies available to the Company, this Commission was effectively denied the opportunity to fully consider the prudency of continuing to expend resources on the project with all information available at the time." The motion continued: "[u]nder any definition of the term prudence, the Company was imprudent in its actions in this case with regard to costs incurred after March 12, 2015" and, "[w]e agree with ORS that it is essential to restore public trust for this Commission to acknowledge that the regulatory compact between the utility and the regulators was broken by

---

[123] https://www.thestate.com/news/politics-government/article210782644.html.

SCE&G." [124]

256.    Though not monitored by the PSC, Defendants Santee Cooper and the individual Santee Defendants took the same active steps toward concealment of project conditions, and assessments, all while repeatedly passing costs on to Santee customers, with knowledge that SCANA was doing the same with its own customers.

## COUNT I

### Violation of the Civil RICO Statute (18 U.S.C. § 1961 et seq.)
### (Against All Defendants)

257.    Plaintiffs repeat and re-allege the allegations set forth above in the preceding paragraphs as though fully set forth herein.

258.    Defendants SCANA, SCE&G, Santee Cooper, the Individual SCANA Defendants, and the Individual Santee Cooper Defendants ("the RICO Defendants") are "persons" within the meaning of 18 U.S.C.A. § 1961(3).

### **The RICO Enterprise**

259.    At all times relevant to this action, the Nuclear Reactor Project constituted an association-in-fact enterprise, including the RICO Defendants, (hereinafter "the Enterprise," the Racketeering Enterprise" or "the Nuclear Reactor Project Enterprise") within the meaning of 18 U.S.C.A. § 1961(4), and said enterprise engaged in activities which have an impact on interstate commerce.

260.    At all times relevant to this action, the RICO Defendants were associated with the Nuclear Reactor Project Enterprise and, at the same time, were engaged in other activities which were separate and distinct from the Enterprise. The RICO Defendants, as members of

---

[124] Public Service Commission of South Carolina Commission Directive, dated January 14, 2019, Docket Nos. 2017-207-E, 2017-305- E, and 2017-370-E.

this Enterprise, functioned as a continuing unit, and communicated between and among themselves on a continuous basis starting in approximately May of 2008, when, as previously alleged in paragraph 65, supra, SCE&G, on behalf of itself and Santee Cooper, signed the EPC Contract with Westinghouse and Stone & Webster, Inc. to act as prime contractors for the Project, known as "the Consortium."

261.     Each and every action undertaken by the RICO Defendants in furtherance of the Enterprise was performed with the intention of taking property from the Class to which the RICO Defendants would not otherwise have had access.

262.     In furtherance of the Nuclear Reactor Project Enterprise, and to gain funds to which the RICO Defendants were not otherwise entitled, the RICO Defendants engaged in two or more acts of racketeering including but not limited to:

    a.   The cost estimates for the Nuclear Reactor Project made by the RICO Defendants on numerous separate occasions were intentionally false and misleading;

    b.   the time estimates for the completion of the Nuclear Reactor Project made by the RICO Defendants on numerous separate occasions were intentionally false and misleading;

    c.   the RICO Defendants falsely stated that they were not aware of Westinghouse's inability to complete the Nuclear Reactor Project, when in truth and in fact, they were well aware of Westinghouse's glaring deficiencies and negligent conduct;

    d.   the RICO Defendants falsely represented that they were controlling costs and properly supervising Westinghouse when, in fact, they knew or should have known that such was not true;

    e.   the RICO Defendants falsely continued to represent that there was a need for the Nuclear Reactor Project, despite a decrease in electricity consumption and demand;

    f.   the RICO Defendants continued to deny the existence of cheaper and readily available alternatives that could have met the demands for any actual increase in electricity consumption;

g.  the RICO Defendants hid or downplayed the fact that the Nuclear Reactor Project's untested design would increase the likelihood of extra design and construction costs for the Nuclear Reactor Project;

h.  the RICO Defendants suppressed the fact that the Nuclear Reactor Project design as presented for approval to the PSC was likely going to change after construction began;

i.  the RICO Defendants intentionally failed to disclose that the proposed generating capacity for the Nuclear Reactor Project greatly exceeded the future anticipated electricity growth of their customer bases;

j.  the RICO Defendants intentionally failed to disclose that the construction timeline estimates for the Nuclear Reactor Project were unreasonable and did not comport with the applicable industry standards;

k.  the RICO Defendants intentionally failed to disclose that construction delays were occurring, such that costs would necessarily increase and the timeline could not be achieved;

l.  the RICO Defendants failed to disclose that a complete fully integrated resource loaded schedule for the project did not exist;

m.  The RICO Defendants failed to disclose that major milestones were being prioritized over the project schedule to boost costs, assessed to customers in furtherance of the RICO scheme;

n.  the RICO Defendants failed to disclose that they knew that Westinghouse's inability to complete the Nuclear Reactor Project on time and on budget would necessarily lead to substantial increases in construction related costs; and

o.  the RICO Defendants failed to disclose that SCANA and Santee Cooper were paying substantial bonuses to officers and employees relating to the Nuclear Reactor Project on the false premise that the Project was being well managed.

263.    The RICO Defendants and Co-conspirators were all part of the Racketeering Enterprise, within the meaning of 18 U.S.C. § 1961(4), which at all relevant times possessed and continues to possess an ongoing organizational structure with sufficient continuity related to the Enterprise.

264.    At all times relevant to this Complaint, the Racketeering Enterprise's activities have affected and continue to affect interstate and foreign commerce and have existed separate

and apart from the racketeering activity. For example, the stated purpose of the Racketeering Enterprise was to provide nuclear energy to the respective classes. The Racketeering Enterprise collected an average of more than $150 million dollars a year in revenues from the Class toward this goal. Yet no nuclear energy has ever been provided to the Class.

265.    Each RICO Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3) as they are entities or individuals capable of owning a beneficial interest in property.  The RICO Defendants knowingly and willfully conducted and participated in the conduct of the Racketeering Enterprise's affairs, directly or indirectly, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

266.    The purpose of the RICO Defendants' fraudulent scheme and their infiltration and use of the Racketeering Enterprise was to fraudulently obtain billions of dollars in proceeds and profits from their utility customers while misrepresenting and concealing that the RICO Defendants knew that the cost and time estimates for completion of the Nuclear Reactor Project made by the RICO Defendants on numerous separate occasions were intentionally false and misleading as alleged throughout ¶¶ 66-254, *supra*.

267.    In furtherance of their scheme, the RICO Defendants used the Racketeering Enterprise to conceal the fact that they were knowingly and intentionally promoting and conducting their operations with proceeds and profits derived from the fraudulent inflated advance finance scheme. For example, the RICO Defendants knew that Westinghouse's inability to complete the Nuclear Reactor Project on time and on budget would necessarily lead to substantial increases in construction related costs. Rather than jeopardize funding, the RICO Defendants chose to derive more proceeds and profits by knowingly concealing these facts from the public, including the PSC, ORS, investors, and customers.

268.     The RICO Defendants wrongfully used the Racketeering Enterprise to further their fraudulent objectives of enriching the RICO Defendants through the payment of bonuses and increased compensation, including compensation alleged *supra* in paragraph 237.

269.     The RICO Defendants also used the Racketeering Enterprise to maintain a false and fraudulent public facade to deceive regulators and the public into believing that certain SCANA and Santee Cooper executives and employees were achieving "operational excellence" and had made noteworthy efforts relating to the Nuclear Reactor Project, and that such executives and employees deserved to receive payment of substantial bonuses and increases in compensation.

270.     The RICO Defendants thus perpetuated the Racketeering Enterprise in order to associate with and conduct or participate, directly or indirectly, in the conduct of the Racketeering Enterprise's affairs through the pattern of racketeering activity alleged herein. Among other things, the RICO Defendants systematically and fraudulently used the Racketeering Enterprise to disseminate fraudulent and misleading information to the PSC, the public and the Class.

271.     There is a substantial nexus between the Enterprise and the RICO Defendants' unlawful predicate acts in furtherance of their Racketeering Enterprise.

272.     Furthermore, without the falsities set forth by the collective RICO Defendants, the Enterprise, and continued collection of fraudulent funds, could not have proceeded.

273.     As alleged throughout this Complaint, the RICO Defendants were well aware that their statements and representations concerning the projected costs and progress of the Nuclear Reactor Project were false and knew that the Project could not be completed within the projected timeframes or costs.

274.    The RICO Defendants thus used the Enterprise as part of their scheme to defraud the public and the Class into believing their false statements, and they further used the Enterprise to cover-up the falsity of their public misrepresentations concerning the Nuclear Reactor Project.

275.    Moreover, the RICO Defendants knew that Westinghouse's inability to complete the Nuclear Reactor Project on time and on budget would necessarily lead to substantial increases in construction-related cost but, nevertheless, concealed their knowledge of the actual projected costs and time estimates for completion of the Nuclear Reactor Project.

276.    As part of their scheme, the RICO Defendants intended to support the enterprise through racketeering activity, including dissemination of false, misleading, material misrepresentations through the mails and wires concerning the projected costs and completion schedule, as well as the substantial problems that the Project was experiencing.

277.    Similarly, the RICO Defendants used the mails and wires in thousands of communications with the Plaintiffs, Class members, the regulators and the public containing numerous material misrepresentations and omissions of material facts, all in furtherance of their fraudulent scheme.

278.    The RICO Defendants intended that these false and misleading communications be disseminated through use of the mails and the interstate wires in furtherance of their scheme to obtain billions of dollars in proceeds and profits at the expense of the Plaintiff Class.

279.    The RICO Defendants in furtherance of the Enterprise transmitted the false and misleading information contained in said communications to regulators, the public, and members of the Class, who relied upon said false and misleading communications when paying the fraudulently inflated advance finance charges, and were injured by reason of the RICO Defendants' fraudulent scheme and unlawful acts in violation of the civil RICO statute.

280.    In reliance on the RICO Defendants' false representations, the PSC allowed SCANA to collect billions of dollars from customers.  Likewise, in reliance on the RICO Defendants' false representations, the Santee Cooper Board, authorized the collection of hundreds of millions of dollars from customers.

281.    In reliance on these misrepresentations by the RICO Defendants, and the intentional failure of the RICO Defendants to disclose material facts, Plaintiffs and the Class paid their fraudulent bills.

282.    The RICO Defendants also used the mails and interstate wires to communicate amongst themselves in furtherance of their scheme to hide material information from the public.

283.    In addition, the RICO Defendants established public channels to disseminate materially false information about the success of the Enterprise, and its necessity for the future of energy needs in the state of South Carolina.

284.    The RICO Defendants also instilled the fear of economic and personal harm into Plaintiffs and the Class, *inter alia*, the cessation of electricity services to the Class, to extort money from the Class, and these acts of economic extortion constitute racketeering activity. The Class had no choice but to comply with the extortionate demands of the RICO Defendants, in the face of the monopoly power Defendants exercised over the Class within their respective service areas.

285.    The RICO Defendants actively concealed and/or expended time and effort to diminish, alter, and fraudulently conceal reports or recommendations that were critical of and/or highlighted the inadequacies of the RICO Defendants' planning and management of the Nuclear Reactor Project.

286.    The RICO Defendants knew there were serious risks associated with their

decision to derive increased proceeds and profits from the Enterprise, rather than telling the truth concerning the progress of the Nuclear Reactor Project.

**The RICO Predicate Acts**

287.    The RICO Defendants are jointly and severally liable for each and every predicate act described herein as a matter of law. Knowledge of and consent to all of the predicate acts described herein is attributed to each and every RICO Defendant as a matter of law.

*Mail and Wire Fraud (Violations of 18 U.S.C. §§ 1341, 1343):*

288.    The RICO Defendants carried out their acts of racketeering by utilizing the mails and interstate wires to further their Enterprise, *inter alia*, by authorizing and mailing bills to Class members for electricity services that included inflated charges solely attributable to the Nuclear Reactor Project, and by using the financial system and wires of interstate commerce to obtain payments from the Class.

289.    The RICO Defendants gave, disseminated and communicated false and deceptive testimony, reports, and projections to induce the PSC and Santee Cooper Board to approve the Nuclear Reactor Project, and such conduct constitutes racketeering activity by the RICO Defendants.

290.    The RICO Defendants gave, disseminated and communicated false and deceptive testimony, reports, and Nuclear Reactor Project projections to induce the PSC and Santee Cooper Board to approve the charges for the Nuclear Reactor Project, thus rendering unlawful the Defendants' advanced charges to the Class. The costs would not have been shifted onto the Class had the RICO Defendants told the truth.

291.    In addition, the RICO Defendants were integral to support one another's

respective positions with regard to the project. Without the partnership between Defendants Santee Cooper and SCANA, the Enterprise would not have been possible, nor could it have continued. The RICO Defendants thus ratified one another's actions throughout the project.

292.    The RICO Defendants' repeated acts of racketeering, including each monthly bill mailed to Plaintiffs and the Class, which included charges for the Nuclear Reactor Project, constitute a pattern of unlawful conduct.

293.    For the purpose of devising and carrying out their scheme and artifice to defraud by means of false and fraudulent pretenses, representations and promises, the RICO Defendants did place in an authorized depository for mail, or did deposit or cause to be deposited with private and commercial interstate carriers, and knowingly caused to be delivered by the United States postal service, letters, memoranda, and other matters, in violation of 18 U.S.C. § 1341, or aided and abetted in such criminal acts by mailing letters referred to in paragraphs 66–254, *supra*; mailing materials described in paragraphs 286, *supra*, and 2941, *infra*, and mailing to Plaintiffs and other members of the Class bills containing fraudulent and inflated finance charges every month from in or about April 2009 to the present (and continuing), constituting more than one hundred predicate acts in furtherance of the RICO Defendants' Racketeering Enterprise.

294.    For the purpose of devising and carrying out their schemes and artifice to defraud the Class by means of false and fraudulent pretenses, representations and promises, the RICO Defendants caused to be transmitted by means of the mails and by wire communication in interstate commerce, writings, signals and sounds, to wit, interstate electronic mail messages and/or facsimiles in violation of 18 U.S.C. § 1343, or aided and abetted in criminal acts including but not limited to:

a. Each utility bill mailed or wired to Plaintiffs and the Class every month from 2009 to the present (and continuing);

b. Each of the nine (9) requests for revised rate increases submitted by the SCANA Defendants to the PSC, supported by the false and fraudulent reports prepared by, on behalf of, and ratified by each of the RICO Defendants;

c. Each of the five (5) rate increases imposed upon customers of Defendant Santee Cooper, supported by the false and fraudulent public dissemination of information regarding project success, viability, and progress, created, fostered, and promulgated collectively by the RICO Defendants;

d. Webpages, and other information disseminated via the internet and meant for public consumption regarding the progress, and status of the project, including a YouTube channel dedicated to the project, and links available through the respective webpages of Santee Cooper and SCANA regarding the new nuclear project;

e. Other material misrepresentations, half-truths, and omissions, as set forth in paragraphs 66-254 *supra.*; and

f. Other predicate acts as may be disclosed during the course of discovery, which has not yet commenced in this action.

295.    As Gary Jones concluded in his pre-filed testimony submitted to the PSC on September 24, 2018: "SCE&G deliberately and repeatedly misled the PSC and ORS by withholding key information on the projected construction schedule. The actions to withhold this information resulted in the approval of revised Project construction schedules and budget increases that would likely not have been approved had this information been properly disclosed and evaluated by the PSC and ORS. This means that 'the evidence of record' required by the statute to be provided by SCE&G was incomplete, omitted and misleading, and SCE&G used deception to obtain PSC approval of erroneous schedules and cost estimates."[125]

296.    As alleged *supra* in paragraphs 255 through 293 the RICO Defendants have

---

[125] Testimony of Gary E. Jones, Docket No. 2017-370-E, September 24, 2018.

engaged in an unlawful 18 U.S.C. § 1961(1) RICO predicate mail and wire fraud scheme.[126] Defendants Marsh and Carter aided and abetted SCANA and Santee Cooper in committing the RICO predicate acts and engaged in unlawful conduct under violation of 18 U.S.C. § 1962(c).

297.    Defendant Marsh had been the CEO of SCANA since November 30, 2011, its President and Chief Operating Officer since January 7, 2011 and the Chief Executive Officer of South Carolina Electric & Gas Company since 2011. As such, Defendant Marsh and the other SCANA Individual Defendants were fully aware of and had full supervisory authority of SCANA's misrepresentations and omissions concerning the Nuclear Reactor Project and knew that the Project could not be completed in the time frame and for the cost set forth.

298.    Defendant Carter was the President and CEO of Santee Cooper at all times relevant to this complaint, and as set forth more fully herein, had been fully aware of and had full supervisory authority over Santee Cooper's misrepresentations and omissions concerning the Nuclear Reactor Project and knew that the project could not be completed for the cost and in the timeframe set forth.

299.    The RICO Defendants were fully aware of SCANA's misrepresentations and omissions concerning the Project, knew that the Project could not be completed in the time frame and for the cost set forth, but nevertheless aided and abetted each other to facilitate continuous and repeated increases to costs borne by Defendants' customers related to the Enterprise, and committed the further acts of fraud as set forth above and herein.

---

[126] The mail and wire fraud was achieved by a scheme to defraud Plaintiffs of the receipt of honest utility services, involving the material misrepresentations and concealments of fact alleged herein. This scheme was undertaken with the specific intent to defraud as described herein and was furthered by the use of interstate wire communications. *See*, *inter alia*, paragraphs 274-280, *supra*.

300.    The Plaintiff Class[127] was injured by reason of the joint conduct of the RICO Defendants in perpetuating this scheme.

***Obstruction of Justice (18 U.S.C. § 1512(b)–(c))***

301.    In violation of 18 U.S.C. § 1512(b)–(c), and for the purpose of carrying out, furthering, and perpetuating the RICO Enterprise, the RICO Defendants:

> a.  Corruptly concealed documents with the intent to impair their availability for use in an official proceeding (*i.e.*, a foreseeable grand jury investigation, investigation by the SEC, and/or investigation by the NRC);

> b.  Otherwise sought to obstruct, influence, or impede a foreseeable official proceeding (*i.e.*, a foreseeable grand jury investigation, investigation by the SEC, or investigation by the NRC); and

> c.  Retaliated against Carlette Walker by placing her on involuntary leave after she identified mismanagement and cost overruns related to the Project and sought to offer testimony to the PSC that the projected costs of the Project were much higher than the value SCANA wished to present.

302.    As detailed in this 3rd Amended Complaint, including paragraphs 158 through 215 the RICO Defendants conspired to, attempted to, and did, conceal the existence, substance, and text of truthful information regarding the status of the Nuclear Reactor project including, *inter alia:* Bechtel's preliminary assessments—as well as the draft Bechtel Report, final Bechtel Report, Bechtel Schedule Assessment Report—from SCANA and Santee Cooper investors, PSC, ORS, other regulators, the public, and the Class. The RICO Defendants accomplished this end through numerous material misstatements and omissions, including those set forth in the 3rd Amended Complaint.

303.    The RICO Defendants knowingly attempted to and did conceal the existence,

---

[127] See n. 5, *supra*, for effect of class action settlement on claims of the SCANA Customer Class against the released defendants.

substance, and text of Bechtel's preliminary assessments—as well as the draft Bechtel Report, final Bechtel Report, Bechtel Schedule Assessment Report—with the intent of impairing the availability of the use of these documents in state regulatory oversight proceedings and in official federal proceedings, including but not limited to a federal grand jury investigation, an investigation by the SEC, or an investigation by the NRC. The RICO Defendants withheld this information with the corrupt motive of furthering the RICO Enterprise and enhancing and retaining past and anticipated future ill-gotten gains associated with the Enterprise.

304.    The RICO Defendants knowingly persuaded one another and their Co-Conspirators to perform the acts as alleged herein

305.    Official proceedings, including investigations by a federal grand jury, the SEC, and the NRC into the Project, were foreseeable, given the sizeable cost of and investments in the Project; the cost overruns and delays associated with the Project; the serious misconduct associated with the Project; the licensing process used by the NRC regarding the first of its kind AP1000 reactor; and Carlette Walker's concerns to personnel at SCANA and Santee Cooper that criminal conduct was occurring at SCANA, which could harm SCANA and Santee Cooper customers, as described above.

306.    If the RICO Defendants had acted lawfully and had appropriately disclosed the existence of the Bechtel inquiry, the Bechtel preliminary assessment, the draft Bechtel Report, the final Bechtel Report, or the final Bechtel Schedule Assessment Report, the PSC would not have issued Order No. 2015-661 dated Sept. 10, 2015 approving rate increases sought by SCANA, acting on behalf of the RICO Defendants, and would not have approved any subsequent cost increase associated with the Project. Likewise, the Santee Cooper Board would not have been able to approve subsequent rate increases to its customers in April 2016 or April

2017 had said information been disclosed to the public.

**The Pattern of Racketeering Activity**

307.    The RICO Defendants' alleged RICO predicate acts, set forth more fully herein, constituted a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5), in that the predicate acts are related and continuous. Each predicate act had the same or similar purpose, which was to make material misrepresentations, omissions and concealments of material fact as part of a scheme to defraud the public, the Plaintiffs and the Class into believing that the Nuclear Reactor Project was necessary to provide electricity for the Class, would be completed within a reasonable period of time and involve reasonable costs, so the RICO Defendants could fraudulently obtain billions of dollars in proceeds and profits from its overcharging scheme.

308.    This pattern of racketeering was separate and distinct from the legitimate purpose of providing the energy needed by Plaintiffs and the Class, and the funding, promotion and operation of the Enterprise alleged herein.

309.    The RICO Defendants were each associated with the Enterprise and did conduct or participate, directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)(B), 1961(5), 1962(b), and 1962(c), to wit:

a. Multiple instances of mail fraud in violation of 18 U.S.C. § 1341;

b. Multiple instances of wire fraud in violation of 18 U.S.C. § 1343;

c. Multiple instances of bank fraud in violation of 18 U.S.C. § 1344; and

d. Multiple instances of obstruction of justice in violation of 18 U.S.C. § 1512.

310.    Plaintiffs have sufficiently alleged these predicate acts and pattern of

racketeering to state a claim under 18 U.S.C. § 1962 in paragraphs 66 through 254, *supra*. As a proximate result of said pattern of racketeering activity and RICO violations engaged in by the RICO Defendants, Plaintiffs and the Class have suffered economic injury and damages to their business and property, as well as other economic damages.

### Continuity of the Racketeering Activity

311.    The pattern of racketeering involved multiple predicate acts that have taken place over many years, thus establishing both relatedness and continuity. These predicate acts illustrate a threat of continued racketeering activity and evince that the predicate acts constitute the regular manner by which the RICO Defendants conduct business.

### The Related Predicate Acts

312.    SCANA's and Santee Cooper's pattern of committing predicate acts of racketeering satisfies the "continuity" requirement of civil RICO, as demonstrated both by the alleged predicate acts in paragraphs 66 through 254, *supra*, along with other related predicates including but not limited to each rate application as described in paragraph 294, *supra*.

313.    As a direct result of the RICO Defendants' unlawful racketeering acts and violation of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business or property and are entitled to recover treble damages and attorneys' fees under 18 U.S.C. § 1964(c).

314.    The actions of the Nuclear Reactor Enterprise—specifically the charging of the Class for the construction of nuclear reactors they did not need, which could not be constructed for the projected costs, and which could not be built within the construction schedule Defendants falsely claimed they could meet -- are separate and apart from the activities for which the RICO Defendants are entitled to lawfully engage.

315.    SCANA would not have received approval to impose these additional charges

upon the Class if the Bechtel report had been disclosed to PSC, and Santee Cooper would have been unable to assess its customers for these costs.

316.    The RICO Defendants individually profited from their participation in the Racketeering Enterprise and in the acts of Racketeering by and through, among other things, their receipt of bonuses, increased compensation, increased share price, and the ability to issue significant bonds associated with the project, as alleged above.

317.    The RICO Defendants' racketeering activities affected interstate commerce by, among other things, the purchase and funding of products outside of the state of South Carolina, which were then imported into South Carolina.

318.    The RICO Defendants' false and misleading representations to, and concealment of material facts from, the PSC, the ORS, regulatory bodies, and the public, which resulted in the fraudulently inflated costs passed on to Plaintiffs, were the proximate cause of injuries to the Class.

319.    The damages suffered by the SCANA Customer Class, as a result of the conduct alleged herein committed by Santee Cooper and the Individual Santee Cooper Defendants, are in an amount to be established at trial.

320.    The damages suffered by the Santee Cooper Customer Class, as a result of the conduct alleged herein committed by the RICO Defendants, are in an amount to be established at trial.

## COUNT II

### RICO Conspiracy
### (Against All RICO Defendants)

321.    Plaintiffs repeat and re-allege the allegations set forth above in the preceding paragraphs as though fully set forth herein.

322.    As set forth in detail in paragraphs 66 through 254 and 294, *supra*, the RICO Defendants engaged in a fraudulent scheme to defraud the public into believing the Nuclear Reactor Project was needed to fulfill the energy needs of the Plaintiffs, and the Class consisting of millions of residents and business in the state of South Carolina, and that they would complete the Nuclear Project on budget and on time.

323.    At all relevant times, the RICO Defendants were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

324.    At all relevant times, the RICO Defendants each met the definition of a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(d).

325.    At all relevant times, the RICO Defendants controlled the Racketeering Enterprise and engaged in racketeering activities for the purpose of defrauding the Plaintiffs.

326.    At all relevant times, the Racketeering Enterprise was engaged in, and its activities affected, interstate commerce, within the meaning of RICO, 18 U.S.C. § 1962(c).

327.    As set forth in Count One, the RICO Defendants controlled the Racketeering Enterprise and the Project with significantly overlapping ownership, and the Defendants conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. §1961(5), in violation of RICO, 18 U.S.C. § 1962(c).

328.    At all relevant times, the RICO Defendants were each associated with the Enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c), *i.e*., agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

329.    The RICO Defendants committed and/or caused to be committed a series of

overt acts in furtherance of the Conspiracy and to affect the objects thereof, including but not limited to the acts set forth above.

330.    As a result of the RICO Defendants' fraudulent misstatements (upon which the PSC, the public, Plaintiffs, and the Class detrimentally relied), and the RICO Defendants' other misconduct, members of the Class were directly and proximately injured in their business or property.

331.    As a result of RICO Defendants' violations of 18 U.S.C. § 1962(c), the Class lost over $2.5 billion and were deprived of the intangible right to honest services.

332.    As a result of the RICO Conspiracy, Defendants and their co-conspirators are liable to the Plaintiffs and the Class for their losses in an amount to be determined at trial, but no less than $2.5 billion.

333.    Pursuant to RICO, 18 U.S.C. § 1964(c), the SCANA Customer Class is entitled to recover threefold their damages plus costs and attorneys' fees from Santee Cooper and the Individual Santee Cooper Defendants.[128]

334.    Pursuant to RICO, 18 U.S.C. § 1964(c), the Santee Cooper Customer Class is entitled to recover threefold their damages plus costs and attorneys' fees from the RICO Defendants.

---

[128] See n. 5, *supra*, for effect of class action settlement on claims of the SCANA Customer Class against the released defendants.

**COUNT III**

**Taking of Santee Cooper Customer Class Property in Violation of the
Fifth Amendment to the United States Constitution
(Against Santee Cooper)**

335.    The following is pled alternatively and cumulatively, the Santee Cooper Customer Class having been informed that they are not required to elect among these causes of action to the extent that they allow a double recovery until the trial of the matter is fully and totally completed.  Accordingly, the Plaintiff re-alleges each of the preceding factual paragraphs as if expressly set forth herein.

336.    The Constitution of the United States provides that private property may not be taken for public or private use without just compensation.

337.    At all times relevant to this complaint, Santee Cooper was operating as an agent of the State of South Carolina.

338.    At all times relevant to this complaint, the Members of the Santee Cooper Customer Class have had a property interest in their own money.

339.    From 2009 continuing to the present, Defendant Santee Cooper, acting as agent of the State of South Carolina, has taken over $540 million from members of the Santee Cooper Customer Class for the purpose of constructing the Nuclear Reactor Project.

340.    At no time have the members of the Santee Cooper Customer Class received any benefit from the funds expended toward the Nuclear Reactor Project.

341.    Moreover, Santee Cooper's advance charges to the Santee Cooper Customer Class for the Reactor project without offering anything meaningful in return violate the long standing "used and useful" principle in utility proceedings.

342.    Santee Cooper's advance charges to the Santee Cooper Customer Class constitute a taking of property without just compensation therefor.

343.    Santee Cooper's advance charges to the Santee Cooper Customer Class for construction of the Nuclear Reactor Project is an uncompensated taking for public use, in violation of the Constitution of the United States.

344.    In addition or in the alternative, Santee Cooper's advance charges to the Santee Cooper Customer Class for construction of the Nuclear Reactor Project constitute a taking for private use by Santee Cooper in violation of the Constitution of the United States.

345.    As a result, the Santee Cooper Customer Class has been injured in an amount to be determined by the trier of fact and entitled to an order disgorging the sums paid in advance to Santee Cooper.

346.    As a direct, foreseeable, and proximate result of the acts of Defendant Santee Cooper, the Santee Cooper Customer Class has been damaged in an amount equal to the just compensation due them under the Fifth Amendment, including interest thereon at a rate to be established by this Court.

347.    As a further direct, foreseeable, and proximate result of the taking of their property without just compensation, the Santee Cooper Customer Class has been required to retain the services of counsel to prosecute this action. The Santee Cooper Customer Class has incurred, and will incur, attorneys' fees, expert witness fees, and costs and expenses of litigation in an amount as yet unascertained.

WHEREFORE, Plaintiffs, on behalf of the Class, respectfully request that judgment be rendered against the Defendants as follows:

a.    Declaring this action to be a proper class action maintainable pursuant to Rules 23 (b)(1), 23(b)(3), and/or 23(c)(4) of the Federal Rules of Civil Procedure; and

declaring Plaintiffs to be proper Class representatives;

b.    Awarding Plaintiffs and the other members of the Class treble the damages suffered as a result of the wrongs complained of herein in Count I of the Complaint, together with interest;

c.    Awarding Plaintiffs and other members of the Class treble the damages suffered as a result of the wrongs complained of herein in Count II of the Complaint, together with interest;

d.    In the alternative, and to the extent not contraindicated by law, awarding a money judgment equal to the just compensation owing to each member of the Santee Cooper Customer Class for the permanent taking of its property for public use, together with interest thereon at the legal rate from the date of taking;

e.    Awarding Plaintiffs and the members of the Class their cost and expenses of this litigation, including reasonable attorneys' fees, expert fees and other costs and disbursements;

f.    Awarding prejudgment interest, post judgment interest, and costs; and

g.    Awarding Plaintiffs and other members of the Class such other and further relief as may be just and proper.

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: July ___, 2019

<div style="margin-left:40%">

Strom Law Firm LLC
By: s/ J. Preston Strom, Jr.
J. Preston Strom, Jr. (Fed. Bar #4354)petestrom@stromlaw.com
Mario A. Pacella (Fed. Bar #7538)
mpacella@stromlaw.com
Bakari T. Sellers (Fed. Bar #11099)
bsellers@stromlaw.com
Jessica L. Fickling (Fed. Bar #11403)
jfickling@stromlaw.com
2110 Beltline Blvd.
Columbia, South Carolina 29204
Tel. No.:(803) 252-4800
Fax No.: (803) 252-4801

</div>

Speights & Solomons, LLC
Daniel A. Speights
dspeights@speightsandsolomons.com
A. Gibson Solomons, III
gsolomons@speightsandsolomons.com
100 Oak Street, East
Hampton, SC 29924
803-943-4444

Richardson, Patrick, Westbrook & Brickman,
L.L.C.
Terry Richardson  (Fed. I.D. #3457)
Daniel S. Haltiwanger (Fed. I.D. # 7544)
dhaltiwangerrpwb.com
Jerry Evans (SC Bar #11658)
jevans@rpwb.com
P. O. Box 1368
1730 Jackson Street
Barnwell, SC 29812
Tel. No.: (803) 541-7850
Fax No.: (803) 541-9625

McCallion & Associates LLP
Kenneth F. McCallion (pro hac vice)
kfm@mcccallionlaw.com
100 Park Avenue – 16th floor
New York, New York 10017
(646) 366-0884

Holman Law, P.C.
Thomas A. Holman (pro hac vice)(N.Y. Reg.
#1536754)
taholman@holmanlawoffice.com
99 Park Avenue, Suite 2600
New York, New York 10016
Tel. No.: (212) 481-1336
Fax No.: (866) 204-1020

Janet, Jenner & Suggs, LLC
Kenneth M. Suggs, (Fed I.D. NO. 3422)
ksuggs@myadvocates.com
Gerald D. Jowers, Jr. (Fed I.D. NO. 8025)
gjowers@myadvocates.com
Janet, Jenner & Suggs, LLC 500 Taylor St.
Columbia, SC 29201
Telephone: (803) 726-0050

Patrick A. Thronson (pro hac vice)
pthronson@JJSjustice.com
4 Reservoir Circle, Suite 200
Baltimore, MD 21208
Telephone: (410) 653-3200
Fax: (410) 653-9030

The Law Offices of Jason E. Taylor, P.C.
Brian C. Gambrell (FED ID NO. 7632)
bgambrell@jasonetaylor.com
Office Address:
810 Dutch Square Blvd, Suite 112
Columbia, SC 29210
Mailing Address:
P.O. Box 2688
Hickory, NC 28603
Telephone: (800) 351-3008
Facsimile: (828) 327-9008