**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**BEAUFORT DIVISION**

| | |
|---|---|
| TIMOTHY GLIBOWSKI, CHRISTINE DELMATER, STEPHANIE SPEICHER, JEFF SHELTON, DAVID DRAKE, CAROL S. ADAMS, AND TRAVIS HAMITER, on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br><br>          -against-<br><br><br>SCANA CORPORATION, SOUTH CAROLINA ELECTRIC & GAS COMPANY, SCANA SERVICES, INC., SOUTH CAROLINA PUBLIC SERVICE AUTHORITY, KEVIN MARSH, JIMMY ADDISON, STEPHEN BYRNE, MARTIN PHALEN, MARK CANNON, RUSSELL HARRIS, RONALD T. LINDSAY, JAMES MICALI, MARION CHERRY, MICHAEL CROSBY, AND LONNIE CARTER,<br><br>                    Defendants. | **Civ. No. 9:18-273-TLW** |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
TO THE MOTION TO DISMISS BY DEFENDANTS SCANA
<u>CORPORATION AND SOUTH CAROLINA ELECTRIC & GAS COMPANY</u>**

# TABLE OF CONTENTS

Introduction ................................................................................................................ 1

Statement Of Facts ...................................................................................................... 2

Standard Of Review .................................................................................................... 8

I. The Filed Rate Doctrine Is Inapplicable to this Case ............................................ 9

II. ............. Count I Of The Complaint Properly Pleads A Rico Claim Under 18 U.S.C. § 1962(C)
....................................................................................................................................... 19

   A.    Standard Of Review For Rico Claims .............................................................. 20

   B.    Required Elements Under 18 U.S.C. §1962(C) ............................................... 21

      1.    Plaintiffs Were Directly Injured As A Result Of Defendants' Predicate Acts ........... 21

      2.    Plaintiffs Sufficiently Allege Predicate Acts ............................................. 26

      3.    The Complaint Sufficiently Pleads A Pattern Of Racketeering Activity ................... 30

      4.    Plaintiffs Properly Allege A Rico Enterprise Separate And Apart From The Alleged Pattern Of Racketeering Activity ............................................................. 33

      5.    The Individual Rico Defendants Are Properly Alleged To Have Participated In the Operation and Management Of the Alleged Enterprise                    34

III...... Defendants Have Not Met Their Burden To Show That  Plaintiffs' Rico Conspiracy Claim Should Be Dismissed. ................................................................................................. 35

   A.    Plaintiffs Have Properly Alleged A Recognized Exception To The Intracorporate Conspiracy Doctrine. ............................................................................................. 40

Conclusion ................................................................................................................. 41

# TABLE OF AUTHORITIES

**Cases**

*Al Abood v. El Shamari*, 217 F. 3d 225 (4th Cir. 2000)...................................................... 33

*Alston v. Countrywide Fin. Corp.*, 585 F.3d 753 (3d Cir. 2009) ........................................... 10, 19

*Anza v. Ideal Steel Supply Corp.,* 547 U.S. 451, 126 S. Ct. 1991, 164 L. Ed. 2d 720 (2006)...... 23

*Brandenburg v. Seidel*, 859 F. 2d 1179 (4th Cir. 1988)...................................................... 32

*Breunig v. Town of Atl. Beach*, 2010 WL 1433429, 2010 U.S. Dist. LEXIS 34768 (D.S.C. April 8, 2010) (Wooten, J.) ...................................................... 29

*Bridge v. Phoenix Bond & Indem. Co.,* 553 U.S. 639 (2008)...................................................... 27

*Butler v. Ford Motor Co.*, 724 F. Supp. 2d 575 (D.S.C. 2010) ...................................................... 8

*Connors v. Lexington Ins. Co.*, 666 F. Supp. 434, 451 n. 12 (E.D.N.Y. 1987) ........................... 33

*Cozzarelli v. Inspire Pharms, Inc*, 549 F. 3d 618 (4th Cir. 2008) .................................................. 31

*Creech v. S.C. Pub. Serv. Auth.*, 20 S.E.2d 645 (S.C. 1942) ........................................................ 12

*Cricket Cove Ventures, LLC v. Gilland*, 701 S.E.2d 39 (S.C. Ct. App. 2010) ............................ 39

*Ctr. Cadillac, Inc. v. Bank Leumi Tr. Co. of New York*, 808 F. Supp. 213 (S.D.N.Y. 1992), aff'd, 99 F.3d 401 (2d Cir. 1995)........................................................... 21

*E. & J. Gallo Winery v. Encana Corp.*, 503 F.3d 1027 (9th Cir. 2007) ................................ 15, 17

*Edge v. State Farm Mutual Auto Insurance Company*, 623 S.E.2d 387 (S.C. 2005)................... 14

*Ellsworth v. U.S. Bank, N.A.*, 908 F. Supp. 2d 1063 (N.D. Cal. 2012)........................................ 19

*Friends of the Earth, Inc. v. Gaston Cooper Recycling Corp.*, 204 F. 3d 149 (4th Cir. 2000) .... 22

*Fullbright v. Spinnaker Resorts, Inc.*, 802 S.E.2d 794 (S.C. 2017).............................................. 15

*Gallo v. PHH Mortg. Corp.*, 916 F.Supp.2d 537 (D.N.J. 2012).................................................. 15

*Ganaway v. Kyoto Highway 7 Inc.*, No. 2:11-CV-2959-RMG, 2012 WL 1354465 (D.S.C. Apr. 18, 2012) ........................................................................................................................... 9

*GE Investment Private Placement Partners II v. Parker*, 247 F. 3d 543 (4th Cir. 2001)............. 33

*Gibson v. Confie Ins. Grp. Holdings, Inc.,* No. 2:16-cv-02872-DCN, 2017 U.S. Dist. LEXIS 105702 (D.S.C. July 10, 2017.......................................................................................... 20, 21

*Greenville Pub. Co. v. Daily Reflector, Inc.*, 496 F.2d 391 (4th Cir. 1974) ................................. 39

*H. A. Sack Co. v. Forest Beach Pub. Serv. Dist.*, 272 S.C. 235, 250 S.E.2d 340 (1978). ........... 13

*H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229 (1989)................................................................. 31, 32

*H.J. Inc. v. Nw. Bell Tel. Co.*, 954 F.2d 485 (8th Cir. 1992) ......................................................... 16

*Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776 (4th Cir. 1999)). ........................ 21

*Hemi Group, LLC v. City of New York,* 559 U.S. 1, 130 S.Ct. 983 (2010) ........................... 22, 23

*HMK Corp. v. Walsey,* 828 F. 2d 1071 (4th Cir. 1987) ................................................................ 33

*In re Hawaiian & Guamanian Cabotage Antitrust Litig.*, 754 F. Supp. 2d 1239 (W.D. Wash. 2010) ...................................................................................................................................... 18

*In re Jiffy Lube Sec. Litigation,* 1990 U.S. Dist. LEXIS 20141 (D. Md. Oct. 31, 1990)............. 21

*Jones v. Bock*, 549 U.S. 199, 127 S. Ct. 910, 166 L. Ed. 2d 798 (2007) ...................................... 18

*Jones v. Ram Med., Inc*., 807 F. Supp. 2d 501 (D.S.C. 2011) ................................................. 9, 20

*Kobe v. McMaster*, No. 3:11-1146-MBS, 2018 U.S. Dist. LEXIS 55500 (D.S.C. Mar. 30, 2018) ......................................................................................................................................... 20

*Lifschultz Fast Freight, Inc. v. Consol. Freightways Corp. of Del.*, 805 F. Supp. 1277 (D.S.C. 1992), *aff'd*, 998 F. 2d 1009 (4th Cir.), *cert. denied*, 510 U.S. 993 (1993)................. 25, 26, 27

*Little v. Ambit Energy Holdings, LLC,* No. 16-CV-8800 (PGS), 2017 WL 6559907 (D.N.J. Dec. 21, 2017). ............................................................................................................................... 19

*Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116 (1990)......................................... 15

*Marrero-Rolón v. Autoridad De Energía Eléctrica De P.R.*, 2015 U.S. Dist. LEXIS 134211 (D.P.R. 2015) ......................................................................................................................... 16

*Martin v. Duffy*, 858 F.3d 239 (4th Cir. 2017), *cert. denied*, 138 S. Ct. 738 (2018) ................... 39

*McLean v. KBR, Inc.,* 2014 WL 310818 (E.D. Va. July 7, 2014) .............................................. 29

*Mims v. Edgefield County Water and Sewer Authority*, 299 S.E.2d 484 (S.C. 1983) ................. 13

*Moody v. City of Orangeburg*, 319 S.C. 184 (S.C. 1995)............................................................. 13

*Morgan v. Bank of Waukegan*, 804 F. 2d 970 (7th Cir. 1986)...................................................... 34

*Morley v. Cohen*, 610 F. Supp. 798 (D. Md. 1985) ............................................................... 21, 26

*Neder v. United States*, 527 U.S. 1 (1999) ........................................................... 27, 29

*Palmetto State Med. Ctr., Inc. v. Operation Lifeline*, 117 F. 3d 142 (4th Cir. 1997). ................. 21

*Peters v. Aetna, Inc.,* 2016 U.S. Dist. LEXIS 117326 (W.D.N.C. Aug. 31, 2016) ..................... 20

*Pridgen v. Ward*, 705 S.E.2d 58 (S.C. Ct. App. 2010) ................................................... 39

*Professionals, Inc. v. Berry*, 1991 U.S. App. LEXIS 1059 (4th Cir. 1991) ........................... 26, 33

*Republican Party of North Carolina v. Martin*, 980 F.2d 943 (4th Cir.1992)). ............................ 9

*Reves v. Ernst & Young,* 507 U.S. 170 (1993) ............................................................. 35

*S.C. Pub. Serv. Auth. v. Carolina Power & Light Co.*, 137 S.E.2d 507 (S.C. 1964) .................... 12

*Salinas v. United States*, 522 U.S. 52 (1997) ............................................................... 38

*Sedima, S.P.R.L. v. Imrex Co., Inc*, 473 U.S. 479 (1985) ........................................... 20, 21

*Simons v. City Council of Charleston*, 187 S.E. 545 (S.C. 1936) ................................... 12, 13

*Slay's Restoration, LLC v. Wright Nat'l Flood Ins. Co.*, 884 F.3d 489 (4th Cir. 2018) ............. 24

*South Carolina Elec. & Gas Co. v. South Carolina Public Service Authority*, 215 S.C. 193 (S.C. 1949). ................................................................................................. 11, 14

*Taffet v. S. Co.*, 967 F.2d 1483 (11th Cir. 1992) (en banc) ............................................ 16, 17

*United States v. Beatty,* 587 F. Supp. 1325 (E.D.N.Y. 1984). ......................................... 33

*United States v. Colton,* 231 F. 3d 890 (4th Cir. 2000) ................................................. 31

*United States v. Gillion*, 704 F. 3d 284 (4th Cir. 2012). ................................................. 27

*United States v. Schmuck*, 489 U.S. 705 (1989) ......................................................... 27

*United States v. Tillett*, 763 F.2d 628 (4th Cir. 1985) ................................................... 39

*Wah Chang v. Duke Energy Trading & Mktg., LLC*, 507 F.3d 1222 (9th Cir. 2007) ............. 16, 17

*Wegner v. Pella Corp.*, 2015 U.S. Dist. LEXIS 60927 (D.S.C. May 5, 2015) ........................... 21

*Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17 (2d Cir. 1994). ................................... 16, 17

*Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788 (6th Cir. 2012) ..................................... 18

*Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017) ................................................................. 39

**Statutes**

18 U.S.C. § 1962(c) ............................................................................................... 20, 21, 36

18 U.S.C. § 1962(d). .......................................................................................................... 36

18 U.S.C. §1343 ................................................................................................................. 28

S.C. Code Ann. § 58-27-20 ............................................................................................... 12

S.C. Code Ann. § 58-31-30(A)(2) .................................................................................... 14

S.C. Code Ann. § 58-31-55(a)(3)(A). ............................................................................... 14

S.C. Code Ann.§ 58-31-200 .............................................................................................. 14

**Rules**

Fed. R. Civ. P. 12(b)(6) .............................................................................................. 8, 12, 39

Fed. R. Civ. P. 8 ................................................................................................................ 21

Fed. R. Civ. P. 8(a)(2) ........................................................................................................ 9

Fed. R. Civ. P. 8(d)-(e) ....................................................................................................... 9

Fed. R. Civ. P. 9(b) .................................................................................................. 20, 21, 29

Plaintiff Travis Hamiter ("Plaintiff"), on behalf of himself and all others similarly situated ("the Class")[1], by and through his counsel, submits this Memorandum in Opposition to the Motion to Dismiss Plaintiffs' Third Amended Complaint by SCANA Corporation and its wholly owned subsidiary, South Carolina Electric & Gas Company (SCE&G").[2]

## Introduction

Contrary to SCANA's principal argument, Plaintiff, a Santee Cooper customer, is not challenging the reasonableness of SCANA's rates set for its customers by the South Carolina Public Service Commission ("SCPSC" or "Commission"). Neither is Plaintiff challenging the reasonableness of Santee Cooper's rates set for its customers by its Board of Directors. Plaintiff Hamiter and the putative Santee Cooper Customer Class ("the Class") are alleging that SCANA and the other Defendants, in furtherance of their Racketeering Enterprise, conducted a series and pattern of racketeering acts in violation of the civil RICO statute, 18 U.S.C. § 1964. Amend. Compl. ¶ 3.

If Plaintiff Hamiter was challenging SCPSC's setting of SCANA customer rates, and he is not, the Commission already found them to be the result of Defendants' misconduct and concealment. In early 2019 the SCPSC stated that SCANA's subsidiary defendant SCE&G "acted imprudently by not disclosing material, and even potentially decisive, information" which denied

---

[1] In the Third Amended Class Action Complaint filed on July 30, 2019 (ECF No. 103), Plaintiffs Timothy Glibowski, Christine Delmater, Stephanie Speicher, Jeff Shelton, David Drake, and Carol S. Adams (the "individual SCANA customer Plaintiffs) no longer assert claims against Defendants SCANA Corporation and SCE&G (recently renamed as Dominion Energy South Carolina). In connection with the settlement of a state court action, *Lightsey, et al. v. South Carolina Electric & Gas, et al.*, Court of Common Pleas, Case No.: 2017-CP-25-335, a release was given on or about November 21, 2018 in favor of SCANA and SCE&G which encompassed certain claims that had been made in this action by the individual SCANA customer Plaintiffs. In the subsequent Amended Complaint, ECF 103, the individual SCANA customer Plaintiffs assert claims only against Santee Cooper and the Santee Cooper Individual Defendants.

[2] Defendants SCANA Corporation and SCE&G will be referred to collectively as "SCANA."

the Commission the opportunity to fully consider the prudency of allowing SCE&G to continue to expend customers' resources on SCE&G's attempt to construct two nuclear reactors known as VC Summer Units 2 and 3 (the "Nuclear Project") in Jenkinsville, South Carolina. The Commission also found that SCE&G's conduct, essentially the same conduct described in the complaint, broke "the regulatory compact between the utility and the regulators." Third Amended Complaint ¶ 255 (July 30, 2019)(Doc. 103).[3]

Plaintiff Hamiter does not ask this Court to determine whether the rates collected by SCANA and SCE&G (or Santee Cooper) were reasonable.  The rate charged to SCANA's or Santee's consumers is not at issue. Instead, the complaint addresses whether the conspiracy among SCANA, Santee Cooper and the individual Defendants should result in an award of damages to the Plaintiff and the Class based on the principles which underly the RICO statutes. The filed rate doctrine, therefore, is not a bar to the relief Plaintiff has requested under the Counts set forth in the complaint. Importantly, this action does not challenge the ratemaking process. Rather, it alleges that Plaintiff and the Class were charged for construction cost advances which resulted directly from the fraud perpetrated by SCANA and its co-conspirators.

## STATEMENT OF FACTS

Plaintiff is a citizen and resident of the state of South Carolina and is a utility customer within the service area of defendant Santee Cooper. Plaintiff alleges that Defendants SCANA, SCE&G, Santee Cooper, Carter, Marsh, Addison, Byrne, Phalen, Cannon, Harris, Lindsay and Micali (collectively referred to as "the RICO Defendants") participated in an unlawful

---

[3] Except as noted, this brief refers to the current amended complaint, which has been amended three times, as the Complaint. Third Amended Complaint (July 30, 2019) (Doc. 103) ("Amend. Compl.").

Racketeering Enterprise in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), Title 18, United States Code, Section 1964 et seq., using the proceeds from fraudulently inflated advance finance charges to generate unlawful proceeds by means of a series of racketeering acts spanning a period of several years and continuing to the present, for the purpose of defrauding the Class of residential customers and commercial customer businesses of their valuable time, money and property. Amend. Compl. ¶ 2.

This lawsuit arises from SCANA and SCE&G's plan to construct two nuclear reactors at the V.C. Summer nuclear site in Fairfield County, South Carolina ("the Reactor Project"). The cost overruns and delays which plagued this project, and led to its eventual cancellation, have resulted in charges to Plaintiff and the Class in excess of $540 million dollars, Amend. Compl. ¶ 339, and have enriched Defendants, for a project that will never be finished or put into operation. The members of Plaintiff's putative class have all paid advance finance charges imposed by the Reactor Project scheme. Amend. Compl. ¶¶ 2-3, and 331.

On May 3, 2007, after lobbying and extensive campaign contributions by SCANA, South Carolina enacted the Base Load Review Act ("the BLRA"). The BLRA was designed to avoid a feared electricity shortage and to incentivize privately-owned utilities to create more nuclear power capacity in South Carolina by providing a regulatory structure to allow utilities to petition state regulators for rate increases and charge rate-paying customers up front for the costs of these large capital projects. While the BLRA's "purpose" is described as providing for the recovery of the prudently incurred costs associated with new base load plants, when constructed by investor-owned electrical utilities, at the same time it was supposed to protect customers of investor-owned electrical utilities from responsibility for imprudent financial obligations or costs. In reality, SCANA believed it was empowered to rack up inflated expenses and cost overruns, and to pay

exorbitant bonuses to SCANA's officers and directors, including defendant Marsh. Amend. Compl. ¶¶ 55-58.

By April 2007 -- before the BLRA had even become law -- SCANA was already publicly touting a massive planned expansion of the V.C. Summer Station. In SCANA's initial plan discussed in the Company's Q1 2007 earnings conference call on April 27, 2007, a SCANA executive stated that "along with our partner, Santee Cooper, we currently expect to file a joint application with the Nuclear Regulatory Commission later this year, for a combined construction and operating license which will cover two units ...." SCANA further stated that they expected to recover capital costs for the project under the BLRA. Upon its passage, SCANA and Santee Cooper immediately acted to take advantage of the BLRA by embarking on an expansive reactor construction project at the V.C. Summer Site, with the plan to charge rate-paying customers up front for the costs. Amend. Compl. ¶ 58.

In May 2008, SCE&G and Santee Cooper, as 55% and 45% owners of the project, respectively, signed an Engineering, Procurement and Construction contract (the "EPC Contract") with Westinghouse Electric Company ("Westinghouse") and Stone & Webster, Inc. to act as prime contractors to build two Westinghouse AP1000 nuclear reactors at the V.C. Summer Site. Amend. Compl. ¶ 61.[4]

On May 30, 2008, SCANA, on behalf of itself and Santee Cooper, filed a Combined Application with the SCPSC, pursuant to the BLRA, seeking a Certificate of Environmental Compatibility and Public Convenience and Necessity and for a Base Load Review Order to construct and operate a two-unit, 2,234 net megawatt nuclear facility, *i.e.*, the Nuclear Reactor

---

[4] Westinghouse, Stone & Webster and all other construction contractors for the Nuclear Reactor Project are hereinafter collectively referred to as "the Consortium."

Project. Approval of its Combined Application would permit the Defendants to impose charges on Plaintiffs to fund the construction of the Reactor Project through rate increases, in advance of any construction taking place. SCANA and Santee Cooper represented to the SCPSC in its Base Load Application, the Reactor Project -- a partnership jointly owned by SCANA and Santee Cooper -- (1) had been pre-approved by the Nuclear Regulatory Commission (NRC); (2) was necessary to meet future demand; (3) would cost $9.8 billion; (4) the two units would be completed on April 1, 2016 and January 1, 2019; and (5) approval of funding in advance would save the ratepayers money. SCANA's statements in support of its application for advance financing charges were false. SCPSC relied on these false representations to approve Defendants' request to charge Plaintiffs in advance of the Reactor Project's construction. Amend. Compl. ¶¶ 66-70.

On May 30, 2008, in addition to filing its Base Load Application, SCANA requested the SCPSC to approve the first of multiple rate increases to fund the Nuclear Reactor Project. On March 2, 2009, pursuant to the BLRA (Order No. 2009-104(A)) and relying on SCANA false and misleading representations, SCPSC approved SCANA's proposal to construct the Nuclear Reactor Project and to increase rates charged to the four service classes. Amend. Compl. ¶ 79.

In Exhibit A to its May 27, 2012 application, SCANA stated that it anticipated the gross construction costs to be $156 million over the projected costs on December 31, 2011. SCANA then falsely represented that the project was moving according to schedule. Amend. Compl. ¶ 109.

From 2009 through 2016, Defendants continued to make false representations to the SCPSC regarding the price, date of completion, risk of delay, and need for the Reactor Project in each application to the SCPSC for rate increases,[5] when they knew or should have known that the

---

[5] Defendants submitted eight rate increase applications between 2009 and 2016. *See id*. at ¶¶ 80-87, 89, 95-97, 102-103, 108-109, 112, 116, 123, 128, 129, 133, 157, 158, 168, 209, and 216.

Reactor Project was wasteful and not in the public interest and could not be completed for the price forecasted and on the date promised. Due to the false or materially misleading statements that SCANA made to the SCPSC, SCANA was allowed to impose increased advance finance charges on their customers while the Nuclear Reactor Project was still on-going, and the two new nuclear reactors were still under construction.[6] Santee Cooper following the lead of its agent, SCANA, imposed very similar increased advanced charges on its customers, including Plaintiff Hamiter.

In August 2011, Westinghouse received an internal report prepared by one of their employees entitled "The Case for Paradigm Shift: An assessment of project delivery risk against the backdrop of industry practice," which detailed risks associated with the AP1000 projects (the "WEC Report"). The WEC Report identified multiple risks associated with the AP1000, and thus the Nuclear Reactor Project. Despite the statements in the WEC Report identifying risks associated with completing the Nuclear Reactor Project, neither Westinghouse, SCANA, Carter nor the Individual SCANA Defendants disclosed these risks to SCPSC when filing the annual application for increased charges to ratepayers. Amend. Compl. ¶¶ 98-99, 101.

In 2014, Defendants commissioned a report from Bechtel to review the Reactor Project. The report identified numerous deficiencies in Defendants' management of the Reactor Project, including that construction plans were not specific to the Reactor Project, were "unbuildable" and required extensive revisions, and could not be used to accurately forecast the Reactor Project's cost or completion date; plans were still needed to complete the design of the project; project managers had not appropriately planned to adapt to the need for design changes; and numerous factors were impeding productivity. The Bechtel Report went on to state that "[t]he number of

---

[6] Amend. Compl. ¶¶ 80-87, 89, 95-97, 102-103, 108-109, 112, 116, 123, 128, 129, 133, 157, 158, 168, 209, and 216.

issues identified during the current civil phase of the construction effort is significant" and "[t]he Project needs to experience some successes, no matter how small." Not only did Defendants fail to materially act on the recommendations made by the Bechtel Report or attempt to remediate the problems with the Nuclear Reactor Project, they actively concealed the existence of the report. Additionally, current and former SCANA executives and board members divested themselves of large portions of SCANA stock after receiving the Bechtel Report. Amend. Compl. ¶¶ 170, 195.

Defendants did not inform the public about the Bechtel Report and their own concerns and continued to charge Plaintiffs for a project Defendants knew was unlikely to ever be completed. Amend. Compl. ¶ 231. Both before and after the Bechtel Report, SCANA and Santee Cooper imposed rate increases to cover cost overruns and delays, which were reasonably foreseeable before the initial application for funding to the SCPSC. Santee Cooper has raised its rates five times for costs associated with the Nuclear Reactor Project. To date, Plaintiff Hamiter and the putative class of Santee Cooper customers have paid at least $530 million in relation to the Reactor Project, which now comprises 8% of a Santee Cooper's customer's power bill. Amend. Compl. ¶¶ 252-253.

On March 27, 2017, Westinghouse filed for bankruptcy. Toshiba, its parent company, subsequently settled SCANA's and Santee Cooper's Reactor Project-related claims against Westinghouse for $2.2 billion, and sold that settlement to Citibank for an immediate cash payment of $1.84 billion. Amend. Compl. ¶¶ 242-243. Defendants elected to abandon the Reactor Project entirely on July 31, 2017. Amend. Compl. ¶ 234. As of August 2017, nine years after the submission of its Base Load Application, the Reactor Project was only one-third complete, and would cost an additional $23 billion to complete. Amend. Compl. ¶ 238.

In 2017, Santee Cooper reduced the rate paid by its customers toward the Nuclear Reactor

project to 4.5%. However, Santee Cooper maintains that its customers are obligated to continue to pay for the costs of the failed Project on a monthly basis, for decades into the future.[7]

## STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint, not the likelihood a plaintiff will ultimately succeed on the merits. *Butler v. Ford Motor Co*., 724 F. Supp. 2d 575, 578 (D.S.C. 2010) (Wooten, C.J.).This Court has held that "[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." (internal citation omitted). *Id.* The Fourth Circuit has held that a complaint should not be dismissed under Rule 12(b)(6) "unless 'after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief.'" *Martin v. Duffy*, 858 F.3d 239, 248 (4th Cir. 2017) (emphasis added) (citation omitted), *cert. denied*, 138 S. Ct. 738 (2018). "[I]mportantly," a motion under Rule 12(b)(6) "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Ganaway v. Kyoto Highway 7 Inc*., No. 2:11-CV-2959-RMG, 2012 U.S. Dist. LEXIS 54166, at *1, 2012 WL 1354465, at *1 (D.S.C. Apr. 18, 2012) (emphasis added) (*quoting Republican Party of North Carolina v. Martin*, 980 F.2d 943, 952 (4th Cir.1992)).

The Federal Rules of Civil Procedure provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

---

[7] *See* "Santee Cooper customers helped pay SCANA execs' bonuses for failed VC Summer project," available at https://www.greenvilleonline.com/story/news/2018/05/10/santee-cooper-customers-helped-pay-scana-execs-bonuses-failed-vc-summer-project/598494002/ (copy attached as Exhibit A).

Allegations should be "simple, concise, and direct," and "[p]leadings must be construed so as to do justice." Fed. R. Civ. P. 8(d)-(e). To survive a motion to dismiss, a pleading should be facially plausible, meaning it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Jones v. Ram Med., Inc.*, 807 F. Supp. 2d 501, 506-07 (D.S.C. 2011) (citation omitted) (Wooten, C.J.). Evaluating whether a complaint has met this standard is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 507 (citation omitted).

## **ARGUMENT**

Plaintiff Hamiter's RICO claims asserted against the SCANA Defendants on behalf of the putative class of Santee Cooper customers states a viable claim for relief. Plaintiff's claims are not barred by the filed rate doctrine and the Complaint adequately alleges the heightened pleading for stating a RICO claim. Therefore, the Complaint should not be dismissed.

### **I. THE FILED RATE DOCTRINE IS INAPPLICABLE TO THIS CASE**

SCANA argues that the filed rate doctrine bars the RICO claims asserted by Plaintiff Hamiter in this action, because this Court cannot be asked to challenge the ratemaking authority and decisions of Santee Cooper, purportedly the governing regulatory body, acting in accordance with South Carolina law.[8] SCANA is unable to rely on the filed-rate doctrine to block Plaintiff's remedies. First, even if SCANA could invoke the doctrine, it does not block Plaintiffs' claims. Plaintiffs challenge Defendants' conduct, not the exact dollar amount of the rate Santee Cooper set. The filed rate doctrine does not bar challenges to unlawful conduct that results in a rate

---

[8] *See Defendants SCANA Corporation and South Carolina Electric & Gas Company's Memorandum of Law In Support Of Their Motion To Dismiss Plaintiffs' Third Amended Complaint* ("Def.'s Br.") at 10 (Aug. 20, 2019) (Doc. No. 112-1).

increase. Plaintiff Hamiter alleges that he paid fraudulently inflated advance finance charges, in violation of the civil RICO statute, 18 U.S.C. § 1964, Amend. Compl. ¶¶ 3, 40, and that the putative class "includes all persons who sustained damage by paying the inflated charges as alleged herein as a result of such advance charges." Amend. Compl. ¶ 40.

Thus, Plaintiff's claim is a challenge to Defendants' allegedly wrongful conduct, and **not** to the reasonableness or propriety of a rate set by the PSC with respect to SCANA or by the Santee Board of Directors with regard to the Plaintiff and the putative Class. *DiGiacomo v. Statebridge Co., LLC*, No. 14-6694 (JEI), 2015 U.S. Dist. LEXIS 82496, 2015 WL 3904594 (D.N.J. June 25, 2015)(*quoting Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 765 (3d Cir. 2009).

Even if the Court decides that contrary to Plaintiff's intention, Plaintiff's allegations make the reasonableness of the rates an issue, the filed-rate doctrine should not be applied. Plaintiff Hamiter alleges against SCANA and its co-conspirators that Defendants have engaged in a scheme to defraud which led to the imposition of inflated advance construction charges by Santee Cooper. While Santee Cooper may be regarded in some sense as a South Carolina state agency, it did not file the rates it determined to impose on its customers and in no way does Plaintiff Hamiter's claim challenge the rates that the Santee Cooper Board of Directors has set. Applying the filed-rate doctrine here is completely inconsistent with South Carolina law.

Nonetheless, SCANA argues irrelevantly that the South Carolina Supreme Court has recognized that "[Santee Cooper] is, in effect, a State agency just as the Public Service Commission."[9] Plaintiff Hamiter does not argue that Santee Cooper should be regarded or not regarded as a state agency, or that Santee Cooper does not have rate setting authority. He does

---

[9] *See* Def.'s Br. at 10 (citing *South Carolina Elec. & Gas Co. v. South Carolina Pub. Serv. Auth.*, 215 S.C. 193, 214, 54 S.E.2d 7775 786 (1949)).

argue that there is a fundamental difference between Santee Cooper and the SCPSC. Unlike the SCPSC Santee Cooper is not an independent regulatory body. Santee Cooper sets its rates, but ratepayers cannot seek a review of those rates by an independent agency. Moreover, Santee Cooper has established no procedure for a ratepayer to seek even an internal review of its rate making decisions. Thus, SCANA entirely overlooks that the relevant issue here is whether the filed rate doctrine should be applied to insulate Santee (and its co-conspirator SCANA) from a ratepayer's judicial challenge where the ratepayer had neither redress to an *independent* regulatory agency nor to even an internal administrative procedure. No case cited by SCANA has ever so held with respect to Santee Cooper, or with respect to any comparable utility anywhere in this country.

A.    **SCANA Cannot Take Refuge in the Filed Rate Doctrine, Because South Carolina Has Long Recognized the Right of Consumers to Challenge Rates Set by Corporations that Are Neither Reviewed Nor Approved By A South Carolina Administrative Agency.**

Since neither SCANA's rates nor Santee Cooper's are being challenged by Plaintiff Hamiter, SCANA should not be able to raise the filed rate doctrine as an affirmative defense. The application of the filed rate doctrine to the facts of this case should not (and cannot) be resolved on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). *See infra* at 17-18. Plaintiff, however, assumes *arguendo* that SCANA can raise the filed rate defense with respect to Plaintiff Hamiter's claims despite the lack of any challenge to the rates set by SCANA or to Santee Cooper, "a public corporation in the nature of a quasi-municipal corporation, exercising certain governmental functions as an agency of the State." *Creech v. S.C. Pub. Serv. Auth.*, 20 S.E.2d 645, 648 (S.C. 1942) (citation omitted) (emphasis added). Neither the SCPSC or any other agency has any power to review Santee Cooper's rates or utility rates charged by other municipal corporations. S.C. Code Ann. § 58-27-20; *S.C. Pub. Serv. Auth. v. Carolina Power & Light Co.*, 137 S.E.2d 507, 510 (S.C. 1964).

11

Long-established South Carolina law establishes that utility rates of municipal corporations like Santee Cooper, which are not set by the SCPSC, may be judicially reviewed to determine whether they are reasonable or otherwise lawful—including situations where the rates have been set at a level to satisfy the utility's obligations to its bondholders. In *Simons v. City Council of Charleston*, 187 S.E. 545 (S.C. 1936), the South Carolina Supreme Court upheld a municipal corporation's power to use utility revenues to guarantee debt needed to expand its waterworks— so long as customers' rates are reasonable. "It seems to us," the court held, "that, in the light of the admitted facts and of applicable principles of law, the choice of the proposed method is within the discretion of the city council, and <u>so long as the revenues it uses for the purpose named are derived from "reasonable" rates</u>, the court will not interfere with the discretion sought to be exercised. *Simons*, 187 S.E. at 546–47 (emphasis added). The *Simons* court also based its decision on a state constitutional provision that required that rates set by municipal utilities be reasonable. That provision does not appear in the current South Carolina constitution. The court made clear, however, that a court's authority to review rates for reasonableness had an independent common-law basis. *See id.* at 547.

The *Simons* court explained that "the rates charged must be reasonable. A waterworks is a public utility, and it makes no difference whether such utility be operated by a municipality or by a private corporation. Both are bound by the rule of reasonableness. . . . '[M]unicipally owned water works stand in no better position in regard to water rates than privately owned systems.'" *Id.* at 547 (*quoting* 6 McQuillin on Water and Water Rights 654). After considering the interest rate on the bonds and other pertinent circumstances, the court held that the rate was reasonable.

Later South Carolina Supreme Court opinions have reaffirmed the role of the courts in entertaining challenges to rates not regulated by the SCPSC. As the court has repeatedly held in

the utility context, "discretionary decisions of municipal corporations regarding utility services will not be disturbed 'except in cases of <u>fraud</u> or clear abuse of power, or where <u>unreasonable</u> or capricious.'" *See, e.g.*, *Moody v. City of Orangeburg*, 319 S.C. 184 (S.C. 1995) (emphasis added). Hence, "a consumer may challenge a rate schedule as being excessive" in the case of a municipal utility. *See Mims v. Edgefield County Water and Sewer Authority*, 299 S.E.2d 484, 485 (S.C. 1983). The South Carolina Supreme Court also has articulated a framework for evaluating the reasonableness of rates. It includes an evaluation of the utility's financial condition, return on rates, and "whether the return realized from the rates is so low as to be confiscatory to the utility or so high as to be unduly burdensome to the utility's customers." *Id.* The "service received" by the ratepayer is also a key factor. *H. A. Sack Co. v. Forest Beach Pub. Serv. Dist.*, 272 S.C. 235, 238, 250 S.E.2d 340, 341 (1978).

A framework for evaluating the reasonableness of rates helps ensure that "[w]hen the rights and interest of the public as a whole and its private citizens or its corporations conflict, the rights and interests of the latter must yield to the rights and interests of the public." *South Carolina Elec. & Gas Co. v. South Carolina Public Service Authority*, 215 S.C. 193 (S.C. 1949). Although this line of cases preceded the Supreme Court's express recognition of the filed-rate doctrine in *Edge v. State Farm Mutual Auto Insurance Company*, 623 S.E.2d 387 (S.C. 2005), *Edge* did not mention, much less overrule it.

Santee Cooper's enabling legislation did not repeal a common-law cause of action to determine whether a rate is reasonable or otherwise lawful. Rather, it assumes the existence of and depends upon this cause of action. It expressly imposes on its directors a duty to set rates that are "just and reasonable." S.C. Code Ann. § 58-31-55(a)(3)(A).

It also reserves any person or entity's right to bring any action which the law allows against Santee Cooper to hold Santee Cooper severally liable for acts or omissions associated with the Reactor Project. *See* S.C. Code Ann. § 58-31-30(A)(2) (Santee Cooper has the "power . . . to sue and be sued"); § 58-31-57 (cause of action and remedy of disgorgement available "against Public Service Authority directors asserting a breach of any duty arising under Sections 58-31-55 [standards for discharge of duties] and 58-31-56 [conflict of interest transactions]"); § 58-31-200 (Santee Cooper is "severally liable, in proportion to its joint ownership interest . . . for the acts, omissions, or obligations performed, omitted, or incurred by the operator or other owners of the plant while acting as the designated agent of the Public Service Authority for purposes of constructing, operating, or maintaining the [V.C. Summer] plant").

The remedy of disgorgement for unreasonable or fraudulent rates is thus expressly contemplated by, not contrary to, Santee Cooper's enabling act. Santee Cooper (and certainly not SCANA as Santee's proxy) cannot wave a wand to transform every filed rate into a lawful rate. As the U.S. Supreme Court observed in the context of the Interstate Commerce Act, "although the filed rate is the *legal* rate, the Act 'did not abrogate, but [rather] expressly affirmed, the common-law duty to charge no more than a reasonable rate." Thus, "the legal rate was not made by the statute a lawful rate—it was lawful only if it was reasonable," and "if [a shipper] could show that it was unreasonable he might recover reparation. *Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 128–29 (1990).

Moreover, the predicate for applying the filed rate doctrine is absent here. "The filed-rate doctrine was developed in the context of filed tariffs that were subject to the usual regulatory process—a time and procedure for public comment and complaint and room for disallowance or adjustment by the regulators." *E. & J. Gallo Winery v. EnCana Corp.*, 503 F.3d 1027, 1049 (9th

14

Cir. 2007) (Fletcher, J. concurring). Here, no agency reviews Santee Cooper's rates, and no regulatory process for challenging Santee Cooper's rates exists. In South Carolina, the filed-rate doctrine does not apply to a challenge to a rate that is not established by an independent administrative agency. *Fullbright v. Spinnaker Resorts, Inc.*, 802 S.E.2d 794, 801 (S.C. 2017).

To succeed in asserting the filed rate doctrine as an affirmative defense, SCANA would have to show that Santee Cooper's rates (i.e. the rates in question) were approved by a governing regulatory agency. See *Gallo v. PHH Mortg. Corp.*, 916 F.Supp.2d 537, 546 (D.N.J. 2012). Santee Cooper (and therefore, SCANA) cannot make this showing, since no other agency has the power to review its rates. And SCANA cites no precedent for sanctioning the strange fiction that Santee Cooper may act at the same time as both a regulating and a regulated entity.

A U.S. District Court made an effort in 2015 to locate such a precedent but was unable to find "any case where the filed-rate doctrine has been applied to a non-regulated or self-regulated entity; rather, the existence of a separate and independent regulatory agency seems to be fundamental to the doctrine's application." *Marrero-Rolón v. Autoridad De Energía Eléctrica De P.R.*, 2015 U.S. Dist. LEXIS 134211, *65-66 (D.P.R. 2015). In the likely event that this Court also finds no precedent, this Court likewise should hold that the filed-rate doctrine has no application to a non-regulated or self-regulated entity such as Santee Cooper, and that the existence of a separate and independent regulatory agency is fundamental to the doctrine's application.

According to SCANA, citing four cases, "[n]umerous federal courts have considered and dismissed RICO claims as barred by the filed rate doctrine, including in cases nearly identical to this one."[10]  However, SCANA is incorrect that these cases "are nearly identical to his one" and

---

[10] Def.'s Br. at 13 *(citing Wah Chang v. Duke Energy Trading & Mktg., LLC*, 507 F.3d 1222, 1225 n.4 (9th Cir. 2007); *Taffet v. S. Co.*, 967 F.2d 1483, 1490 (11th Cir. 1992) (en banc); *HJ Inc. v.

is further incorrect in asserting that "this statutory rate-setting process for Santee Cooper is similar to state administrative processes that multiple appellate courts have held should not be disrupted through collateral lawsuits."

In *Taffet*, consumers had remedies that were not available to Santee's customers. In *Taffet* the Eleventh Court described those remedies:

> Georgia's Assembly sought to ensure that consumers of utility services are adequately represented in proceedings affecting utility rates and services. [citation omitted] Thus, anyone with an interest in the rate-determination proceeding may file a motion to intervene in the proceeding. [citation omitted]. A person who has exhausted the administrative remedies available before the PSC and who is 'aggrieved' by the PSC's rate-making decision may seek judicial review of the decision first in the Superior Court of Fulton County, and, then, in the Georgia Court of Appeals or the Georgia Supreme Court.

Here, Santee Cooper consumers could not file a motion to intervene in a rate setting proceeding. There was no such proceeding. Here, also, a Santee Cooper consumer could not exhaust administrative remedies available before the SCPSC. The Santee Cooper consumer had no administrative remedies before the SCPSC, and consequently could not seek judicial review. There was no SCPSC decision to review. *Taffet* is distinguishable.

In *HJ Inc. v. Nw. Bell Tel. Co.*, the Eight Circuit emphasized that the filed rate doctrine should be applied because there was an administrative process available to the ratepayers:

> In this case, the state agency, at least so far as the 83-600 rate is concerned, has already reviewed the 83-600 rate and determined it was 'tainted.' This resulted in a prospective rate decrease and a refund to telephone customers. Thus, not only are damages available through the state administrative process, they have actually been received.[11]

---

*Nw. Bell Tel. Co.*, 954 F.2d 485, 495-96 (8th Cir. 1992); *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 21 (2d Cir. 1994)).
.

[11] 954 F.2d at 496.

*HJ Inc.* is clearly distinguishable, in that there is no state administrative process here. Similarly, in *Wegoland Ltd. v. NYNEX Corp.*,[12] there was a state administrative process available to ratepayers seeking to challenge the reasonableness of the rates that had been set. In *Wah Chang v. Duke Energy Trading & Mktg., LLC* the rates in question were "approved by the Federal Energy Regulatory Commission under its market-based rate setting approach" and plaintiffs who contested a filed rate would first have to bring their claims before the FERC. 507 F.3d at 1224, 1227. Here, by contrast, plaintiffs are not challenging any filed rate, so the rationale for applying the filed rate doctrine is completely absent in this context.

Finally, the filed rate doctrine is an affirmative defense. *E. & J. Gallo Winery v. Encana Corp.*, 503 F.3d 1027, 1039 n.11 (9th Cir. 2007). The filed rate doctrine will only require the dismissal of a complaint if its applicability is apparent on the complaint's face. *Jones v. Bock*, 549 U.S. 199, 215 (2007); *In re Hawaiian & Guamanian Cabotage Antitrust Litig.*, 754 F. Supp. 2d 1239, 1244 n.9 (W.D. Wash. 2010).

The Complaint here does not allege that Santee Cooper filed its rates or that its rates were subject to a state administrative challenge; nor does SCANA's motion so allege. The Defendants' filed rate defense must therefore be rejected at this stage of the case. *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 797 (6th Cir. 2012); *see also CSX Transp., Inc. v. Gilkison*, 406 F. App'x 723, 728 (4th Cir. 2010)("We have noted that asserting an affirmative defense, like a statute of limitations defense, in a motion to dismiss presents a particular 'procedural stumbling block' for defendants.").

B. **Even if the Filed Rate Doctrine Applied to Santee Cooper, It Does Not Apply to This Action, Where Plaintiffs Challenge the Conduct of the Defendants, Do Not Allege That Santee Cooper's Rates Have Been Filed With Any Administrative Agency, and Do Not Challenge the Dollar Value of the Rate Filed.**

---

[12] 27 F.3d 17 (2d Cir. 1994)

Assuming *arguendo* that SCANA has standing to invoke the filed rate doctrine with respect to Santee Cooper's rates, it should not have applicability to Plaintiff Hamiter's claims against SCANA. Plaintiff does not seek review of any specific rate -- whether rates filed by SCANA (and approved by the SC PSC) or of the unfiled rates approved only by the Santee Cooper Board of Directors.[13] Instead, Plaintiffs allege that they were required to pay unreasonable advance finance charges imposed as a result, in part, of SCANA's fraudulent concealment in violation of the civil RICO statute, 18 U.S.C. § 1964. Amend. Compl. ¶ 267.

SCANA was Santee's agent (Amend. Compl. ¶¶ 53, 65, 67, 107, and 247) and its mismanagement of the Nuclear Project caused monumental project cost overruns. This management led directly to the Santee Cooper Board's imposition of rate increases to fund the nuclear reactor project. The putative class "includes all persons who sustained damage by paying the inflated charges as alleged herein as a result of such advance charges." Amend. Compl. ¶ 40. Thus, Plaintiff's claim is a challenge, essentially, to SCANA's allegedly wrongful conduct, and not to the reasonableness or propriety of a rate proposed by a utility (whether by SCANA or Santee Cooper) and approved or modified by an independent regulatory agency. Significantly, no independent regulatory agency has ever approved Santee Cooper's rates.

A challenge to SCANA's conduct is not a challenge to the Santee Cooper rate schedule. In *Alston v. Countrywide Fin. Corp.*, the Third Circuit Court of Appeals found that the filed rate doctrine did not apply to bar claims where "Plaintiffs challenge [Defendant's] allegedly wrongful conduct, not the reasonableness or propriety of the rate that triggered that conduct." 585 F.3d 753, 765 (3d Cir. 2009). The fact that the damages to be awarded are for SCANA's misconduct in

---

[13] Plaintiff does not attack a ratemaking process by a regulatory agency overseeing Santee Cooper's ratemaking. *There is no such agency or process*.

18

causing the increased rates does not implicate the filed rate doctrine. *See Ellsworth v. U.S. Bank, N.A.*, 908 F. Supp. 2d 1063, 1082–83 (N.D. Cal. 2012) ("Ellsworth does not challenge the rates or the premiums he paid but instead challenges the alleged kickbacks. ASIC's argument that he really is challenging the premiums is unpersuasive. Just because the damages are based on increased costs incurred as a result of the alleged kickback scheme does not transform a challenge to conduct and practices into a challenge to the premiums."); *see also DiGiacomo*, 2015 U.S. Dist. LEXIS 82496 (filed-rate doctrine should not be applied where Defendants were alleged to have engaged in an unlawful, undisclosed kickback scheme); *Little v. Ambit Energy Holdings, LLC*, No. 16-CV-8800 (PGS), 2017 WL 6559907, at *4 (D.N.J. Dec. 21, 2017).

Similarly, Judge John C. Hayes, III of the South Carolina Court of Common Pleas found that "the amounts of the rate charged to consumers by SCE&G is not the issue. Instead, this complaint seeks to address whether funds collected by SCE&G, pursuant to the PSC approved rates, should be recouped by the ratepayers . . . [t]he filed-rate doctrine is thus no bar to the relief Plaintiff has requested." *Cleckley v. S. C. Elec. & Gas Co*., No. 2017-CP-40-04833, Order Denying Defendant SCE&G's Motion to Dismiss (S.C. Ct. Common Pleas, Mar. 1, 2018) (copy attached as Exhibit B).

## II. COUNT I OF THE COMPLAINT PROPERLY PLEADS A RICO CLAIM UNDER 18 U.S.C. § 1962(c)

Defendants assert that Plaintiff failed to sufficiently plead their substantive RICO claims under 18 U.S.C. § 1962 (c) in Count I of the Complaint.[14] As discussed below, this is incorrect; Plaintiff's RICO claims are adequately pled. *Kobe v. McMaster*, No. 3:11-1146-MBS, 2018 U.S. Dist. LEXIS 55500, at *54 (D.S.C. Mar. 30, 2018)(for a civil RICO claim to survive

---

[14] Def's Br. at 17.

a Rule 12(b)(6) motion to dismiss, plaintiff must allege '(1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering' [citation omitted] and additionally plead proximate cause, such that she was injured in her business or property 'by reason of' the RICO violation. [citation omitted]; *accord Gibson v. Confie Ins. Grp. Holdings, Inc.,* No. 2:16-cv-02872-DCN, 2017 U.S. Dist. LEXIS 105702, at *22, 2017 WL 2936219 (D.S.C. July 10, 2017).

### A. Standard of Review for RICO claims

RICO is a remedial statute. Accordingly, complaints alleging a RICO violation should be construed liberally. *Sedima, S.P.R.L. v. Imrex Co., Inc*, 473 U.S. 479, 498 (1985); *see also*, *Peters v. Aetna, Inc.,* 2016 U.S. Dist. LEXIS 117326, *22-23 (W.D.N.C. Aug. 31, 2016).

RICO claims should comply with Federal Rule of Civil Procedure 9(b), which requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." *Jones*, 807 F. Supp. 2d at 507. However, a party's state of mind "may be alleged generally," Fed. R. Civ. P. 9(b), and "the court must read the complaint generously and draw all inferences in favor of the pleader." *Ctr. Cadillac, Inc. v. Bank Leumi Tr. Co. of New York*, 808 F. Supp. 213, 228 (S.D.N.Y. 1992), *aff'd*, 99 F.3d 401 (2d Cir. 1995); *see also, In re Jiffy Lube Sec. Litigation,* 1990 U.S. Dist. LEXIS 20141, *15 (D. Md. Oct. 31, 1990). Rule 9(b) must be construed in light of Rule 8, however, which contemplates a short and plain statement of a claim. *Morley v. Cohen*, 610 F. Supp, 798, 814 (D. Md. 1985); *Ctr. Cadillac, Inc.*, 808 F. Supp. at 228.

Additionally, the Fourth Circuit has instructed that "[a] court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Wegner v. Pella Corp*., 2015 U.S. Dist. LEXIS 60927, *14 (D.S.C. May 5, 2015)(*quoting Harrison v. Westinghouse Savannah River*

*Co.*, 176 F.3d 776, 784 (4th Cir. 1999)).

**B. Required Elements Under 18 U.S.C. §1962(c)**

A complaint properly alleges a violation of Section 1962(c) of civil RICO when it pleads the following four elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496; *see also Gibson v. Confie Ins. Grp. Holdings, Inc.,* 2017 U.S. Dist. LEXIS 105702, at *22.

An enterprise is defined in Section 1964(4) as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." Thus, a RICO enterprise is "an ongoing organization, formal or informal, in which the various associates function as a continuing unit." *Palmetto State Med. Ctr., Inc. v. Operation Lifeline*, 117 F. 3d 142, 148 (4th Cir. 1997).

**1.    Plaintiffs Were Directly Injured As a Result of Defendants' Predicate Acts**

SCANA argues that Plaintiffs' Complaint is defective in that the injury alleged was not proximately caused by Defendants' alleged racketeering activity.[15] This is incorrect. The Supreme Court has "made clear" that "[p]roximate cause for RICO purposes … should be evaluated in light of its common law foundations; proximate cause thus requires 'some direct relation between the injury asserted and the injurious conduct alleged.'" *Hemi Group, LLC v. City of New York,* 559 U.S. 1, 9 (2010). To establish injury in fact, a plaintiff must demonstrate that he/she has "suffer[ed] an invasion of a legally protected interest which is concrete and particularized, as well as actual or imminent." *Friends of the Earth, Inc. v. Gaston Cooper Recycling Corp.*, 204 F. 3d 149, 154 (4th Cir. 2000).

SCANA asserts wrongly that "Plaintiffs' alleged injury is the payment of allegedly inflated

---

[15] Def.'s Br. at 18-20.

rates to Santee Cooper. But the complained-of conduct is the SCANA Defendants' issuance of allegedly false or misleading statements to the PSC and the public."[16]    Defendants' characterization of the RICO allegations in the Complaint misses the basic point that the ultimate objective of the racketeering scheme was "to obtain billions of dollars in proceeds and profits therefrom" to which they were not legitimately entitled, and that these monies would be coming (and did come) directly from the Plaintiff and the putative Class, not the Public Service Commission. *See, e.g.*, Amend. Compl. ¶ 279 ("members of the Class … relied upon said false and misleading communications when paying the fraudulently inflated advance finance charges, and were injured by reason [thereof]"); Amend. Compl. ¶ 280 ("in reliance on the RICO Defendants' false representations, the Santee Cooper Board … authorized the collection of hundreds of millions of dollars from customers"); Amend. Compl. ¶ 281 ("In reliance on these misrepresentations by the RICO Defendants, and the intentional failure of the RICO Defendants to disclose material facts, Plaintiffs and the Class paid their fraudulent bills").

In other words, the Plaintiff and the Santee Cooper Customer Class were the object of the scheme. *Slay's Restoration, LLC v. Wright Nat'l Flood Ins. Co.,* 884 F.3d 489, 493 (4th Cir. 2018)(*quoting Anza v. Ideal Steel Supply Corp.,* 547 U.S. 451, 126 S. Ct. 1991, 164 L. Ed. 2d 720 (2006))(holding that "a court facing a RICO claim should not focus on whether the harm to the RICO plaintiff was a foreseeable result of the defendant's conduct or even whether it was 'the intended consequence[] of [that] behavior,' but rather on 'the directness of the relationship between the conduct and the harm.'") The harm to Plaintiff and the Class was directly attributable to the conduct engaged in by the alleged enterprise, through the active deception of the public and the rate payers.

---

[16] Def.'s Br. at 18.

In *Hemi*, for example, the Supreme Court found that an out-of-state vendor's failure to report cigarette purchasers to tax authorities was not sufficiently direct and broke the "causality chain" resulting in failure to pay excise taxes, reasoning that the defendant's failure of customers to pay taxes was the conduct directly responsible for the harm, and that the fraud by the vendor only made enforcement more difficult. *Hemi Group, LLC*, 559 U.S. at 10-11.

Here, in contrast, while the PSC approved the construction of the nuclear project in question, it was the SCANA Defendants in conspiracy with Santee Cooper – not the PSC – that assessed the Nuclear Reactor Project costs against customers of Defendants SCANA and Santee. For example, SCANA, in conspiracy with the Santee Defendants, actively raised the rates of the SCANA Customer Class members nine times in order to raise the funds from Plaintiffs and other class members, and "these advanced charges were …levied regardless of a customer's electricity usage. Amend. Compl. at ¶ 251.  At the height of the project, approximately 18% of the power bill of the average customer went toward the funding of the Nuclear Reactor Project. *Id*. at ¶ 252. The Complaint further alleges: "Santee Cooper has raised its rates five times for costs associated with the Nuclear Reactor Project. Santee Cooper customers have paid 8% of their bills toward the Nuclear Reactor Project and have contributed over $530 million thus far. In 2017, Santee Cooper reduced the rate paid by its customers toward the Nuclear Reactor project to 4.5%. However, Santee Cooper maintains that its customers are obligated to continue to pay for the costs of the failed Project on a monthly basis, for decades into the future." *Id*. at ¶ 253.

Clearly, therefore, the Defendants' concerted misrepresentations made to Plaintiff that his funds were necessary to support the Nuclear Reactor Project were in fact directly responsible for the harm to Plaintiff, the "causality chain" remains intact as there are no intervening third-party acts; Fourth Circuit law is not to the contrary. SCANA's reliance on *Slay's Restoration, LLC v.*

23

*Wright Nat'l Flood Ins. Co.*, 884 F.3d 489 (4th Cir. 2018) is misplaced. *See* Def's Br. at 18. In *Slay's Restoration* plaintiff was a subcontractor of First Atlantic, who was a contractor of City Line, who had an insurance policy with Wright Insurance, who employed the defendants, and this attenuated relationship was found not to support proximate cause. However, here there was a close relationship between SCANA to the Santee ratepayers, because SCANA was Santee's joint venture partner, and most importantly, was Santee's agent with respect to all aspects of the nuclear project. SCANA made application to the PSC for approval of the project as Santee's agent. Amend. Compl. ¶¶ 168, 217, and 227.

The Complaint thus clearly alleges a direct nexus between Defendants' conduct and the harm that it caused, *i.e.*, the collection of overcharges directly from the ratepaying Plaintiff. The Complaint further alleges that Defendants' fraudulent scheme was directly designed to extort money from Plaintiff and the putative Class members by "instill[ing] the fear of economic and personal harm, *inter alia*, the cessation of electricity services to the Class….," (*id.* at ¶ 284) and that Defendants' scheme was intended to "derive increased proceeds and profits" through direct overcharges to the Plaintiff and direct collection of those overcharges. *Id.* at ¶ 286.

Although the Complaint alleges that some of Defendants' misrepresentations were contained in submissions and communications with the PSC, it also unequivocally alleges that "Defendants systematically and fraudulently used the Racketeering Enterprise to disseminate fraudulent and misleading information to …*the public and the Class,*" (Amend. Compl. ¶ 270, emphasis added) and that Defendants' intent was "to defraud the public and Plaintiffs into believing their false statements" and to conceal "their knowledge of the actual projected costs and time estimates … from the … public and the Class" so that the fraudulently inflated bills sent to customers would be paid. Amend. Compl. ¶ 275.

24

Defendants heavily rely on *Lifschultz Fast Freight, Inc. v. Consol. Freightways Corp. of Del.*, 805 F. Supp. 1277, 1295 (D.S.C. 1992), *aff'd*, 998 F. 2d 1009 (4th Cir.), *cert. denied*, 510 U.S. 993 (1993), for support for their flawed argument that the Complaint fails to sufficiently allege proximate cause between the RICO fraudulent scheme and Plaintiff's injuries. However, *Lifschultz* is clearly distinguishable and actually supports Plaintiff's position here since, in that case, the court found that "any link between the alleged violations and the injury is at best remote and tenuous [since] the alleged predicate acts were all directed at third parties, the rate bureaus, the ICC, and customers. 805 F. Supp. at 1291. In *Lifschultz*, the plaintiff was a freight carrier who was alleging that its competitors participated in a RICO scheme and conspiracy to manipulate freight rates and to restrain competition. There were no allegations asserted in that case that there were any misrepresentations or other predicate acts directed against *Lifschultz*, as opposed to third parties.

Here, in contrast, the Complaint alleges that "[t]he RICO Defendants and the Enterprise *transmitted* the false and misleading information contained in said communications *to the Plaintiffs* and members of the class, who relied upon said false and misleading communications when paying their fraudulent inflated advance finance charges that form the subject matter of the economic injury to Plaintiffs *directly caused* by Defendants' fraudulent scheme and unlawful acts in violation of the civil RICO statute." Amend. Compl. ¶ 279 (emphasis added). The Complaint further alleges that "[t]he purpose of the Defendants' fraudulent scheme …was to fraudulently obtain billions of dollars in proceeds and profits from their utility customers …" Amend. Compl. ¶ 278.

*Lifschultz* is also significant in that the court noted that, "while … it is not necessary to establish detrimental reliance by the victim in order to make out a violation of the federal mail

fraud statute, such reliance is necessary to establish injury to business or property 'by reason of a predicate act of mail fraud…..'" 805 F. Supp. at 1292 (*quoting Brandenburg v. Seidel*, 859 F. 2d 1179, 1188 n. 10 (4th Cir. 1988), and *citing Morley v. Cohen*, 888 F. 2d 1006, 1011 (4th Cir. 1989) and *Professionals, Inc. v. Berry*, 959 F. 2d 231 (4th Cir. 1992)).

While the *Lifschultz* court found that there was no detrimental reliance in that case, since the alleged mail and wire fraud was exclusively directed "at the rate bureaus and at customers or prospective customers,"[17] the Complaint here alleges that the alleged fraud was directed, at least in significant part, at the Plaintiff customers and ratepayers. *See, e.g.*, Amend. Compl. ¶ 275.

### 2.     Plaintiffs Sufficiently Allege Predicate Acts

While Defendants challenge the sufficiency of the RICO predicate acts alleged in the Complaint by, for example, pointing out that the utility bills mailed by Defendants to Plaintiffs and other ratepayers did not themselves contain any explicitly false or misleading statements (Def.'s Br. at 22), they concede, at the same time, that "the mailings or wire submissions itself need not contain the false information …." *Id.* (*citing Bridge v. Phoenix Bond & Indem. Co.,* 553 U.S. 639, 647 (2008)).   This concession is inevitable since it is settled RICO case law that even "innocent" mailings may be "incident to an essential part of the scheme." *United States v. Schmuck*, 489 U.S. 705, 710-11 (1989); *see also id.* at 714-15 (1989) (finding that the sending of title applications to the State of Wisconsin to finalize automobile sales that were predicated on odometer tampering was sufficient to satisfy the mailing element of mail fraud, and that "although the registration-form mailing may not have contributed directly to the duping of either the retail dealers or the customers, they were necessary to the passage of title, which in turn was essential to the perpetuation of [defendant's] scheme").

---

[17] 805 F. Supp. at 1292.

As this Circuit ruled, "[t]o establish the existence of a scheme to defraud [it may be shown] that the defendant failed to disclose material information." *United States v. Gillion*, 704 F. 3d 284, 296 (4th Cir. 2012). The failure to disclose material information is also the basis for a proper predicate act of racketeering activity. *Neder v. United States*, 527 U.S. 1, 25 (1999) ("acts taken to conceal, create a false impression, mislead, or otherwise deceive in order to prevent the other party from acquiring material information" suffice as predicate acts establishing the existence of a scheme to defraud).

Plaintiff alleges in the Complaint both numerous affirmative misrepresentations as well as concealment of material facts, all of which resulted in the fraudulently inflated bills being forwarded to Plaintiff and other ratepayers. Specifically, Defendants affirmatively made "intentionally false and misleading" cost estimates regarding the Nuclear Reactor Project, as well as time estimates for the completion of the Project and Westinghouse's ability to complete the Project (Amend. Compl. ¶ 169 (a), (b) and (c)); they also affirmatively misrepresented that there was a continuing need for the Project, despite a decrease in electricity consumption and demand and the existence of cheaper and readily available alternatives. Amend. Compl. ¶ 169 (e) and (f). However, in addition, Defendants attempted to justify the mailing of inflated bills to customers through the concealment of material facts, including, (a) the fact that the Project's design was untested, (b) that it was likely that the design was going to have to be changed after construction had begun, (c) that the proposed generating capacity of the Project greatly exceeded the future anticipated electricity growth of Defendants' customer base, (d) that the construction timeline estimates for the Project were unreasonably and recklessly optimistic, (e) that construction delays were already occurring, (f) that the construction costs were likely to dramatically increase, and (g)

27

that SCANA was paying substantial bonuses to its officers and employees related to the Project on the false premise that it was being well managed. Amend. Compl. ¶¶ 169 (g) – (m).

In addition to the predicate act allegations of mail fraud relating to the mailings of bills and other written communications with Plaintiffs and other customers, the Complaint also sufficiently alleges wire fraud through the use of interstate wires, in that the inflated charges to support the Project involved the use of "the financial system and wires of interstate commerce to obtain payments from the Class." Amend. Compl. ¶ 288. These uses of wire communications as predicate acts included the transmission of "interstate electronic mail messages and/or facsimile in violation of 18 U.S.C. §1343." Amend. Compl. ¶ 294.

Defendants further assert that "Plaintiffs do not plead facts to support why the statements were false," referencing *Breunig v. Town of Atl. Beach*, 2010 WL 1433429, at *1 (D.S.C. April 8, 2010) (Wooten, J.) ("'[R]ecitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'"). See Def.'s Br. at 22. Defendants further claim that the Complaint fails to plead "why the representations were false as required by Rule 9(b)." *Id.* at 26-27, *quoting Hedley v. ABHE & Svodoba, Inc.*, 2015 WL 4626880, at *4 (D. Md. July 31, 2015), and *citing McLeain v. KBR, Inc.,* 2014 WL 310818, at *4 (E.D. Va. July 7, 2014) (false claims must be identified with particularity under Rule 9(b).

Contrary to Defendants' claim, paragraph 113 of the Complaint provides significant details regarding specific details showing that Defendants knew or should have known that as the time that SCANA made the Base Load Application, the promulgated construction schedules could not possibly be met, since "Westinghouse did not [yet] have a complete set of engineering drawings to construct the reactor," and Westinghouse did not even have any licensed engineers on staff "to craft blueprints and conduct complex engineering calculations," resulting in incomplete design

28

drawing that did not even have "the details of what bolts needed to be installed, where electrical wires would run, and how pipes would be configured…" Amend. Compl. ¶ 70.

In other words, by failing to disclose – or account for in its construction schedules – the fact that Westinghouse did not even have a complete set of engineering drawings for a reactor-type (the Westinghouse AP1000) that had never been constructed before, and then by publicly disseminating completion schedule and commercial service dates for Reactor Units 2 and 3 of April 1, 2016 and January 1, 2019, SCANA was intentionally and fraudulently making false representations so that reactor construction costs would be paid by Plaintiff and the Santee Cooper Customer Class whether or not the reactor units were ever completed.

Defendants also misleadingly attempt to make much of the fact that "Plaintiffs concede that the Westinghouse AP1000 reactor had received design certification in 2004," Br. at 21, while omitting the remainder of the sentence in Amend. Compl. ¶ 70 (c), which plainly alleges that SCANA failed to disclose that "…Westinghouse submitted revisions to the AP1000 designs to the NRC on September 2008, and they had not yet been approved and continued to seek approvals through 2011." Thus, Plaintiffs clearly articulate the theory of their case regarding Defendants' racketeering scheme, which was, in part, to make representations that they would use "standardized designs" and "advanced modular construction 2 techniques," but without disclosing that the engineering drawings for those designs had not yet been completed or that revisions to those "standardized designs" were still pending before the NRC or that construction could not move forward in any meaningful way without those NRC approvals and completion of the engineering drawings by licensed engineers (none of which Westinghouse had working on the design of the project at that time that SCANA was publicly making its misrepresentations).

Notwithstanding Defendants' protestations to the contrary (*see*, *e.g.*, Def.'s Br. at 23-24), Plaintiffs also provide significant details as to why and how Defendants knew that their representations that they were meeting their construction "milestones" and were on schedule were false. For example, specific reference is made to the internal "WEC Report," which in August 2011 confirmed that "the AP1000 Design was [still] not complete," and that even though construction of the reactors was ongoing, it was "virtually assur[ed that] large numbers of changes to both systems and structures" would have to be made. Amend. Compl. ¶ 99(b).

Plaintiffs further allege that the Bechtel Report was concealed by Defendants from "the public." *Id*. at ¶177. The Complaint further alleges in detail that, despite Defendants' knowledge of the design, production and other issues outlined in these publicly undisclosed studies and reports, and despite the knowledge that Defendants would be unable to meet their construction "milestones" and cost estimates as publicly disclosed, they falsely represented "that the Nuclear Reactor Project remained on schedule to complete all required milestones ….," (*id*. at ¶¶ 103-104, 228, 262, and 267) and within budget. *See*, *e.g.*, *id*. at ¶¶ 228, 262, and 267.

Thus, Plaintiff Hamiter has met his burden of pleading "why the statements that [he cites] …were false and misleading." *Cozzarelli v. Inspire Pharms, Inc*, 549 F. 3d 618, 629 (4th Cir. 2008). At the same time, the overwhelming details provided by Plaintiff in the Complaint demonstrated exactly how the Defendants were engaging in "active concealment" of crucial information, such that it created "a false impression or representation" of material information. *United States v. Colton*, 231 F. 3d 890, 899-900 (4th Cir. 2000).

3.    **The Complaint Sufficiently Pleads A Pattern of Racketeering Activity**

Defendants contend (Def.'s Br. at 29) that "Plaintiffs Fail to Allege a Pattern of Racketeering Activity that Poses a Threat of Continued Criminal Activity." This argument,

however, misstates the requirement under civil RICO that for a "pattern of racketeering activity," the alleged predicate acts "are related, and that they *amount to* or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co*., 492 U.S. 229 at 239 (1989) (emphasis added). As the Supreme Court noted in *H.J. Inc*., "[a] party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." *Id*., 492 U.S. at 241. As to the relationship component, the Supreme Court, in *H.J. Inc*., further explained that "'[c]riminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id*., 492 U.S. at 240. The court must consider such factors as "the number and variety of predicate acts and the length of time over which they were committed, the number of putative victims, the presence of separate schemes, and the potential for multiple distinct injuries." *Brandenburg v. Seidel*, 859 F. 2d 1179, 1185 (4th Cir. 1988). However, the ultimate focus of the inquiry "must always be on whether the related predicate acts indicate ongoing criminal activity of sufficient scope and persistence to pose a special threat to social well-being." *Id*.

Given that the Complaint clearly alleges that the pattern of racketeering activity engaged in by Defendants spanned a period of years from 2009, from when the first utility bills were sent to Plaintiff and other customers containing advance finance charges, see, e.g., Amend. Compl. ¶294, to the present, there can be no serious question that the fraudulent scheme engaged in by Defendants "amounts to …continued criminal activity" within the meaning of *H.J. Inc*. and the civil RICO statute, even if there were no threat that such racketeering activity were to continue into the future. However, Plaintiff properly alleges that, not only has the pattern of racketeering activity been ongoing for a lengthy time period, but also that this scheme does not have a set

31

endpoint and is still ongoing, as Plaintiff and the Santee Cooper Customer Class continued to incur charges for the Reactor Project from which they will never benefit. *Id.* at ¶310. In fact, Plaintiff specifically alleges that Defendants' Enterprise "continues to possess an ongoing organizational structure with sufficient continuity ....," *id*. at ¶ 263, that the "continuity" element is demonstrated by the "pattern of racketeering involv[ing] multiple predicate acts that have taken place over many years," and that the threat of continued racketeering activity is also demonstrated by the fact that "the predicate acts constitute the regular manner that SCANA conducts business." *Id*. at ¶ 311.

Defendants' attempt to mischaracterize their longstanding and highly complex RICO scheme as an "ordinary or garden-variety fraud,"[18] borders on the frivolous, given the fact that the detailed allegations in the Complaint easily rise to the minimum level required for a RICO fraud, which is that the alleged scheme's "scope and persistence set [it] above the routine." *HMK Corp. v. Walsey,* 828 F. 2d 1071, 1074 (4th Cir. 1987). Although Defendants cite extensively to *GE Investment Private Placement Partners II v. Parker*,[19] their reliance is misplaced in that the fraud there was solely "related to the sale of a single enterprise," which did not constitute or threaten the "long-term criminal conduct that RICO was intended to address." *Id.,* 247 F. 3d at 549-551.

Here, by contrast, Defendants' *modus operandi*, which was for Santee Cooper to bill Plaintiff and other Santee customers on a continuous basis for the costs of construction of the Project while construction was still ongoing, was carried out through a complex web of related predicate acts. As detailed in the Complaint, this goal was not accomplished by one act, as in *GE Investment* (the sale of the business), but by an ongoing series of charges to customers that is still

---

[18] Def.'s Br. at 21 *quoting Al Abood v. El Shamari*, 217 F. 3d 225, 238 (4th Cir. 2000)
[19] *GE Investment Private Placement Partners II v. Parker*, 247 F. 3d 543 (4th Cir. 2001).

ongoing. See *Connors v. Lexington Ins. Co.*, 666 F. Supp. 434, 451 n.12 (E.D.N.Y. 1987), citing *United States v. Beatty,* 587 F. Supp. 1325 (E.D.N.Y. 1984).

Indeed, where, as here, a large number of acts are alleged to be to be part of the RICO scheme, it speaks in favor of the existence of a valid RICO claim, not against it, and there is no requirement that multiple schemes or multiple objectives be pled for a defendant to be held liable under civil RICO. *Professionals, Inc. v. Berry*, 1991 U.S. App. LEXIS 1059, *5-6 (4th Cir. 1991)("We have deliberately declined to adopt any mechanical rules to determine the existence of a RICO pattern, holding instead that the issue is a matter of criminal dimension and degree to be decided on a case-by-case basis. Factors relevant to this inquiry include the number and variety of predicate acts and the length of time over which they were committed, the number of putative victims, the presence of separate schemes, and the potential for multiple distinct injuries. These factors are not exclusive, and no one of them is necessarily determinative; instead, a carefully considered judgment taking into account all the facts and circumstances of the particular case -- with special attention to the context in which the predicate acts occur -- is required."); *see also Morgan v. Bank of Waukegan*, 804 F. 2d 970, 975 (7th Cir. 1986) ("[T]he proposition that the predicate acts must always occur as part of separate schemes in order to satisfy the continuity aspect of the pattern requirement focuses excessively on continuity, and cannot be accepted as a general rule. Otherwise defendants who commit a large and ongoing scheme, albeit a single scheme, would automatically escape RICO liability for their acts, an untenable result.").

### 4.    Plaintiffs Properly Allege A RICO Enterprise Separate and Apart from the Alleged Pattern of Racketeering Activity

As Defendants concede (Def's Br. at 32), Plaintiff alleges that "the Nuclear Reactor Project constituted an association-in-fact enterprise." Amend. Compl. ¶ 259.  However, Defendants are incorrect to the extent they allege that this association-in-fact enterprise – which included the

RICO Defendants, Santee Cooper, Westinghouse, Stone & Webster and other companies and contractors involved in the Nuclear Reactor Project – is not alleged to have "functioned as a continuing unit…." Def.'s Br. at 32. The Complaint explicitly alleges that the "RICO Defendants … at all relative times possessed and continue[] to possess an ongoing organizational structure with sufficient continuity related to the Enterprise." Amend. Compl. ¶ 263. The mere fact, that there were sometimes disagreements between members of the Enterprise does not negate the existence of the Enterprise any more than a family quarrel will negate the existence of a family.

Defendants also point out that the Enterprise alleged must be distinct from the alleged pattern of racketeering.[20] Plaintiff properly alleges that, while the Enterprise had a legitimate purpose in providing utility and other services to the public, and in supporting the provision of those services through design, planning, construction and other activities normally associated with the ongoing operation of a utility, the Defendants perverted this legitimate purpose through their racketeering scheme for the illegitimate purpose of collecting billions of dollars from Plaintiff Hamiter and other customers that they would not otherwise have received but for their racketeering scheme.

### 5.    The Individual RICO Defendants Are Properly Alleged to Have Participated in the Operation and Management of the Alleged Enterprise

The Complaint clearly alleged that the individual Defendants participated in the alleged wrongful conduct relating to the "operation or management" of the Enterprise. *Reves v. Ernst & Young,* 507 U.S. 170, 182 (1993). Defendants argue that these allegations are not sufficient, while conceding that there are clear references in the Complaint to the operation or management of the

---

[20]  Def.'s Br. at 31.

enterprise by individual Defendants in the list of common questions of law to the class.[21] The Complaint further alleges that the individual Defendants abused their positions as officers and/or employees of SCANA and SCE&G by selling their stock while, at the same time, colluding and conspiring to suppress the negative information they knew about the Project and to disseminate false information to the public regarding the status of the Project. *See*, *e.g.*, Amend. Compl. ¶¶ 54, 77, and 195.

Thus, the Complaint contains sufficient allegations regarding the involvement of the individual Defendants with the operation and/or management of the Project.

## III.     DEFENDANTS HAVE NOT MET THEIR BURDEN TO SHOW THAT PLAINTIFFS' RICO CONSPIRACY CLAIM SHOULD BE DISMISSED.

Defendants claim incorrectly that Plaintiffs have not alleged RICO predicate acts sufficient to support a basis for Plaintiffs' RICO conspiracy count under 18 U.S.C. § 1962(d). The foregoing arguments in Point II, *supra*, show this argument to be baseless. Plaintiffs allege with specificity qualifying predicate acts under the RICO statute—mail fraud and wire fraud—that support a RICO conspiracy claim. Amend. Compl. ¶¶ 51, 267-282, 288, 294, 296.

Defendants then mistakenly contend, based on unreported case law, that Plaintiffs "fail to allege that the RICO Defendants knew of and agreed to the objective of the RICO offense."[22] A full and fair reading of the Complaint demonstrates this contention is false. Defendants isolate Plaintiff's legal contention that Defendants agreed and conspired to violate 18 U.S.C. § 1962(c) in that "each agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity."[23] Defendants portray this paragraph as the sum total of Plaintiffs' allegations on the subject.

---

[21] Def.'s Br. at 33-34.
[22] Def.'s Br. at 34.
[23] *Ibid*.

The truth is far different. As the 87-page Complaint alleges in extensive detail, the objective of the Nuclear Reactor Project was to enrich the Defendants by defrauding the SCPSC and the public and collecting charges from the Class through wrongful use of the mails and wires. The count containing the allegation in paragraph 200 incorporates the factual averments preceding it in the Complaint (¶¶ 193–194), which include the following:

- SCANA and the Individual SCANA Defendants wrongfully enriched themselves (in specific amounts detailed in the Complaint) on the false pretense of progress and success in constructing the Reactor Project (Amend. Compl. at ¶¶ 86-87);

- SCANA and the Individual SCANA Defendants fraudulently induced Santee Cooper to consent to SCANA seeking advance payment for construction of the Reactor Project (*id.* at ¶ 290);

- SCANA, through the Individual SCANA Defendants, made false and misleading representations intended to secure (and which, in fact, resulted in securing) approval of its Base Load Application and nine subsequent rate increases to fund the Nuclear Reactor Project (*id.* at ¶¶ 66-70);

- The individual Defendants "disputed in bad faith" concerns raised with the SCPSC regarding the Project (*id.* at ¶ 74);

- The Individual SCANA Defendants "expected to benefit from their fraudulent scheme, through bonuses, increased salaries and other compensation, and through the artificial inflation of stock holdings, and the issuance of attractive bonds" (*id.* at ¶77), which was accomplished in part by the false pretense that Defendants were achieving "operational excellence" (*id.* at ¶ 239);

- The Individual Defendants were rewarded with bonuses for work on the Project, even while it was facing abandonment (*id.* at ¶ 240); and,

- The RICO Defendants all participated in the Project in furtherance of the scheme to defraud the SCPSC through false and misleading statements regarding its cost and completion date (*id.* at ¶ 78);

- Defendants "also used the Racketeering Enterprise to conceal the fact that they were knowingly and intentionally promoting and conducting their operations with proceeds and profits derived from the fraudulent inflated advance finance scheme," an example of which was "cho[osing] to derive more proceeds and profits by knowingly concealing" that Westinghouse could not complete the Project on time and within budget (*id.* at ¶ 267); and

36

- Defendants used the mails and wires in knowing furtherance of the aforementioned fraudulent scheme (*id.* at ¶¶ 276-278, 282). The instances in which Defendants criminally used—or aided and abetted the criminal use of—the mails and the wires are identified with specificity in paragraph 294, and primarily comprise bills submitted to customers and submissions to the Public Service Commission.

These allegations are more than sufficient to establish that the Defendants knew of and agreed to the objective of the RICO offense. *See* Amend. Compl. at ¶¶ 56 (SCANA lobbied heavily for passage of the BLRA, which permitted advance charges for nuclear power plant construction, and had already begun planning for expansion of the V.C. Summer site to two new reactors even before passage of the law); ¶ 76 (Defendants had a pecuniary interest in making false and misleading representations to the PSC and the public, and their fraudulent scheme successfully shifted the cost of the Project onto the Class); ¶¶101, 177-178 (Defendants failed to report the conclusions of or materially respond to the Bechtel Report or the Westinghouse WEC report); ¶ 231 (Defendants continued to charge the Class for the Project despite knowing that the Project was unlikely ever to be completed); ¶ 262 (Defendants "[i]n furtherance of the Nuclear Reactor Project Enterprise" engaged in racketeering by making numerous false and fraudulent misrepresentations, which the Complaint describes in detail).

The objective of the offense was to reap billions of dollars in advance project costs, and additional compensation upon funding and construction of the Project. This objective was achieved through the fraudulent use of the wires and mails. Plaintiffs' Complaint clearly alleges—and common sense indicates—that the Defendants understood and agreed to this objective in carrying out the fraudulent scheme alleged.

Moreover, there need not be agreement between all conspirators on each element of the entire scheme. Rather, "[a] conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense. The partners in the criminal plan must

agree to pursue the same criminal objective and may divide up the work, yet each is responsible for the acts of each other." *Salinas v. United States*, 522 U.S. 52, 63–64 (1997).

Thus, a plaintiff "need not establish that each conspirator had knowledge of all of the details of the conspiracy but, rather, only that the defendant participated in the conspiracy with knowledge of the essential nature of the plan." *United States v. Tillett*, 763 F.2d 628, 632 (4th Cir. 1985).

The averments detailed above properly allege that the Defendants participated in the conspiracy with an understanding of the essence of the plan: actualizing an enormous transfer of wealth from the Class to Defendants through mail and wire fraud. Defendants simply do not meet the high burden of a Rule 12(b)(6) in this Circuit that "it appears certain that the plaintiff <u>cannot prove any set of facts</u> in support of his claim entitling him to relief.' " *Martin v. Duffy*, 858 F.3d at 248.

## A.     Plaintiffs Have Properly Alleged a Recognized Exception to the Intracorporate Conspiracy Doctrine.

The intracorporate conspiracy doctrine generally provides that "an agreement between or among agents of the same legal entity, when the agents act in their official capacities, is not an unlawful conspiracy." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017). However, in *Greenville Pub. Co. v. Daily Reflector, Inc.*, 496 F.2d 391, 399 (4th Cir. 1974), the Fourth Circuit adopted an exception to the doctrine where "an officer has an independent personal stake in achieving the corporation's illegal objective." South Carolina likewise has adopted the "personal stake" exception to intracorporate immunity. *Cricket Cove Ventures, LLC v. Gilland*, 701 S.E.2d 39 (S.C. Ct. App. 2010); *Pridgen v. Ward*, 705 S.E.2d 58 (S.C. Ct. App. 2010).

For the purposes of a Rule 12(b)(6) motion, this Court should only determine whether the Plaintiff has alleged such an independent personal stake. These allegations are found in, *inter alia,*

38

paragraphs 24-31, 78, 233, 239, 294, and 297 of the Complaint. These allegations detail the personal bonuses and increased stock value realized by the individual Defendants separate and apart from the gains of the corporations as a whole.

Moreover, Plaintiff also alleges a conspiracy between SCANA and the Individual SCANA Defendants on the one hand, and Lonnie Carter and Santee Cooper on the other. Carter and Santee Cooper are not affiliates of SCANA. The intracorporate conspiracy doctrine does not apply to the conspiracy between them and SCANA or the Individual SCANA Defendants.

For these reasons, this Court should reject Defendants' attempt to dismiss the action based on the intracorporate conspiracy doctrine.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff Hamiter, on behalf of himself and the putative class of all others similarly situated, respectfully requests that the Court deny Defendant SCANA's motion to dismiss the Third Amended Class Action Complaint.

Respectfully Submitted this 27th Day of September, 2019.

Strom Law Firm LLC

s/Mario A. Pacella
J. Preston Strom, Jr. (Fed. I.D. #4354)
petestrom@stromlaw.com
Mario A. Pacella (Fed. I.D. #7538)
mpacella@stromlaw.com
John R. Alphin (Fed I.D. # 9923)
jalphin@stromlaw.com
Bakari T. Sellers (Fed. I.D. #11099)
bsellers@stromlaw.com
Jessica L. Fickling (Fed. I.D. #11403)
jfickling@stromlaw.com
2110 Beltline Blvd.
Columbia, South Carolina 29204
Tel. No.:(803) 252-4800
Fax No.: (803) 252-4801

Richardson, Patrick, Westbrook & Brickman, L.L.C.
Terry Richardson (Fed. I.D. #3457)
Daniel S. Haltiwanger (Fed. I.D. # 7544)
dhaltiwangerrpwb.com
Jerry Evans (SC Bar #11658)
jevans@rpwb.com
P. O. Box 1368
1730 Jackson Street
Barnwell, SC 29812
Tel. No.: (803) 541-7850
Fax No.: (803) 541-9625

Speights & Solomons, LLC
Daniel A. Speights
dspeights@speightsandsolomons.com
A. Gibson Solomons, III

40

gsolomons@speightsandsolomons.com
100 Oak Street, East
Post Office Box 685
Hampton, South Carolina 29924
Tel. No.: (803) 943-4444
Fax No.: (803)943-4599

McCallion & Associates LLP
Kenneth F. McCallion (pro hac vice)
kfm@mcccallionlaw.com
100 Park Avenue – 16th floor
New York, New York 10017
(646) 366-0884

Holman Law, P.C.
Thomas A. Holman (pro hac vice)(N.Y. Reg. #1536754)
taholman@holmanlawoffice.com
99 Park Avenue, Suite 2600
New York, New York 10016
Tel. No.: (212) 481-1336
Fax No.: (866) 204-1020

Janet, Janet & Suggs
Kenneth M. Suggs, (Fed I.D. No. 3422)
ksuggs@myadvocates.com
Gerald D. Jowers, Jr. (Fed I.D. No. 8025)
gjowers@myadvocates.com
Janet, Janet & Suggs, LLC
500 Taylor St.
Columbia, SC 29201
Telephone: (803) 726-0050

Patrick A. Thronson (pro hac vice)
pthronson@JJSjustice.com
4 Reservoir Circle, Suite 200
Baltimore, MD 21208
Telephone: (410) 653-3200

The Law Offices of Jason E. Taylor, P.C.
Brian C. Gambrell (FED ID NO. 7632)
bgambrell@jasonetaylor.com
Office Address:
810 Dutch Square Blvd, Suite 112
Columbia, SC 29210
Mailing Address:
P.O. Box 2688

41

Hickory, NC 28603
Telephone: (800) 351-3008
Facsimile: (828) 327-9008